UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                  Hon. David M. Lawson

-vs-                              No. 17-CR-20662

D-1   CELIA WASHINGTON,          Sentencing Date: April 18, 2018

                       Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM
## AS TO DEFENDANT CELIA WASHINGTON

The United States of America submits the following memorandum in
connection with the sentencing of defendant Celia Washington on
April 18, 2018.

## I.    Statutory Factors

As the court is aware, Title 18, United States Code, Section 3553(a) requires
the court to impose a sentence that is sufficient but not greater than necessary to
comply with the purposes set forth in that section, based on the factors discussed
below.

### A.  The Nature and Circumstances of the Offense

Celia Washington, an attorney and Deputy Police Chief for the City of
Detroit, sold her office and her integrity for several thousand dollars from towing
magnate Gasper Fiore.

1

1.      **The Cash and Towing**

In February of 2016, Celia Washington accepted approximately $4,000 in cash from Gasper Fiore.  At the time, Washington was charged with overseeing the Detroit Police Department's towing rotations with respect to private towing companies.  In that role, she had the power to affect at least four towing companies controlled by Fiore.  Fiore gave Washington the cash in order to receive favorable treatment from Washington, as he was aware that new towing permits would be issued later that year and there was a potential to either lose or gain towing rotations.

Wiretap interceptions of Washington and Fiore make clear that Washington was attempting to help Fiore with respect to permitting and rotation placement of his tow companies.  In a call on April 28, 2016, about a month before the permits were issued, Washington told Fiore that this was a "me and you conversation," then asked Fiore if he could meet a May 1, 2016, deadline that Washington was going to set for towing permit applications.   Fiore indicated that he could meet that deadline.  Washington told Fiore that she did not want to set a deadline for permit applications that Fiore could not meet.

 In later conversations, Washington asked Fiore to send her information about which rotations he wanted, but to send it in an email to Washington's personal email address, rather than her Detroit Police Department email address.

Interceptions of Fiore revealed that he directed a relative to send this information to Washington's personal email address.  That relative did so in an email on May 9, 2016.  In that email, the Fiore relative discussed the four Fiore controlled towing companies, Boulevard & Trumbull, Javion and Sam's, Gene's, and B&G that currently have police rotations.  The email also requested that Washington add two additional Fiore towing companies, E&G and Troy Auto Bans, to the police rotations.  In the end, the towing permits and rotations stayed the same, with Fiore's four companies retaining their spots and E&G and Troy Auto Bans not receiving any rotations.  In a wiretapped call between Washington and Fiore on June 3, 2016, Washington was apologetic for not getting Fiore's other two towing companies added to the rotations.  She told Fiore, "I did everything I could."

    2.    **The Free Car**

Approximately three years ago, Washington told Gasper Fiore that she needed a car.  At that time, Fiore owned a Ford Fusion that he was having fixed at a local car repair shop.   Fiore told Washington to go to the shop and look at the Fusion.  Washington did so, then paid the shop owner about $5,000 for the car. Fiore then had the shop owner write him (Fiore) a check for the same amount, then Fiore gave approximately $5,000 in cash to Washington.

3.     **Other Items of Value from Tow Company Owners**

In addition to the cash and the free car, Washington admitted in her

June 7, 2017, interview with the FBI that she routinely accepted free oil changes

from another tow company owner.  Washington said she knew that owner was

seeking a change in the towing rotations.  During her June 22, 2017, interview with

the government, Washington admitted that same tow company owner provided her

with about $2,400 in free engine repairs on her car.  Washington said the

individual also gave her a $2,700 loan to help her purchase her home.  Washington

said she has repaid about half of this money.  Washington also admitted that Fiore

paid for the bar tab from her birthday party in 2016, which is estimated to have

been about $800.

In her Sentencing Memorandum, Washington claims that her accepting the

$4,000 from Fiore was "an isolated incident."  (Memorandum at 31).  She further

claims that, at least initially, she unknowingly "accepted a thing of value from

someone with ill intent."  (Memorandum at 32).  Her pattern of accepting items of

value from tow company owners that want to influence her belie this claim.

Moreover, the wiretap interceptions speak volumes.

There is the call where she tells Fiore this is a "me and you" conversation,

then asks Fiore if he can meet the permitting deadline of May 1, 2016.  There are

calls where Washington instructs Fiore to send her the tow rotations Fiore wanted

(but send the information to her private email). Then, when the rotations were settled in 2016, Washington tells Fiore she "did everything [she] could" to add Fiore's other two towing companies to the rotations and hoped Fiore was not mad at her for failing to do so. She even admitted to Agent Beeckman that she intended to give Fiore the impression that she was helping him with his towing business. All of the evidence points to Washington's corrupt intent.

4.    **Washington's Lies**

When first confronted by the FBI in June of 2017, Washington could have admitted her criminal conduct. Instead, at every turn in the investigation, she lied. Even before going to the FBI for an interview about Fiore, Washington spoke with the Chief of Criminal Enforcement for the City of Detroit Law Department. Knowing that she was about to be interviewed by the FBI about Fiore, Washington asked this Law Department official if she were in trouble. In turn, the official asked Washington whether she had taken anything of value from Gasper Fiore. Washington lied to him and said she had not. He then asked if Fiore had ever loaned her money. Again, she lied and said that he had not.

Washington then went to the FBI for an interview with FBI Special Agent Robert Beeckman. Washington told him she borrowed $800-$900 in cash from Fiore in early 2016. She claimed she never paid it back because Fiore "disappeared." This was a lie. In a statement to the government on June 22, 2017,

Washington said that she lied to Agent Beeckman about the amount of money she received from Fiore. It was actually about $4,000. She said she spent half of it and had $2,000 left. She was directed to bring the $2,000 to the FBI the following day.

On June 23, 2017, Washington showed up at the FBI offices with $2,000 in cash.[1] However, she started by telling Agent Beeckman that when she went home she realized she only had $1,600 of the Fiore cash left, not $2,000, so she added $400 of her own money to make up the difference. Later in that same interview, Washington told agents she lied again. She told Agent Beeckman that there had really only been $1,000 of Fiore's cash left, so she added $1,000 of her own money to what she turned over to the FBI. Washington said she lied because she thought "it would not look so bad" if she had only be off by $400.

That Washington has continued to lie to law enforcement throughout the investigation undermines her claim that she did not know Fiore's corrupt intent

---

[1] In her Sentencing Memorandum, Washington cites the fact that she brought $2,000 to the FBI as an "extraordinary effort to right her wrong" that should earn her a departure in her sentencing range. However, Washington only brought the money to the FBI after being directed to do so, and she lied about the amount of money she had left from Fiore's bribe payment. Moreover, it is routine in corruption investigations that the FBI requests officials who have taken (and still have possession of) cash to turn that cash in as fruits and evidence of the crime.

6

when accepting things of value from him.  She is merely continuing her attempt to minimize her criminal conduct so it does not look so bad.

**B.** **History and Characteristics of the Defendant**

Washington has no prior criminal arrests or convictions.  From her Sentencing Memorandum and letters of support, it appears that Washington was active as a youth leader in her church, and has the support and respect of many in her community.

**C.** **Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment**

The defendant's criminal conduct is serious.  The damage caused by former Deputy Police Chief Washington is the loss of precious public trust, a toll that cannot be measured in dollars.  Not only was Washington a high level public official, she was an attorney working for the very agency charged with enforcing the City's laws.  A betrayal of the public trust by someone in Ms. Washington's position is immeasurably harmful to the City and its residents.  Her sentence should reflect the seriousness of her crimes and adequately punish her.

**D.** **Providing Adequate Deterrence**

Sadly, over the past decade, the citizens of Detroit have been front row to public corruption in their City government.  From City Council to the Mayor's office, to the elected Mayor himself, public servants have committed felony corruption offenses.  A less-than-substantial sentence for a corrupt Deputy Chief of

7

1 of 10

the Detroit Police Department would send the wrong message to the community. Washington needs to be punished so that others are deterred from engaging in similar conduct.

###### E.    Protection of the Public from Further Crimes of the Defendant

Given Washington's lack of criminal history and the fact that she no longer holds a position in the Police Department, the public should be adequately protected from further crimes by Washington.

###### F.    Kinds of Sentences Contemplated by the Sentencing Guidelines

The government concurs with the factual findings and guidelines calculations contained in the Presentence Investigation Report (PSIR). Washington's guidelines range with an offense level 15, Criminal History Category I, is 18-24 months.

## II.    CONCLUSION

The defendant was the Deputy Chief of Police and a licensed attorney, she repeatedly took cash and other items of value from those she knew sought to influence her, and she lied repeatedly to law enforcement about her conduct.  Even

at her plea hearing, the defendant attempted to minimize and did not fully accept responsibility for her conduct.  In light of all of this, the appropriate sentence for the defendant lies at the top of the guidelines range, that is, 24 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/R. MICHAEL BULLOTTA                    s/DAVID A. GARDEY
Assistant United States Attorney         Assistant United States Attorney

Dated:  April 12, 2018

9

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

> Arnold Reed and
> Pamela Rice
> *Attorneys for Celia*
> *Washington*

s/R. MICHAEL BULLOTTA
Assistant U. S. Attorney

Dated:  April 12, 2018