AO 243 (Rev. 09/17)

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District   Eastern District of Michigan | |
|---|---|---|
| Name *(under which you were convicted):*  CELIA WASHINGTON | | Docket or Case No.:  17-20662 |
| Place of Confinement:  Alderson Federal Prison Camp | Prisoner No.:  56066-039 | |
| UNITED STATES OF AMERICA                      V. | Movant *(include name under which you were convicted)*  CELIA WASHINGTON | |

**FILED**

APR 29 2019

CLERK'S OFFICE
DETROIT

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

     U. S. District Court
     Eastern District of Michigan, Southern Division
     Theodore Levin United States Courthouse
     231 West Lafayette Blvd., Detroit, MI  48226

   (b) Criminal docket or case number (if you know): _____ 2017-20662 _____

2. (a) Date of the judgment of conviction (if you know): _____ April 25, 2018 _____

   (b) Date of sentencing: __ April 18, 2018 __

3. Length of sentence: ___ One year and one day ___

4. Nature of crime (all counts):

     COUNT ONE _ BRIBERY CONSPIRACY CONCERNING PROGRAMS RECEIVING FEDERAL
               FUNDS - 18 U.S.C. §371 and 666(a)

     COUNT TWO _ BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS
                18 U.S.C. §666(a)  **dismissed**

5. (a) What was your plea?  (Check one)

     (1) Not guilty ☐        (2) Guilty ☒        (3) Nolo contendere (no contest) ☐
                       **as to Count One only**

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

     **N/A   Count Two was dismissed**

6. If you went to trial, what kind of trial did you have?  (Check one) **N/A**   Jury ☐        Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?        Yes ☐        No ☒

Page

## Motion to Vacate, Set Aside, or Correct a Sentence
## By a Person in Federal Custody

### (Motion Under 28 U.S.C. § 2255)

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit any legal arguments, you must submit them in a separate memorandum. Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this motion.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original and ____ copies to the Clerk of the United States District Court at this address:

Clerk, United States District Court for
Address
City, State  Zip Code

If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9. **CAUTION: You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

AO 243 (Rev. 09/17)

8. Did you appeal from the judgment of conviction?       Yes ☐       No ☒

9. If you did appeal, answer the following:       **N/A**

   (a) Name of court: _____

   (b) Docket or case number (if you know): _____

   (c) Result: _____

   (d) Date of result (if you know): _____

   (e) Citation to the case (if you know): _____

   (f) Grounds raised:




   (g) Did you file a petition for certiorari in the United States Supreme Court?       Yes ☐       No ☐

       If "Yes," answer the following:

       (1) Docket or case number (if you know): _____

       (2) Result: _____

       (3) Date of result (if you know): _____

       (4) Citation to the case (if you know): _____

       (5) Grounds raised:




10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

    Yes ☐    No ☒

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court: _____**N/A**_____

        (2) Docket or case number (if you know): _____

        (3) Date of filing (if you know): _____

AO 243 (Rev. 09/17)

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:          Yes ☐          No ☐

(2)  Second petition:          Yes ☐          No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

AO 243 (Rev. 09/17)

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:    VIOLATION OF DUE PROCESS – NEW ARGUMENT / THEORY PRESENTED AT SENTENCING THAT WAS NOT BROUGHT BEFORE GRAND JURY**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Allegations related to "other people" giving things of value to influence Washington related to towing outside of Mr. Fiore was not a part of the Indictment, and Washington was not given the opportunity to have those allegations go before a grand jury or properly object at the time of sentencing.

Further, at sentencing the government alleged that "Fiore gave Washington cash in order to receive favorable treatment" in the future. This alleged pattern and practice argument was clearly not the reason the Grand Jury indicted Washington. It was not presented as such within the four corners of the Indictment and there was no evidence which suggested that Fiore would not have obtained an equitable share of tow rotations without Washington.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☐    N/A

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☐    N/A

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐    N/A

AO 243 (Rev. 09/17)

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know):   _____

Date of the court's decision:   _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**   <u>REPETITIVE FALSE TESTIMONY OF DETROIT POLICE OFFICER</u>
<u>KENYATTA MYERS AND LIEUTENANT MICHAEL PARISH</u>

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

On January 2, 2018, during the plea hearing, this Court twice told the prosecutor trhat the factual basis was lacking.
Further, in a prior sworn statement made by Officer Myers, he stated that Washington had **nothing** to do with the selection of towers or the tow rotation for police authorized towing, and that he never consulted Washington because it was not her job.  However, Myers testified to the Grand Jury that Washington was the overseer of  towing and that he could make no decisions because Washington was his superior. Lieutenant Parish, who was not working with Myers in 2011 or 2016, corroborated Myers testimony.  In a related civil case, the City of Detroit declared Myers' testimony as not being "accurate" and had Myers prior Affidavit stricken from the civil case.  In addition, Chief of Police James Craig in his statement to the FBI confirmed that Washington was not the overseer of towing and not her job.

(b)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☐     N/A

(2)   If you did not raise this issue in your direct appeal, explain why:

_____

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☒

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐   No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:** **FACTUAL CHANGE RELATED TO THE TOWING RULES   WAS A**

**SUBSTANTIAL VARIANCE IN THE INDICTMENT AND DUE PROCESS VIOLATION**

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

```
The Indictment and plea obtained by the government was based on the
testimony of Myers and Parish.  Specifically, the Grand Jury was led
to believe that Washington assisted Mr. Fiore in violation of the
ownership provision(s) of the police authorized towing rules
promulgated by the City of Detroit.  This court sustained Washington's
objection at sentencing and held that no violation occurred.  This
constituted a fatal variance from the Indictment presented to the
Grand Jury.
```

(b)  **Direct Appeal of Ground Three:**

  (1)  If you appealed from the judgment of conviction, did you raise this issue?

  Yes ☐   No ☐   **N/A**

  (2)  If you did not raise this issue in your direct appeal, explain why:

(c)  **Post-Conviction Proceedings:**

  (1)  Did you raise this issue in any post-conviction motion, petition, or application?

  Yes ☐   No ☒

  (2)  If you answer to Question (c)(1) is "Yes," state:

  Type of motion or petition: _____

  Name and location of the court where the motion or petition was filed:

  _____

  Docket or case number (if you know): _____

  Date of the court's decision: _____

  Result (attach a copy of the court's opinion or order, if available):

  _____

  (3)  Did you receive a hearing on your motion, petition, or application?

  Yes ☐   No ☐

  (4)  Did you appeal from the denial of your motion, petition, or application?

  Yes ☐   No ☐

  (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

  Yes ☐   No ☐

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)   Did you receive a hearing on your motion, petition, or application?

     Yes ☐     No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

     Yes ☐     No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

     Yes ☐     No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND FOUR:**   **THE ELEMENTS OF THE FEDERAL BRIBERY STATUTE CANNOT BE SATISFIED.**

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

```
The government was unable to prove that the $3000 alleged bribe
satisfied the statutory threshold, and could only rely on
the potential profit a tower could make by having a permit or
a position on the rotation.  This would only be true IF Fiore
was not entitled to be placed on the towing rotation without
assistance.  This court's ruling took aware the government's
ability to use the benefit of the bribe theory, because the
evidence provided shows that Fiore and his companies met all
the qualifications to be considered for an equitable share of
tows.  Basing the valuation on vague potential is flawed.
No indication that the Fiore companies were in jeopardy of losing
a rotation position.
```

(b) **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☐   N/A

(2)   If you did not raise this issue in your direct appeal, explain why:

_____

(c) **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain
       why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*



_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255,
paragraph 6, provides in part that:
     A one-year period of limitation shall apply to a motion under this section. The limitation period shall run
from the latest of –
        (1)   the date on which the judgment of conviction became final;
        (2)   the date on which the impediment to making a motion created by governmental action in violation of
        the Constitution or laws of the United States is removed, if the movant was prevented from making such a
        motion by such governmental action;
        (3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has
        been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral
        review; or
        (4)   the date on which the facts supporting the claim or claims presented could have been discovered
        through the exercise of due diligence.

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the you are challenging? Yes ☐ No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

N/A

(b) At the arraignment and plea:

Arnold Reed and Pamela Rice Campbell

(c) At the trial:

N/A

(d) At sentencing:

Arnold Reed and Pamela Rice Campbell

(e) On appeal:

N/A

(f) In any post-conviction proceeding:

pro se with assistance from counsel

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time? Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ☐ No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? Yes ☐ No ☐

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief:

_____ Vacate Washington's conviction to remedy a serious miscarriage _____
or any other relief to which movant may be entitled.  of justice

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ 4-23-19 _____
(month, date, year)
April 23, 2019

Executed (signed) on _____ 4-23-19 _____   (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

-v-                        Case No. 17-20662

Celia Washington,

        Defendant/Movant.

_____/

**MEMORANDUM OF LAW IN SUPPORT
OF MOVANT'S PETITION UNDER
28 U.S.C. §2255**

Celia Washington
In Pro Per
With the Assistance
Of Counsel
Alderson FPC
Box A
Alderson, WV  24910

# TABLE OF CONTENTS

Page No.

Table of Authorities ................................................. ii

I.    Brief Legal Background ........................................ 1

II.   Factual Background ............................................ 1

      A.  Grand Jury Testimony ..................................... 1

      B.  The Indictment .......................................... 2

      C.  Repetitive False Testimony of
          Police Officer Kenyatta Myers and
          Lieutenant Michael Parish ............................... 4

III.  Legal Argument ............................................... 10

      A.  Standard of Review ...................................... 10

      B.  The factual change related to the towing
          rules was a substantial variance in the
          Indictment and a Due Process violation .................. 12

          1.  The government's argument at sentencing ............. 12
          2.  No validity to the government's new
              arguments .......................................... 13

      C.  Based on the Revised Facts in the Indictment
          the Elements of Bribery Cannot Be Satisfied
          Thus the Wrongful Conviction of Washington ............. 16

          1.  Federal Bribery Statute $5,000 Threshold ........... 16
          2.  The government cannot prove Washington
              had corrupt intent. ................................ 21

IV.   Conclusion ................................................... 29

Certificate of Service ............................................. 30

Exhibits 1 - 38    (Copies of additional exhibits
                    are available upon request)

## TABLE OF AUTHORITIES

| Cases | Page No. |
|---|---|
| Bousley v. United States, 523 U.S. 614 (1998) | 11 |
| Brady v. United States, 397 U.S. 742 (1970) | 10,11 |
| Gall v. United States, 21 F.3d 107 (6th Cir. 1994) | 10 |
| Griffin v. United States, 330 F.3d 733 (6th Cir. 2003) | 10 |
| Jeffers v. United States, 392 F.2d 749 (1968) | 12 |
| McMann v. Richardson, 397 U.S. 759 (1970 ) | 11 |
| Mesarosh v. United States, 352 U.S. 1 (1956) | 7 |
| Napue v. Illinois, 360 U.S. 264 (1959) | 15 |
| New York ex rel. Whitman v Wilson, 318 U.S. 688 (1943) | 11 |
| Parker v. North Carolina, 397 U.S. 790 (1970) | 11 |
| Smith v. O'Grady, 312 U.S. 329 (   ) | 10,11 |
| Stirone v. United States, 361 U.S. 212 (1960) | 10 |
| United States v. Aguilar, 515 U.S. 593 (1995) | 21 |
| United States v. Garcia-Paz, 282 F.3d 1212 (9th Cir. 2002) | 12 |
| United States v. Mills, 140 F.3d 630 (6th Cir. 1998 ) | 18, 19, 28 |
| United States v. Owens, 697 F.3d 657 (2012) | 17, 18, 19 |
| United States v. Tillmon, 2019, U.S. App LEXIS 5621* ___F.3d ___ (4th Cir. 2019) | 16 |
| White v. Ragen, 324 U.S. 760 (1945) | 11 |

**Statutes**

| | |
|---|---|
| 18 U.S.C. §371 | passim. |
| 18 U.S.C. §666 et seq. | passim. |
| 28 U.S.C. §2255 | passim. |

**Ordinances**

| | |
|---|---|
| City of Detroit Ordinance §55-15-8 | 22 |

## I.  BRIEF LEGAL BACKGROUND

On October 11, 2017, Defendant, Celia Washington
("Washington") was charged with a two-count Indictment: Count One
- Bribery Conspiracy Concerning Programs Receiving Federal Funds,
in violation of 18 U.S.C. §371 and 666(a); and Count Two – Bribery
Concerning Programs Receiving Federal Funds, in violation of 18
U.S.C. §666(a).  On January 2, 2018, Washington pled guilty to
Count One of the amended Indictment and Count Two was dismissed.
On April 18, 2018, Washington was sentenced to the Bureau of Prisons
to be imprisoned for a term of one year plus one day.

As shown below, this case warrants 28 U.S.C. §2255 review
because the record shows that the Indictment was based on plainly
false testimony regarding Washington's (Petitioner's) authority, or
intent to take a bribe in exchange for favorable disposition of
police towing business.  Similarly, contrary to record evidence and
the plain meaning of the towing ownership rules, the Grand Jury was
led to believe that Washington assisted in the violation of these
rules when, in fact, no violation occurred.  Washington can
demonstrate that there is a reasonable likelihood that the improper
use of false testimony in this case adversely affected her outcome.
In addition, the government's presentation of a new theory at
sentencing that was never submitted to a Grand Jury supports
Washington's claim of a Due Process violation.   §2255 is the
appropriate procedural vehicle in which to review these issues.  In
particular, this Court sustained one of Washington's objections to
the misapplication of the towing rules only at sentencing, without
review of the implication of this objection to the case.  Petitioner
Washington respectfully suggests to this Honorable Court that now
be the time.

## II.  FACTUAL BACKGROUND

On October 11, 2017, the Grand Jury convened.  During that time,
the Grand Jury heard testimony from Police Officer Kenyatta Myers and
Lieutenant Michael Parish.  Pertinent to this motion Officer Myers
("Myers") and Lieutenant Parish ("Parish") testified that Washington
was involved in the selection of **both** the 2011 and 2016 towing rotations.
Further, both Myers and Parish testified that Washington helped Fiore
get a permit and get on the rotation although it was against the rules.
In sum, Myers testified that there should not be four companies directly
or indirectly controlled or owned by one person in the tow rotation.
He testified that Gasper Fiore was breaking the rules

1

by being allowed to be on the rotation, and by owning or controlling more than one company. **[Exhibit $\underline{1}$, Myers GJ testimony P.7]** He also testified that if Washington wanted to change the rotation, the application deadline, or any other portion of the towing process, she could have because she ranked higher than him in the police department.

Parish attempted to corroborate Myers' testimony by claiming that **he was told** that Washington, while the attorney for the Board of Police Commissioners, helped select the towing rotation in 2011. As such, she would have known that Mr. Fiore was violating the towing rules. **[Exhibit $\mathcal{V}$, Parish GJ testimony P.11]** Further, that by keeping the rotation the same as it was in 2011, she continued to help him break the rules in 2016 because she allowed him to have more than one towing permit. **[Exhibit $\mathcal{V}$, Parish GJ testimony, P.12]**

**B.   The Indictment**

Based primarily on this testimony, on October 11, 2017, Washington was charged with a two-count Indictment:  Count One - Bribery Conspiracy Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. Sections 371 and 666(a); and Count Two - Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. §666(a).

The following general allegations formed the basis for the two-count Indictment:

1. At all times relevant to the Indictment, defendant CELIA WASHINGTON was an agent of the City of Detroit, Michigan, in that she was employed as a legal advisor to the Chief of the Detroit Police Department with the title of Deputy Chief of Police.  Part of her job responsibilities included overseeing the Detroit Police Department's licensing, regulation, and use of private tows.

2. At all times relevant to this Indictment, Detroit, Michigan was a local government entity that received federal assistance in excess of $10,000.00 during each of calendar years 2016 and 2017.

3. All of the overt acts in this Indictment occurred in the Eastern District of Michigan.

4. At all times relevant to this Indictment, the total potential yearly revenue for towing companies receiving City of Detroit tows exceeded two million dollars.

5. At all times relevant to this Indictment, City of Detroit towing rules were in place prohibiting a towing owner from having more than one towing company in each police district or precinct towing rotation.

6. At all times relevant to this Indictment, CELIA WASHINGTON was aware that the owner of several towing companies ("the owner") had controlling ownership interest in multiple towing companies that

had been placed in a single police district or precinct towing rotation, in violation of the City of Detroit towing rules.  [Exhibit 3 , Indictment]

## C. Repetitive False Testimony Given By Myers and Parish and the Sentencing Proceedings

On January 2, 2018, during the plea hearing in which this court twice told the prosecution that the factual basis was lacking, Washington pled guilty to Count One of the amended Indictment.  Count Two of the Indictment was dismissed.  The sentencing hearing was later held on April 18, 2018.  After obtaining the presentencing report, Washington objected to various portions of the report that pertained to the relevant conduct in the Indictment.

First, Washington denied that she was the overseer of towing, and that she made any final decisions related to the 2011 or 2016 towing rotation.  Washington argued that during 2011, she was employed with the Board of Police Commissioners, and was present during the creation of the towing rules as the scribe, but was not involved in the towing selection in any manner.  In 2011, the Resource Management Unit ("formerly known as the "Management Services Bureau") of the Detroit Police Department ("DPD") was solely responsible for vetting all towing applications and selecting the tow companies that received permits and tow rotations.[1]  Washington, at that time, was not an employee of the Office of the Chief of Police of the Detroit Police Department. However, in 2013, Washington was hired as the legal advisor to

---

[1] Interoffice memo from Lt. Adams of Resource Management explained the rotation to his superior Deputy Chief Ben Lee.  **[Exhibit 4, Interoffice Memo]**

the Chief of Police, James Craig ("Chief").  According to the Chief, Washington's job description did not include overseeing towing.  On June 7, 2017, Chief Craig explained to the government that people often came to her with towing questions because she was considered to be the most knowledgeable based on her prior tenure with the Board of Police Commissioners.  The Chief provided the following to the government:

> **When Washington came to the Chief's Office, she stayed connected to the Board of Police Commissioners (BOPC).  Chief Craig told Washington that she should not have anything to do with towing.  She was never given towing as part of her responsibilities while working for Craig.  She did labor law.  People who had responsibility for towing in the police department looked at Washington as an expert because she was the former legal advisor to the BOPC.  [Exhibit 6 , Chief's Statement to the FBI]**

Essentially, Washington was hired by Chief Craig who was her direct command, and he did not give her authority over towing but had no problem with those who were assigned to towing to ask her questions as the legal advisor.  Not to mention that, Officer Myers previously testified under oath in a deposition and in a DPD Internal Affairs investigation interview that Washington had nothing to do with his decisions in the 2016 towing rotation and application process, and that Assistant Chief White was his direct command.[2]  Assistant Chief White also admitted in a February 9,

---

[2] Mainstay Motors d/b/a Red's Towing vs. City of Detroit, Case # 2016-009203-AW. Moreover, he also provided this same information in an Internal Investigation interview with the Detroit Police Department held on November 2, 2016 at the Academy where Washington was exonerated.

2018 deposition that **he was the overseer of towing and Washington was not under him.** [**Exhibit** 6 , **Deposition White, P.10,21**] However, Myers did acknowledge that he sent out and vetted all applications and not Washington. [**Exhibit** 7 ] Therefore, assuming arguendo that there were any towing violation, he would be responsible. Certainly, this would explain why Myers attempted a complete about-face and claim Washington was the overseer to avoid responsibility. Ironically, since Myers testified before the Grand Jury, Myers attempted to continue the lies regarding Washington's position in towing in an Affidavit drafted by the City of Detroit in order to defend itself in a federal civil lawsuit. [**Exhibit** 8 , **Affidavit**] However, the City admitted that Myers civil Affidavit and thus the grand jury testimony "may not be accurate" and requested that Myers' Affidavit be removed from the court file of the civil proceeding. [**Exhibit** 9 , **Def Corrected Response**] Thus, it would appear that the City of Detroit seeks to rely on Washington's guilty plea to abscribe blame, yet refuses to rely on knowingly false testimony that Washington had authority. Similarly, the government should be aware by now that the City of Detroit has declined to rely on their own employee's false testimony which was key to convicting Washington.

Nontheless, this court determined that it could not sustain the objection of Washington because Parish attempted to corroborate the testimony of Myers, along with other circumstantial evidence.

The law has long inferred that a witness who will lie about one fact will lie about others. <u>Mesarosh v. United States</u>, 352 U.S. 1, 13-14 (1956) (refusing to credit witness' testimony in defendant's trial because of witness's false testimony in other settings). As such, a conviction premised on Myers' refuted testimony regarding Washington's position in towing should be reviewed and cannot stand. This is precisely what occurred with both Myers' and Parish'stestimony, and is a clear representation of the Court's holding in <u>Mesarosh</u>. Parish and Myers lied about Washington being the overseer of towing, and more pertinent to this Motion, Parish and Myers lied about the towing rule prohibitions. At the time of sentencing, Washington also objected to the portion of the presentencing report that recites the Indictment alleging that Washington helped Fiore break the towing rules. Washington based this objection entirely onsthe actual, plain meaning, black and white, interpretation of the towing rule which provided, in relevant part:

> **Authorized Towers which are cross owned on a basis which is greater than 10% or under common ownership to an extent greater than 10% or which are owned by members of the same family (spouse, sibling, parent or child), will occupy only one position on the rotation roster and will receive towing assignments in succession... [Exhibit _10_, Tow Rules]**

In sum, and contrary to the Indictment, it was <u>not</u> against the towing rules to have commonly owned or cross owned tow trucks in the same district or precinct. The rules provided that, if this occurred, those companies would be required to share the same "spot", and rotate towing dispatches within the one spot.

In fact, there is no rule that prohibits an owner from owning more than one towing company and position on the rotation with a non-family member.  The ownership interest, however, cannot be greater than 10%.  So, arguendo, if Mr. Fiore did own more than one tow company, there was no prohibition.  In fact, it is common knowledge to the City of Detroit and to the Detroit Police Department that Anthony Soave is affiliated with four towing companies that occupy the rotation – Detroit Auto, City Auto, J&C and ABA Towing.[3]  A review of the Detroit Police Department towing files would also reveal that the four companies mentioned above (J&C Towing, ABA Towing, City Auto and Detroit Auto [Recovery]) **did not own** towing trucks  at the time of permit renewal.  Myers gave those companies a "temporary permit" and gave them 90 days to come into compliance with the rules.  Once they showed compliance, Myers gave them a permit and allowed them to tow, thus using the rules as

The government responded to Washington's objection        convenient. regarding the ownership provisions of the tow rules by attaching the grand jury testimony of Myers and Parish as its basis for this allegation in the Indictment, but failed to refer to the actual rules themselves.  Prior to the government's response to the objection, Washington was unaware that Parish and Myers had testified in this manner.

After hearing arguments on Washington's objection regarding the ownership provision, **the court agreed** that the towing rules **did not** prohibit what the government alleged in the Indictment, and as copied in the presentencing report.  At the hearing, the government maintained that it believed the interpretation of the rules cited in the Indictment, as well as Myers' and Parish's interpretation.  Since Washington's sentencing hearing, Washington has been able to obtain documents verifying that the Detroit Police Department's interpretation of the towing ownership provision of the towing rules was, and in fact still is, the same as Washington's

---

[3]See Article, How Duggan Created a Costly Towing Scandal That Helps Kwame Crony, by Steve Neavling.  November 29, 2018 **[Exhibit 11 ]**

8

objection and this court's interpretation.[4]  The companies with common ownerships were allowed to share rotational positions in the same district.  Fiore's family was not the only company that shared positions on the rotation.  **[Exhibit 33 ]**

      As set forth below, this court's decision to sustain Washington's objection regarding the ownership provision of the tow rules during the sentencing proceedings, constituted a significant, "fatal" variance from the offense alleged in the Indictment, thereby violating Washington's Fifth Amendment right to be charged by a grand jury.  Moreover, this information provided and used by the prosecution was based on perjured testimony which also constitutes a due process violation. Additionally, this substantial factual change would prevent the government from satisfying the requirements of conviction under 18 U.S.C. §666.  Although it is unclear whether this court was aware that this was a factual statement cited directly from the Indictment, this court did, however, recognize this fundamental right to have factual amendments to the Indictment return to the Grand Jury. **[Exhibit 12, Plea Hearing p4 ]** Therefore, this substantial change in the Indictment, coupled with the perjured testimony of Detroit Police Department officers, entitled Washington to a dismissal of the Indictment or, at a minimum, the issuance of a superceding indictment.  Neither of which occurred,

---

4 In an effort to ensure the interpretation of the rules, and prior to the sentencing hearing, Washington's attorney, Pamela Rice-Campbell sent a Freedom of Information Act Request to the City of Detroit requesting, among other documents, the tow rotation lists. However, the City under now IG Attorney Ellen Ha failed and/or refused to disclose the requested information but cashed the check issued for the information prompting a lawsuit Case No. 18-006433-CZ. After the lawsuit was filed, the City voluntarily disclosed the rotation list along with other pertinent information confirming that there were commonly owned companies owned by the Fiore family, they shared a rotation spot. Unfortunately, this was six months after Ms. Washington was sentenced so this information was unavailable at the time of sentencing. It appears in later rotations that some of the companies were sold to the satisfaction of the Detroit Police Department prior to Washington's employment with DPD. It is unclear what if any interest Mr. Fiore had in these companies. However, the rules did not require that he give up all interest in any sold companies to be a part of another rotation position.

thereby offering evidence to this Honorable court that Washington was unfairly convicted and a miscarriage of justice has occurred.

## III.  LEGAL ARGUMENT

### A.  Standard of Review

In order to prevail under 28 U.S.C. §2255,"a defendant must show a 'fundamental defect' in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." Gall v. United States, 21 F. 3d 107, 109 (6th Cir. 1994). "A federal district court may grant relief to a prisoner in custody only if the petitioner can 'demonstrate the existence of an error of constitutional magnitude' which had a substantial and injurious effect or influence on the guilty plea..." Griffin v United States, 330 F.3d 733, 736 (6th Cir. 2003).

If there is a variance from the offense alleged in the indictment, it is a violation of a Defendant's Fifth Amendment right to be charged by a grand jury. See Stirone v United States, 361 U.S. 212, 217-18, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960). Also it bears repeating that this Honorable Court has recognized that even a relatively minor correction to the indictment, would require the government to go backto the grand jury and issue a superceding indictment. **[Exhibit /〤, Plea transcript, P.4].**

Only a voluntary and intelligent guilty plea is constitutionally valid. Brady v. United States, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 90 S. Ct. 1463. A plea is not intelligent unless a defendant first receives real notice of the nature of the charge against him. Smith v. O'Grady, 312 U.S. 329, 334,

85 L. Ed. 859, 61 S. Ct. 572.  Petitioner's plea would be contrary to the Eighth Circuit's view, constitutionally invalid if he proved that the district court misinformed him as to the elements of the offense.  Brady v. United States, supra, McMann v. Richardson, 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441, and Parker v. North Carolina, 397 U.S. 790, 25 L. Ed. 785, 90 S. Ct. 1458, distinguished. Pp. 3-5.

In Bousley v. United States, 523 U.S. 614, 118 S. Ct. 1604; 140 L. Ed. 2d 828 (1998), the Court held that although his claim was procedurally defaulted, petitioner might be entitled to a hearing on the merits if he made the necessary showing to relieve the default.  The Court's decision that held that a substantive federal criminal statute did not reach certain conduct necessarily carried a significant risk that the petitioner stood convicted of an act that the law did not make criminal.  The Court also held that a petitioner's claim might still be reviewed if he could establish that the constitutional error in his plea colloquy resulted in the conviction of one who was actually innocent.  Petitioner must demonstrate that in light of all the evidence it is more likely than not that no reasonable juror would have convicted him.

Lastly, the Supreme Court has long been committed to the principle that due process forbids the government from obtaining a conviction through the use of false testimony.  Through a long line of cases, the Court has condemned the prosecution's use of false testimony.  See, e.g., White v. Ragen, 324 U.S. 760, 764 (1945) (acknowledging that obtaining conviction through knowing use of perjury violates due process); New York ex rel. Whitman v. Wilson, 318 U.S. 688, 689 (1943).

11

**B.   The factual change  related to the towing rules was a substantial variance in the Indictment and a Due Process violation.**

**1.   The government's argument at sentencing**

After the objection regarding the subject tow rule was sustained, the government simply argued that Washington "brought to the office with her a propensity to commit bribery offense that she, time and time again, accepted things of value from people whom she knew were attempting to influence her with respect to towing." **[Exhibit __, Sentencing Hearing]** Moreover, in its sentencing memorandum, the government alleged that **"Fiore gave Washington the cash in order to receive favorable treatment from Washington, as he was aware that new towing permits would be issued later that year and there was a potential to either lose or gain towing rotation[s]."** This alleged pattern and practice argument was clearly <u>not</u> the reason the Grand Jury indicted Washington, nor was the vague potential for Fiore to lose or gain a position on the rotation. So, as a result, it was **not** the basis for Washington's plea.  See <u>United States v. Garcia-Paz</u>, 282 F.3d 1212, 1216-17 (9th Cir. 2002) (stating that cases holding variance fatal were those where conviction was permitted on <u>different behavior</u> from that alleged in indictment), <u>cert. denied</u>, ___ U.S. ___, 154 L. Ed. 2d 242, 123 S. Ct. 47, 2002 U.S. LEXIS 7314 (Oct. 7, 2002); <u>Jeffers v. United States</u> 392 F.2d 749, 751-52 (9th Cir. 1968) (finding a fatal variance where the indictment charged that donations from followers of a religious group were used for non-religious purposes, but the evidence showed only that the money was used in ways contrary to the representations made when collecting).

2. **No validity to the government's new arguments.**

Because allegations related to "other people" giving things of value to influence her related to towing outside of Mr. Fiore was a part of the Indictment, Washington was not given the opportunity to have those allegations go before a grand jury or properly object at the time of sentencing. Additionally, the Indictment was not based on Washington taking cash because the towing rotation was coming up and he had the potential to lose or gain towing rotations.  The government's purported new argument was prejudicial and should not have been considered.

This new argument prevented Washington from adequately defending herself and/or from making a "knowingly, intelligently and voluntary" plea in this case.  Washington should have been given the opportunity to advise the court that the "other people" to whom they referenced did not take ownership of a towing company until 2016.  **[Exhibit B, Affidavit]** So, in fact, the purported oil changes and "other repairs" alleged by the government occurred before this individual even had an ownership interest in a towing company, and certainly before Washington helped Myers with towing questions.  Perhaps most important is the fact that the Detroit Police Department ("DPD") was well aware that the owner of this company, provided these services for free or at a discounted rate to all members of the Detroit Police Department.  Specifically, Assistant Chief James White, overseer of the Administrative Operations portfolio including the Resource Management Unit, was aware of this person providing

these services to DPD members and had a friendship with the owner. Id. This person provided DPD with free vehicles for the neighborhood police program as noted in the Affidavit and corroborated by prior news articles.  In a proffered statement to the government, it was also known that this person offered collision repairs to DPD squad cars for a reduced cost.  In fact, a closer look at this owner will show that he has generously and continously provided and offered to provide services for the City of Detroit as a whole, and not just to Washington.  This again is referenced in a text message in the Affidavit of Assistant Chief James White along with a text message received from Washington.  [Exhibit 13, Text Message]

Further, after receiving knowledge that this "other company" owned a towing company, Washington immediately advised Assistant Chief White who was the overseer of towing and admitted this in a recent deposition.  [Exhibit 6 - Deposition of White, P.20,22].

Unfortunately, the City of Detroit and the Detroit Police Department were obviously aware that these services were rendered to DPD, as set forth in the Affidavit, but has deliberately and maliciously allowed these false narratives, as it has with Myers, in order to continue to insulate itself from all the current civil litigation against it due to its negligent handling of towing matters.

Additionally, as it pertains to any other "things of value" related to Mr. Fiore, according to the government, Mr. Fiore claimed that he paid Washington $5000 for a Ford Fusion three years prior to December 22, 2017 (which would have been approximately 2014.) Washington objected to the government's argument, and the court agreed that such an allegation could not be corroborated. [Exhibit 14]

According to the testimony given by the government's star witness, Officer Myers testified that he did not meet Washington until late 2015 or early 2016.  Yet, he has been the liason between the City of Detroit Police Department and the towing companies since 2014, running the day to day operations of towing without any involvement from Washington.± **[Exhibit |__, GJ transcript]**  Thus, it is safe to presume that prior to at least the end of 2015 early 2016, Mr. Fiore talked to Myers regarding towing matters and **not** Washington.  Therefore, it would be illogical to believe that any "overt act" was allegedly done based on an intent to be influenced. Particularly in light of the fact that Washington was not recognized as being connected to towing until the end of 2015 or early 2016.

Clearly, this plea was not knowingly, intelligently and voluntarily made, as Washington was not sentenced based on the Indictment referenced in her plea hearing, but rather based on a variation or unilaterally amended indictment.  Further, this indictment was premised on testimony that is beyond mere inconsistency, but perjury.  The Supreme Court has long-since held that the due process clause protects against convictions based on testimony that the prosecutor knew or should have known was false. Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d. 1217 (1959). The testimony offered by both Myers and Parish was found to be false based on easily ascertainable evidence which violated Defendant's Due Process rights and required a dismissal of the Indictment, or at a minimum the issuance of a super seding one.

---

± In addition, there were three companies that did not pay administrative fees to the City-Tri County, Washington Towing and Red's Towing (aka Mainstay Motors).  Myers did not give them a permit. Red's Towing sued the City and was allowed back on the rotation. Further, MARS Towing allowed its State license to expire, essentially towing without permission from the State. Myers was notified by the Michigan State Police. Myers testified in a deposition that he, on his own (without BOPC approval) suspended MARS, but reinstated MARS immediately after they regained their license. None of these companies were affiliated with Fiore.

**C.    Based on the revised facts in the Indictment, the elements of Bribery cannot be satisfied.   Thus, Washington was wrongfully convicted and a miscarriage of justice has occurred.**

**1.    Federal Bribery Statute $5,000 Threshold**

The Federal program bribery statute prohibits"agents of federally funded entities from soliciting or accepting "anything of value" intending to be influenced... in connection with any business, transaction, or series of transactions...involving anything of value of $5,000 or more[.]" 18 U.S.C. §666(a)(1)(B). There have been varying approaches in valuing the $5,000. The statutory language reveals that this element requires proof of the value of whatever was exchanged for the bribe. This has led other circuits to describe this requisite proof as identifying the value of the "subject matter" of the bribe.[5]

Recognizing that using the alleged bribe amount would not satisfy the statutory threshold, the government, as indicated during the sentencing hearing, could not rely on the alleged bribe to value the alleged transaction. So, the government attempted to meet the $5000 threshold by looking at the profit a tower could make by having a permit or position on the rotation. This approach has been called the benefit-of-the bribe approach. Id. The government argued that the towing companies could make upward of two million dollars if they received a permit and position on the rotation. So, in this case, **if** Mr. Fiore was not entitled to be placed on the towing rotation but Washington assisted him in renewing his permit and/or rotation position, he

---

[5] United States v Tillmon 2019, U.S. App LEXIS 5621* _F.3d_ ( 4th Cir. 2019)

could benefit by profiting up to two-million dollars.  This profit
is what was used to establish the $5000 threshold.  However, the
"benefit" would **only** apply **if** Mr. Fiore was violating the rules
as proposed in the Indictment.  However, this argument is flawed
in many ways.  As more fully discussed below, the court's ruling
that Mr. Fiore did not violate the towing rules takes away the
government's ability to use the benefit of the bribe theory.
Based on this court's ruling that the rules were not violated,
this transaction falls under the exception found is 18 U.S.C.
§666(B)(c) which provides that "This section does not apply to
bona fide salary, wages, fees or other compensation paid, or
expenses paid or reimbursed, in the usual course of business."
Therefore, the government has failed to meet its burden.

In United States v. Owens, 697 F. 3d 657 (2012), Dominick
Owens was a zoning inspector for the City of Chicago Zoning
Department.  This department issued certificates of occupancy
certifying that the homes were "ready to be lived in and used."
The building could not be occupied without a certificate being
issued.  Owens was indicted under the Federal Bribery statute for
accepting bribes in exchange for expediting the issuance of the
certificates of occupancy on eight occasions.  The government
admitted that the bribes accepted did not exceed $5,000, so the
governmentpresented documents showing that the homeowners of the
four homes for which Owens issued the certificates received
mortgages with notes ranging from $200,000 to over $600,000.  The
zoning documents indicated that the construction costs for each

17

were estimated to be between $180,000 and $250,000.  According to
the government, the mortgage value and construction costs for the
homes, 'coupled with the fact that homes could not be occupied
without certificates,' permits the 'reasonable inference that the
certificates involved something valued at $5000 or more.' Id. at
660.

        In Owens, the Court determined that in order to understand
why the government's evidence failed, the court had to look more
closely to the "subject matter" of the bribes at issue.  The
government identified the issuance of the certificates of occupancy
for the four properties as the "thing of value of $5000 or more."
The court held that this was an inappropriate valuation because
anyone that complies with the Board of Zoning procedures and has a
home that passes inspection can receive a certificate of occupancy
for free.  Id.  Therefore, "obtaining the issuance of the
certificates through greasing a palm rather than through legitimate
means must therefore create value in some other way." Id.

        Further, in United States v. Mills, 140 F. 3d 630 (6th
Cir.), the Chief Deputy Sheriff was accused of approaching several
individuals and obtained $3500 and $3930 from them in exchange for
a promise that Mills could hire them to fill employment slots as
full-time commissioned deputy sheriffs.  Mills did in fact make
such appointments, and then named individuals to serve as fully
compensated employees of Shelby County government.  In Mills,
the district court concluded that a statutory exception to the
Federal Bribery statute precluded prosecution of the defendants

for their alleged misdeeds. The court held that section (c) of the statute clearly states that "this section [i.e. 18 U.S.C. §666] does not apply to bona fide salary...paid...in the usual course of business." Therefore, the value of the yearly salary of a deputy sheriff's job, if bona fide, should not be considered in establishing the $5000 transactional value. In the Mills case, the only guide to determining the value would be the amount paid which would be from $3500 to $3930. The government argued that the salaries paid to the named co-conspirators who obtained deputy sheriff positions could not have been bona fide because of the illegal nature of the employment procurement process. They argued that subsection (c) exception cannot, therefore, be applied to these dealings. The court disagreed and held that the indictment did not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment. In the absence of such allegations, the government had no support for its claims that the salaries paid to the deputy sheriffs were not properly earned "in the usual course of business."

In this case, and like Owens the government valued the issuance of the permit and rotation placement based on the potential profit from being placed on the rotation. Similarly, as in Mills, there was no indication that any towing companies that the government claimed to be associated with Fiore were in jeopardy of losing a rotation position. According to evidence obtained after Washington's sentencing hearing, the companies referenced by the

government as being associated with Mr. Fiore all met all of the qualifications to receive a tow permit and rotation. **[Exhibit 3̶4̶, List]** In fact, only three other companies had total compliance with the inspection. Not to mention that Myers in a statement explaining why Gene's Tow was being paid as the sole provider for storage of evidence vehicles, said that "Gene's Tow has been an exemplary tower in Detroit for the City of Detroit since 2001, and has catered to the needs of the City of Detroit and its citizens. **[Exhibit 15, memo dated November 2, 2016]**

Moreover, the towing rules provide that the permits are "renewed" and the rules do not require that there be a new process **[Exhibit 10, tow rules]** Therefore, unless one of these companies was suspended, revoked or terminated, they were not required to go through a new process to get on the list. In addition, only the Board of Police Commissioners can vote to suspend, revoke or terminate a tower's permit. Such a recommendation could only be made with the approval of Assistant Chief James White - the only person, other than Chief Craig, with authority. **[Exhibit 6, White Deposition, P. 64]** Unlike contracts, the towing companies did not have to bid to get on the towing rotation.[6]

There has not been a scintilla of evidence presented in Washington's Indictment or otherwise to even argue that Mr. Fiore was in jeopardy of being excluded from the 2016 rotation, and somehow needed to bribe Washington.

---

[6]In 2011, the City of Detroit Law Department, together with the approval of the City's Purchasing Department and Police Department, implemented the use of permits. **[Exhibit 16, Edwards' opinion]** In 2017, the City of Detroit Law Department made the decision to declare all permits void ab initio with the inference that Washington had issued the permits (which she did not) with some sinister motive.

So, like in <u>Owens</u> and <u>Mills</u>, since the government has failed to put forth any evidence linking any alleged action by Washington as creating some additional value outside of what Mr. Fiore would have already received by continuing to follow the general application renewal process or that any of the towing companies referenced did not comply with towing requirements, the government has failed to reach its $5000 threshold.

2. **The government cannot prove that Washington had corrupt intent**

In <u>United States v. Aguilar</u>, 515 U.S. 593, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995), "[T]he term 'corruptly' in criminal laws has a longstanding and well-accepted meaning. It denotes '[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others.'" <u>Id.</u> at 616. The government cannot prove that any action rendered by Washington was done with corrupt intent. The wiretaps reveal that on May 2, 2016, Mr. Fiore met with Myers, not Washington, to discuss towing. Shortly thereafter, Mr. Fiore contacted Washington requesting a meeting with her as well. Washington learned from Fiore that a company, E&G, received an authorized police towing permit four (4) years prior, there were current open rotations, and E&G was never placed on the rotation. This information was provided in the May 7, 2016 wiretap where Fiore was talking to a relative and said:

> "She goes [talking about Celia Washington] 'How long have they had a permit?' And I said they had a permit for years. He further says "we have been waiting and paying and paying and never get considered. So, there being on the waiting list, so anything would be appreciate."

This is additional proof that Washington was not aware of E&G until Fiore provided her with information on this day **[Exhibit _17_, wiretap].**

Again, the government cannot argue that Mr. Fiore gave Washington the loan just in case some time in the future she may be asked to help with towing.  Clearly, he did not discuss any companies with Washington prior to this conversation.  During that conversation. Washington learned from Fiore that before her tenure with Chief's Office, E&G was given a permit from the Detroit Police Department, Resource Management Unit, bearing number 11-006, but was given no equitable towing on the rotation. [Exhibit 37] This was in contravention to the City of Detroit ordinance §55-15-8 which provides for "equitable distribution of police authorized towing to all towers on the list of qualified towers. Further, a "waiting list" with no rotation was not in conformity with the police authorized towing rules.  Washington had no information about a towing "wait list".[7] In addition, wiretap conversations also disclosed that a city council member made inquiry on behalf of the Fiore's regarding this "waiting" list. [**Exhibit 18, wiretap**]

Washington did not know why E&G was given a permit or who owned E&G.  After getting this information, Mr. Fiore kept asking for a meeting regarding E&G and explained why this copmany should be on the tow rotaton.  Fiore asked for meetings at Detroit Public Safety Headquarters.  Mr. Fiore was not trying to make this meeting a secret as he was entitled to a position pursuant to the City ordinance.  Mr. Fiore attempted to give Washington a paper, presumably containing information regarding E&G and its permit.  She finally

---

7 It was later confirmed in the FOIA requests filed. that despite telling towers with permits that there was a "wait list" there was no "wait list." Moreover, it is unclear who he was "paying and paying" to get on this list. However, when there were available spots in 2011, the Police Department conducted a "blind draw" for those spots. It is unclear if there were anymore "blind draws" since.

told Fiore to email what he was requesting.  However, Washington

never opened the email or otherwise responded as she was awaiting

further information related to this company from her superior.

**[Exhibit 19, Washington's email]**  The subject email was opened by

her attorney during Washington's pretrial period.

Washington tried to talk to the Chief regarding the issue.

This is referenced in the wiretap on May 18, 2016:

> Fiore:  Well the other thing, I don't know, I'll talk to
> you when I see you.  I, I figured whoever's not in...they
> shouldn't be adding nobody new.  And the guys that have
> been waiting should be considered.  And, and the guys
> that are compliant should get put on and all that other
> stuff that's on hold and who ain't, and who did did this
> should be waitin'till they figure it all out."

> CW:  I-I got that.  But I'm...I had a conversation ...a
> brief conversation with him [Chief Craig] before I went
> on vacation."

So, Washington did not secretly attempt to figure out what was going

on with E&G alone, but involved Chief Craig.  However, she never got

a response from the Chief, so as provided in her proffer statement,

she started brushing Mr.Fiore off, regarding E&G because there was

nothing she could do to help without authority from the Chief or

Assistant Chief White.  It was not a part of her job description

as referenced by Chief Craig's statement.  Obviously, the Chief

had authority to make any decision related to towing, and was her

superior.

On a June 3, 2016 wiretap, Washington calls Fiore and asks if he

is mad at her.  She then says:

> CW:  Okay, you better not be mad at me, Cause I did
> I did everything I could [meaning she asked her superiors
> about E&G] and I told um, I told Jennifer that, you know
> I'm all about fair and they're...**[Exhibit 20, Wiretap]**

23

As with the "other" towing company referenced earlier, the Detroit Police Department was well aware of Washington's friendship with the Fiore family.  In fact, this is precisely why the Detroit Police Department often sent Washington to discuss other business matters with both Fiore and his attorney Nick Bachand.  **[Exhibit 21, List]**  The Detroit Police Department owed Fiore-owned businesses tens of thousands of dollars in unpaid rent for properties located at Dix and Fort Street where evidence and forfeiture vehicles were stored for safekeeping.  In fact, at one point in time the lease had expired at one of the properties and the Detroit Police Department faced eviction as a holdover tenant.  [Exhibit 32] In order to preserve the interests of the Department and the security of these vehicles, Washington was requested by Assistant Chief White to negotiate extensions because alternate facilities owned by the City were not yet suitable for storage.  Washington was concerned that the towing issue could affect her negotiation efforts, so she wanted Fiore to know that had done all she could within her power.

Although there was clearly a strong indication that the Detroit Police Department had not followed the towing rules prior to Washington's tenure with the Chief's Office, this did not negate the fact that Fiore, according to the rules, was entitled to get on the rotation.  Any assistance from Washington would have been to encourage compliance with rules in order to avoid litigation, and not the result of a bribe.

The Indictment also alleges that Fiore somehow benefitted from the act of Washington's phone call, both to Fiore and to Fiore's attorney Bachand, asking that Fiore get his application in by May 2, 2016.  However, this was a courtesy call requested by Myers as he had

set this date in contravention to the towing rules which allowed companies to renew their permits anytime within the last year of the permit's expiration date.  [**Exhibit** 22, **phone records**] The earlier date was a benefit to Myers, allowing him time to do inspections and ensure compliance.  This was not a required date pursuant to the tow rules.  Therefore, **both** Myers and Washington called tow companies to ensure they couldcomply with the revised deadline. [**Exhibit** 23, **BOPC Minutes**]  In essence, the towers had three more weeks left to renew permits as verified by the City of Detroit attorney in the deposition of Kenyatta Myers as follows:

> Q:  (City Attorney) At one point you were asked about whether you had told the applicants when they would have to have their applications submitted.  Do you recall that?
>
> A:  (Kenyatta Myers) Yes.
>
> Q:  And you said that when you sent them out you did not tell them when they had to have the application packet in the city, correct?
>
> A:  Yes
>
> Q:  But isn't it true that the existing permits all expired May 31st of 2016?
>
> A:  Yes they did.
>
> Q:  So you would assume that the applicant would know when that expired?
>
> A:  Yes. [**Exhibit** 1]

The towing companies were aware that Washington would assist with questions related to the towing rules.  However, they also knew that she did not assist with anything else towing related until or unless she was asked or told to by her superiors.  As with any legal advice given to the Detroit Police Department either from the City of Detroit Law Department or the legal advisor, sometimes the advice [Exhibit 38] is followed and other times it is not.∧ It is ultimately up to the

department to follow the advice of counsel.  Washington was an advisor, she did not give orders but carried out orders at the direction of her superiors.  As corroboration, this was captured in the following conversation with Fiore and another individual on a June 2, 2016 wiretap:

> GF:  ...You think he would do me one more favor?

> GF:  I think Vince just gotta let the mayor say something to the chief and the chief says something to Celia Washington which is...she is the new lawyer for the chief. I don't know if you know her. She was...used to be a lawyer...

> GF:  Anyways, she is kind of heading it up and I have been trying to talk to her in a round about way and I think she is <u>telling me no on E&G</u> but I think I need to <u>go over her head</u> on that issue if the chief says something to her it will be done. I am trying to get it done today because after the meeting today it is going to be too hard to do.

> GF:  All he would have to do is tell him you know put in chief's ear to tell Celia...you know add E&G whatever.  *[EXHIBIT 24]*

Contrary to the government's contention that Washington was somehow "spinning" Fiore or intentionally misleading him in order to garner ill-gained funds, it is overwhelmingly clear that there was no ambiguity in Fiore's mind.  Washington was unwilling and unable to make <u>any</u> decisions with regard to E&G or any other towing matter. Thus his need to **"go over her head."**

This is also captured in a later conversation where Fiore was aware that a towing competitor was calling Washington regarding towing issues and responded on May 18, 2016 wiretaps:

> GF:  Uh, because I know he'll have uh, he'll have his brother uh, D.C. [Deputy Chief] call you, call you or A.C. [Assistant Chief White] call you.  [Exhibit <u>25</u>, wiretap]

Additionally, Assistant Chief White, who is the direct chain of command to Myers, has requested that Washington set up and attend meetings regarding towing issues, as well as with tow companies.[8]

---

[8][Exhibit <u>21</u>]

For example, these messages were captured from Washington's cellular phone:

> Washington:  "Need to set up a conference call with you and ac white tomorrow per ac"

> Washington:  "Good morning!  Can you and Louie meet with AC White here at headquarters at 1 today?

[Exhibit 20]

Again, in July 2016, Detroit Mayor Duggan directed the coordinator of his clergy roundtable, Tara DeFoe, to call Washington to have her set up a meeting with another towing company that had been promised additional positions on the rotation.  Washington advised Chief Craig of the call from Ms. DeFoe and the Mayor's directive.  Washington complied, and held the meeting at Detroit Public Safety Headquarters and was attended by Myers and Greg Hicks, Secretary to the Board of Police Commissioners, along with the individuals who had spoken to the Mayor.  During that meeting, the tow company owners were advised that there was nothing that Washington could do, and that any such changes to rotation positions would have to be made through Resource Management and approved by the Board of Police Commissioners.  After the meeting Washington advised Ms. DeFoe that the meeting had been held, and attempted to schedule a meeting with her or the Mayor to discuss further. [Exhibit _61_, text message]  Again, this meeting was not initiated by Washington but by Mayor Duggan.  It is a grave miscarriage of justice for Washington to be convicted based on help she provided at the request of her superiors.  Moreover, it is a further travesty that the Detroit Police Department not only sit back silently and allow this false narrative, but has attempted to use Washington's plea to defend itself in recent litigation (i.e. "the Celia Washington defense)  [Exhibit  ]

27

Moreover, the infamous <u>unopened email</u> sent to Washington would not have provided any additional benefit to Fiore. Again, the towing rules provided that this was to be a renewal process. All companies referenced by the government as "Fiore" companies were already police authorized towing companies and were renewing their permits. It should also be noted that "the email," remained unopened until Washington's pretrial period, and was opened by her counsel.[9] In all actuality, the email was duplicative information requested by Myers' questionnaire included in the application packets. [**Exhibit** _29_, **Questionnaire**] At most, the information contained in the email may have gotten a company that had held a permit for 4 years, its "equitable distribution" that the Detroit Police Department, Resource Management and the BOPC entitled it to **prior to Washington's tenure with the Office of the Chief of Police.** Assuming arguendo that they did have new companies, there were available slots so they would have been entitled to be considered for those available spots if they were in full compliance. Further, as held in <u>Miller</u>, the potential profit alleged in the Indictment is considered <u>bona fide</u> compensation and is an exception to the subject statute.

Finally, Washinton has maintained throughout her plea hearing and sentencing that the money received in early 2015 was a loan. [**Exhibits** _30_ ] Moreover, this loan occurred in 2015 long before Washington began assisting Myers with towing. [**Exhibit** _31_ ] In all candor, as much as the city owed the Fiore owned businesses, Washington had no reason to believe that Mr. Fiore needed to bribe her for any favors with the City.

## IV.   CONCLUSION

As demonstrated herein, the government secured Washington's Indictment and guilty plea for Bribery Conspiracy by a) relying on demonstrably false Grand Jury testimony; b) a legally flawed "benefit-of-the bribe" valuation and c) submitting new facts at sentencing never presented to the Grand Jury, i.e., unindicted behavior.  Specifically, Washington did not have the authority over towing and could not/did not help Fiore break the rules or receive any benefit he did not already have.  Myers' and Parish's statements to the Grand Jury regarding their interpretation of the towing rules <u>and</u> Washington's overseeing the towing permits and rotation process were false and unreliable.  The testimony regarding the meaning of the towing ownership rules was wrong, as confirmed by this court, and Fiore's ownership of several towing companies did not violate the rules.  Second, whether loan or bribe as characterized by the government, $3,000 does not meet the requisite $5,000 legal threshold.  Finally, unindicted so called "propensity" theory - even if true - was not presented to the Grand Jury and thus cannot sustain this conviction.

Any one of these important issues requires remand. Taken together, the Court must vacate Washington's conviction under §2255 to remedy the serious miscarriage of justice that has occurred.  It is no answer to say that Washington has already largely served her one year and a day sentence, or that the record reflects certain errors in judgment or appearance of

impropriety. Washington was wrongly convicted and is entitled to relief. The factual issues presented are fatal to the government's case. The legal issues presented should still be resolved now, not only to clear Washington but to further clarify the federal bribery law.

For the foregoing reasons, Washington's motion under §2255 should be granted.


Respectfully submitted,

_____
Celia Washington, In Pro Per
Prepared With the Assistance of Counsel


DATED: April 22, 2019

## CERTIFICATE OF SERVICE

I, CELIA WASHINGTON, certify that on April 23, 2019, I caused the foregoing document, together with the accompanying Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody to be served by first class mail, postage prepaid to: Clerk of the Court, U.S. District Court, Eastern District of Michigan, Theodore Levin United States Courthouse, 231 West Lafayette Boulevard, Detroit, MI 48226 and Michael Bullotta, United States Attorney's Office, 211 West Fort Street, Suite 2001, Detroit, Michigan 48226, by placing said documents in the prison mailing system.

Executed this 23rd day of April

_____
Celia Washington

30

**EXHIBIT 1**

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - -
                                    )
In the matter of:                   )
                                    )
    FEDERAL GRAND JURY               )
                                    )
- - - - - - - - - - - - - - - - - -

Case No.

Proceedings had and testimony taken of

KENYATTA MYERS before a Federal Special Grand Jury at Room

_____, U.S. Courthouse, Detroit, Michigan, on

Wednesday, October 4, 2017.


PRESENT:

    R. MICHAEL BULLOTTA
    Assistant United States Attorney

    DAVID A. GARDEY
    Assistant United States Attorney




REPORTED BY:

EXHIBIT 2

**Parish**

```
 1                        UNITED STATES OF AMERICA
                          UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF MICHIGAN
                              SOUTHERN DIVISION
 3
       - - - - - - - - - - - - - - - - - -
 4                                           )
       In the matter of:                     )
 5                                           )
            FEDERAL GRAND JURY                )
 6                                           )
       - - - - - - - - - - - - - - - - - -
 7
 8                                  Case No.
 9              Proceedings had and testimony taken of
10     MICHAEL PARISH before a Federal Special Grand Jury at
11                     , U.S. Courthouse, Detroit, Michigan, on
12     Wednesday, October 25, 2017.
13
14
15     PRESENT:
16         MICHAEL BULLOTTA
           Assistant United States Attorney
17
           DAVID GARDEY
18         Assistant United States Attorney
19
20
21
22
23
24     REPORTED BY:
25
```

EXHIBIT 3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA

Case:2:17-cr-20662
Judge: Lawson, David M.
MJ: Stafford, Elizabeth A.
Filed: 10-11-2017 At 12:39 PM
vs.                                    INDI USA V WASHINGTON (BG)

**VIOLATIONS:  18 U.S.C. § 666(a)**
**18 U.S.C. § 371**

D-1   CELIA WASHINGTON,

    Defendant.
_____/

## INDICTMENT

The Grand Jury charges:

### GENERAL ALLEGATIONS

1.    At all times relevant to this Indictment, defendant **CELIA WASHINGTON** was an agent of the City of Detroit, Michigan, in that she was employed as a legal advisor to the Chief of the Detroit Police Department with the title of Deputy Chief of Police.  Part of the defendant's job responsibilities included overseeing the Detroit Police Department's licensing, regulation, and use of private towing companies.

1

2.     At all times relevant to this Indictment, Detroit, Michigan, was a local government entity that received federal assistance in excess of $10,000 during each of the calendar years 2016 and 2017.

3.     All of the overt acts in this Indictment occurred in the Eastern District of Michigan.

4.     At all times relevant to this Indictment, the total potential yearly revenue for towing companies receiving City of Detroit tows exceeded two million dollars.

5.     At all times relevant to this Indictment, City of Detroit towing rules were in place prohibiting a towing owner from having more than one towing company in each police district or precinct towing rotation.

6.     At all times relevant to this Indictment, **CELIA WASHINGTON** was aware that the owner of several towing companies ("the owner") had controlling ownership interest in multiple towing companies that had been placed in a single police district or precinct towing rotation, in violation of the City of Detroit towing rules.

2

2:17-cr-20662-DML-EAS   Doc # 1   Filed 10/11/17   Pg 3 of 7   Pg ID 3

## COUNT ONE

(18 U.S.C. §§ 371 & 666(a) – Bribery Conspiracy
Concerning Programs Receiving Federal Funds)

### D-1   CELIA WASHINGTON

### THE CONSPIRACY

From in and about February 2016 until June 2017, in the Eastern District of
Michigan, Southern Division, defendant **CELIA WASHINGTON** did unlawfully,
willfully, and knowingly combine, conspire, confederate, and agree with the owner
and others, to corruptly agree to accept and accept cash from the owner with the intent
to influence and reward **CELIA WASHINGTON** in connection with a business,
transaction, or series of transactions of the City of Detroit, Michigan involving $5,000
or more, in violation of Title 18, United States Code, Section 666(a).

### MANNER AND MEANS BY WHICH THE
### CONSPIRACY WAS CARRIED OUT

It was part of the conspiracy that **CELIA WASHINGTON** would meet with
the owner in the City of Detroit and accept thousands of dollars in cash from the
owner.

It was further part of the conspiracy that, in exchange for the cash, **CELIA
WASHINGTON** would tell the owner she would use her official position as Deputy
Chief of Police to assist the owner with towing permits and rotation placement in the
City of Detroit.

3

It was further part of the conspiracy that **CELIA WASHINGTON** assisted the owner in violating the City of Detroit rules that prohibited the owner from having multiple towing companies on a single district or precinct towing rotation.

## OVERT ACTS

In furtherance of the unlawful conspiracy, and to effect its objectives, the co-conspirators committed the following overt acts, among others:

1.     In or about February of 2016, **CELIA WASHINGTON** met with the owner and requested money.

2.     In or about February of 2016, the owner gave **CELIA WASHINGTON** at least $3,000 in cash.

3.     On April 28, 2016, **CELIA WASHINGTON** had a telephone conversation with the owner in which **WASHINGTON** made sure the owner would be able to comply with a deadline that **WASHINGTON** would be setting for the application for towing permits in the City of Detroit.

4.     On May 6, 2016, the owner had a telephone conversation with an associate and told the associate that **WASHINGTON** wanted an email sent to **WASHINGTON's** personal email address that specified which towing rotations the owner wanted in the City of Detroit.

5.     On May 6, 2016, the owner had a telephone conversation with a relative

4

who works for the owner. The owner instructed the relative to send **WASHINGTON** the desired police precinct rotations that the relative wanted for the owner's towing businesses.

6.     On May 9, 2016, the relative of the owner sent an email to **WASHINGTON's** personal email address that described the desired police precinct towing rotations for the owner's towing companies.

7.     On or about June 2, 2016, **CELIA WASHINGTON** assisted in issuing a towing rotation which violated the City of Detroit towing rules because the owner had multiple towing companies in single precincts.

8.     On June 3, 2016, **CELIA WASHINGTON** had a telephone conversation with the owner and told the owner that she "did everything [she] could" to help the owner get his towing businesses placed in the police precinct rotations that the owner wanted.

All in violation of Title 18, United States Code, Sections 371 and 666(a).

## COUNT TWO

(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds)

### D-1   CELIA WASHINGTON

In or about February 2016, in the Eastern District of Michigan, Southern Division, defendant **CELIA WASHINGTON** did unlawfully and corruptly accept and agree to accept approximately $3,000 in cash from the owner, with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a).

THIS IS A TRUE BILL

s/Grand Jury Foreperson
GRAND JURY FOREPERSON

DANIEL L. LEMISCH
Acting United States Attorney

s/R. Michael Bullotta
R. MICHAEL BULLOTTA
Assistant United States Attorney

s/David A. Gardey
DAVID A. GARDEY
Assistant United States Attorney
Chief, Public Corruption Unit

Dated:  October 11, 2017

6

EXHIBIT 4

**INTER-OFFICE MEMORANDUM**
**RESOURCE MANAGEMENT**

detroit **police**
Chief of Police
Ralph L. Godbee, Jr.   D.P.D. 568 (rev. 9/97)

| Date |
|------|
| August 11, 2011 |

To:     Deputy Chief Benjamin F. Lee, Management Services Bureau (Direct)

Subject **CHANGE IN TOWING ROTATIONS**

From:    Lieutenant Michael Adams, Resource Management

The following is an explanation of the changes in the June 24, 2011, towing rotation base upon the formation and approval of new towing services providers. The Department received documentation that City Wide Towing and Gene's Towing were sold to Mr. Paul Ott and are now separate from Joan Fiore. In addition, B & G Towing was sold to Mr. Anthony Thomas and is now separate from Joan Fiore. Finally, BBK Towing, located in the Northeastern District was added as an approved tower after resubmitting an application.

1.  **Northwestern District:** - There were no changes made to the June 24, 2011, rotation.

2.  **Southwestern District:** - Prior to this change the Southwestern District was full with towing providers who were based in the Southwestern District. The sale of City Wide Towing and Gene's Towing did not open any new tow rotation opportunities. City Wide Towing, and Gene's Towing were sold and became separate from the original group of companies (B&T, Javion and Sams, and E&G) are now considered new companies and they have been removed from the current rotation and placed on the Southwestern District waiting list.

3.  **Central District:** - The new companies, City Wide Towing and Gene' Towing, are located in the Central District and were added to the towing rotation.. Since they are both owned by the same individual, they were granted one towing opportunity in the rotation. BBK Towing (1.2 miles) and B & G Towing (4.6 miles) were added to the Central District based upon mileage. Red's Towing (5.3 miles), Tri-County (5.4 miles) and 7D's Towing (6 miles) were removed from the Central District based on their distance from the Central District.

4.  **Eastern District:** - E & G, B & T, and Genes were approved for their zoning at 9550 Conner, located in the Eastern District on July 1, 2011. On the prior June 24' 2011 rotation, there were four available slots open for Eastern District based towers. Since Gene's Towing has now secured property within the Eastern District at 9550 Conner they were added to the 4th position in the rotation. status changed to being located in the Eastern District. Since B & T and E & G are located in the Eastern District, their position on the rotation is no longer based on the distance from the Eastern District. B & G Towing, (2 miles) which has changed ownership and is now treated as a new company was placed into the 5th position based on their distance from the Eastern District. New Executive Towing (3.9 miles) and Wayne's Towing (4.4 miles) were removed based on their distance from the Eastern District.

To:     Deputy Chief Benjamin F. Lee, Management Services Bureau (Direct)   July 25, 2011

Subject  New Tow Rotation                                       Page 2

5. **Northeastern District:** - As of June 24, 2011, the Northeastern District was full with towing providers based in the Northeastern District. The sale of the City Wide Towing and Gene's Towing and their separation from the original group of companies (B&T, Javlon and Sams, and E&G) did not open any new tow rotation opportunities. Therefore, City Wide Towing, and Gene's Towing are considered new companies have been removed from the current rotation and placed on the Northeastern District waiting list.

6. **Tenth Precinct:** The new companies of City Wide Towing (3.5 miles) and Gene's Towing (3.5 miles) were added to the Tenth Precinct based on mileage. A C Towing (3.8 miles) was removed based on mileage.

7. **Twelfth Precinct:**- There were no changes made to the June 24th rotation.

**MICHAEL ADAMS**
Lieutenant L-38
Resource Management

Serial 48

EXHIBIT 5

FD-302 (Rev. 5-8-10)

- 1 of 2 -



OFFICIAL RECORD

**FEDERAL BUREAU OF INVESTIGATION**

Statement of Chief Craig and Lashinda Stair
protected by court order.

James White, Jr.
2/9/2018

Page 1

1                      UNITED STATES OF AMERICA

2                   EASTERN DISTRICT OF MICHIGAN

3    NATIONWIDE RECOVERY, INC. et al,

4            Plaintiffs,

5                              Case No. 4:17-cv-12378

6       -vs-                   Hon. Linda V. Parker

7                              Mag. Jdg. Stephanie Dawkins Davis

8    CITY OF DETROIT et al,

9            Defendants.

10                                          /

11   PAGE 1 TO 185

12

13            The Deposition of JAMES WHITE,JR.,

14            Taken at 1301 Third,

15            Detroit, Michigan 48226

16            Commencing at 1:00 p.m.,

17            Friday, February 9, 2018,

18            Before Shacara V. Mapp, CSR-9305.

19

20

21

22

23

24

25

HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO    313-567-8100

James White, Jr.
2/9/2018

Page 10

1   remained the Assistant Chief. In 2014, when Chief
2   Craig came along, and I was reappointed by Chief Craig
3   to Assistant Chief where I have sat. We established
4   the support operations side of the department and
5   that's where I currently sit.
6   Q.   Is there any major distinguishing feature from what you
7        do today as an AC versus what you were doing when you
8        were first appointed because to me, it sounds very
9        similar?
10  A.   When I was first appointed to AC?
11  Q.   Yes.
12  A.   There's a lot of add-ons. For example, my first
13       appointment, we didn't have a lockup. So, all of our
14       lockups were at the precincts. When I became Assistant
15       Chief, we centralized our lockup. So that's one of the
16       commands that reports to me. Let's see.
17            I have lockups. I have training. I have towing.
18       I have a lot of the administrative functions of the
19       Police Department. There's so many. There's an org
20       chart over there that, kind of, illustrates that.
21  Q.   Have you always -- since you've been AC, you've always
22       been on the administrative side?
23  A.   I spent a short stint over on the investigative side.
24       For a period of time, homicide reported to me, all of
25       the investigative operations, as well as what I do now.

Page 11

1            So I probably spent about six months with the
2        investigative side of the house being under my command.
3        The Chief made that move about a year, a year and a
4        half ago.
5            That has since went back over to invest -- I'm
6        sorry, neighborhood policing. And now, I'm back to
7        administrative operations.
8            So primarily, to answer your questions, my career
9        has been that of administrative operations.
10  Q.   And the Detroit Police Department, is that a
11       paramilitary organization?
12  A.   Yes.
13  Q.   What does that term mean to you?
14  A.   Paramilitary, semi-military. We're structured in a way
15       that we have a hierarchy here, where the highest
16       ranking is Chief of Police. And as you indicated
17       earlier, the rank structure in the Police Department.
18       So I would, in theory, be the third ranking member of
19       the -- of the Police Department.
20  Q.   I know the Chief would be above you. Who is the other
21       person above you?
22  A.   The First Assistant Chief.
23  Q.   Okay. So who do you report to?
24  A.   I report directly to the Chief.
25  Q.   Okay.

Page 12

1   A.   But the Chief's logical number two is the First
2        Assistant Chief. So there's this conversation with the
3        First Assistant with regards to the operation of the
4        Police Department and there are directives from the
5        First Assistant. Essentially, she's speaks for the
6        Chief.
7   Q.   So in the Detroit Police Department, is it accurate to
8        say that as a paramilitary organization, the only two
9        people who could give you orders that you would have to
10       follow would be the first Assistant Chief and the
11       Chief?
12  A.   That's an accurate statement.
13  Q.   Who -- how many director reports do you have?
14            MR. BRESSACK: And, it's really just what you
15       remember right now.
16            THE WITNESS: I'm going to say seven.
17  BY MR. DELDIN:
18  Q.   Okay.
19            You had said you oversaw Civil Rights slash
20       Integrity, what's the integrity side of that?
21  A.   It's not slash integrity. The acronym is CRIB, it's
22       the Civil Rights Integrity Bureau.
23  Q.   Okay.
24  A.   And we refer to it as CRIB. It was born out of
25       resolving the issues that were revealed to us in the

Page 13

1   consent judgment as it relates to uses of force and
2   conditions of confinement.
3        My job is to ensure that we are following the
4   policies and procedures of the Detroit Police
5   Department, that our policies are progressive, meaning,
6   that, you know, they move with the times. For example,
7   social media, things like that, that weren't
8   necessarily in existence when the policy was written.
9        But more importantly beyond that, is that the
10  officers are conducting themselves consistent with the
11  rules and regulations of the Police Department.
12  Q.   You know, I wrote it down as Civil Rights slash
13       Integrity. That's why I asked.
14  A.   Okay.
15  Q.   And when you were over CRIBs, did the department get
16       all its consents from you?
17  A.   That's correct.
18  Q.   I'm going to show you what I'll have the court reporter
19       mark as Exhibit 1. It's the dep notice. I didn't
20       bring multiple copies.
21            DEPOSITION EXHIBIT 1 WAS MARKED BY THE REPORTER
22            FOR IDENTIFICATION: Deposition Notice
23  BY MR. DELDIN:
24  Q.   Have you ever seen that, sir?
25  A.   I have not.

4 (Pages 10 to 13)

**James White, Jr.**
**2/9/2018**

Page 18

1  Q. Can you give me an example?
2  A. That's a -- that's a hard -- suspects that are not
3     members of the Police Department?
4  Q. Yes.
5  A. Well, if we go to just -- I mean, I'm -- we're dealing
6     with a hypothetical?
7  Q. Correct.
8  A. So as I indicated, you know, I'm responsible for every
9     building that we have in the City of Detroit. And if
10    there's a larceny or some type of damage that occurs in
11    that building, we would investigate that. And if it's
12    determined that it's not a member of the department, it
13    would certainly be someone else out of the department.
14    I guess I need to understand the question a little
15    more, so I can properly answer it.
16 Q. We'll cover it a little bit later.
17 A. Okay.
18 Q. What's the difference between an administrative
19    investigation and a criminal investigation?
20    MR. BRESSACK: To your understanding sitting
21    here.
22    THE WITNESS: I'm sorry.
23    MR. BRESSACK: Just to your understanding
24    sitting here.
25    THE WITNESS: Okay. I can't answer the

Page 19

1  question?
2  MR. BRESSACK: You can. You can. Sorry.
3  THE WITNESS: Okay.
4  Essentially, all investigations are administrative
5  investigations. The -- an investigation by its very
6  nature, is administrative. The facts of that
7  administrative investigation or that initial
8  investigation takes you to criminality or
9  non-criminality. So essentially, there really isn't a
10 difference. It's -- it's an investigation.
11 BY MR. DELDIN:
12 Q. So if the facts of an administrative -- of an
13    investigation lead to criminal activity, it's an
14    investigation under your command, does it getting
15    routed to the investigative command?
16 A. It could. It depends on the entity in which it's
17    conducting the investigation.
18 Q. Okay. Do you know Sam Hussein?
19 A. I do.
20 Q. Okay. When did you first meet him?
21 A. I met Sam Hussein approximately two, two and a half
22    years ago.
23 Q. What were -- what were the circumstances?
24 A. I met Sam at a press conference, out front. And he was
25    here for a donation of neighborhood police vehicles to

Page 20

1  the Police Department.
2  Q. I'm going to show you what is marked as Exhibit 2?
3     DEPOSITION EXHIBIT 2 WAS MARKED BY THE REPORTER
4     FOR IDENTIFICATION: Photo of Press Conference
5  BY MR. DELDIN:
6  Q. Do you recognize that picture?
7  A. I do, sir.
8  Q. Is that when you first met Sam?
9  A. Yes.
10 Q. And Sam was donating vehicles to the department?
11 A. He was. He was donating vehicle repairs.
12 Q. Vehicle repairs?
13 A. Yes.
14 Q. And did he end up doing those repairs?
15 A. He did.
16 Q. Do you know the quality of his work?
17 A. Good work.
18 Q. Do you know how many vehicles he repaired for the
19    department, or ballpark?
20 A. Approximately, three.
21 Q. Okay. Do you know Celia Washington?
22 A. I do.
23 Q. How do you know her?
24 A. She was a Second Deputy Chief, which is a Civilian
25    Deputy Chief position in the Detroit Police Department.

Page 21

1  Q. Prior to her resignation, was she under your command?
2  A. She was not.
3  Q. Whose command?
4  A. The Chief of Police.
5  Q. All right. Did you ever work with her?
6  A. I did.
7  Q. Did she ever say anything to you or did you ever hear
8     her say anything to other people about Nationwide
9     Recovery?
10 A. No.
11 Q. About Sam Hussein?
12 A. No.
13 Q. About Louay Hussein?
14 A. Yes.
15 Q. What about Gerry Parker?
16 A. No.
17 Q. What about me?
18 A. No.
19 Q. What did you hear Ms. Washington say about Nationwide
20    Recovery?
21    MR. BRESSACK: These are -- these are things
22    you can testify to. Obviously, we've segregated out
23    the information that would be subject to investigative
24    privilege. But the information, your conversations
25    with Celia Washington are okay.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

**James White, Jr.**
**2/9/2018**

Page 22

1     THE WITNESS: These are conversations that,
2  you know, ranged over a span of time. So I can't tell
3  you on Monday, or what date.
4     But that Louay owned Nationwide Recovery. That he
5  recently purchased it. That he was very vocal. Just
6  as things would come up, she would, kind of, just tell
7  me who he was in terms of his complaints and some of
8  the things that he had brought to her attention. And,
9  what he felt was being done in regards to the tow
10  process.
11  Q.  So I asked you about Nationwide Recovery. Is there
12  anything else that she said, just about Louay Hussein,
13  other than what you've already mentioned?
14  A.  Other than what I've mentioned, I can't remember
15  anything specifically.
16  Q.  Did she ever tell you that Nationwide Recovery or Louay
17  Hussein were paying off cops?
18  A.  She never told me that.
19  Q.  Okay. Did you ever hear her say it?
20  A.  No, I did not.
21  Q.  In October of 2016, did you have a meeting with Sam and
22  Louay in this conference room?
23  A.  Yes.
24  Q.  Okay.
25  A.  Not sure of the date, but that's approximately correct.

Page 23

1  Q.  Fall of 2016?
2     MR. LOUAY HUSSEIN: October.
3  BY MR. DELDIN:
4  Q.  What was that meeting about?
5  A.  That meeting, I believe -- that meeting involved
6  myself, Celia Washington, Sam Hussein, and Louay. And
7  I also believe there was a member of our Internal
8  Affairs there.
9     And please understand, there was a number of
10  meetings. And I'm going to try to recall this meeting.
11  But at the time, I did not document, you know, every
12  aspect of the meeting. But I do remember that there
13  was some concerns about tow rotation at one point, and
14  there was also concerns about behavior of other towers.
15  Q.  Who asked for the meeting?
16  A.  Celia asked me to meet with them to discuss issues that
17  they had brought to her attention.
18  Q.  During the meeting, did Nationwide -- when I say
19  Nationwide, I'm talking about Sam and Louay. Did they
20  describe for you, Nationwide Recovery's business model?
21     MR. BRESSACK: Form.
22  BY MR. DELDIN:
23  Q.  Did they tell you that they go and hunt for stolen
24  vehicles?
25  A.  Yes.

Page 24

1  Q.  And then, they would have other agencies recover them?
2  A.  That's correct.
3  Q.  I'm going to show you what will be marked as Exhibit 3.
4     DEPOSITION EXHIBIT 3 WAS MARKED BY THE REPORTER
5     FOR IDENTIFICATION: List of Hot Spots
6  BY MR. DELDIN:
7  Q.  During this meeting, did Louay or Sam give you a list
8  of what they refer to as either hot spots or spots?
9  A.  Yes, sir.
10  Q.  Does Exhibit 3 look like that?
11  A.  It does.
12  Q.  And did you retain a copy of that?
13  A.  I did.
14  Q.  And is it correct that Louay or Sam had told you, these
15  are spots where thieves often dump cars, and these are
16  spots that we go and check?
17  A.  That is correct.
18  Q.  Did they express frustration that they couldn't get the
19  Detroit Police Department to go and recover vehicles
20  for them, in that manner?
21     MR. BRESSACK: Form.
22  BY MR. DELDIN:
23  Q.  You can answer.
24  A.  Yes.
25  Q.  Did you keep a copy of this list?

Page 25

1  A.  I forwarded a copy of that list.
2  Q.  Who did you forward it to?
3  A.  Commercial Auto Theft.
4  Q.  Did you forward the e-mail?
5  A.  No, I did not. I had it given to them.
6  Q.  Do you see in the second grouping, the address 15774
7  Greenlawn?
8  A.  Yes, I do.
9  Q.  When that meeting concluded, were you under the
10  impression that Nationwide would go and look at these
11  specific spots for stolen vehicles?
12     MR. BRESSACK: Form.
13     THE WITNESS: Was I under the impression they
14  would go and look for cars in these certain locations?
15  I was under the impression that these were locations
16  that they knew cars would be dumped and it was possible
17  that they would at some point.
18  BY MR. DELDIN:
19  Q.  Who did you talk to about your deposition today?
20     MR. BRESSACK: You can answer that. You can
21  say the names of the attorneys. Well, if you remember
22  my name.
23     THE WITNESS: Sorry, I'm horrible with that.
24  Our attorney, the gentleman to my left, Lieutenant
25  Michael Parish, Chuck Raimi. And I mentioned that I

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

**James White, Jr.**
**2/9/2018**

Page 62

1     towing companies?
2        MR. BRESSACK: Form, foundation. He's asking
3     for your personal opinion right now. You can answer it
4     if you can.
5        THE WITNESS: No. Terminated? No.
6     BY MR. DELDIN:
7     Q. So they're suspended?
8     **A. They're suspended.**
9     Q. Is there a time frame on the suspension?
10     **A. For my purposes?**
11     Q. Yes.
12     **A. The conclusion of the investigation -- when there is a**
13     **conclusion to the investigation and the determination**
14     **on the direction of the investigation, that's -- that's**
15     **it.**
16     Q. And when is the investigation going to be concluded?
17     **A. When the investigation and the facts of the**
18     **investigation then conclude it, and we make a final**
19     **determination of which direction to go in the**
20     **investigation.**
21     Q. Who decides on whether or not Nationwide is reinstated?
22     **A. Well, at the --**
23        MR. BRESSACK: Asking your opinion. He
24     didn't ask you to clarify between the prior roles as
25     they existed or, you know, the current process. So you

Page 63

1     can answer to the extent you can.
2        THE WITNESS: The process, it would really
3     determine largely on the conclusion of the
4     investigation.
5     BY MR. DELDIN:
6     Q. Well, who determines whether a towing company is added
7     to the list of authorized towers?
8        MR. BRESSACK: Calls for speculation. Well,
9     can you repeat the question?
10     BY MR. DELDIN:
11     Q. Who determines whether a towing company is added to the
12     list of authorized towers?
13        MR. BRESSACK: Objection. Form. And calls
14     for a legal conclusion. You can answer the question.
15        THE WITNESS: My understanding is the Board
16     of Police Commissioners.
17     BY MR. DELDIN:
18     Q. Who determines whether a company can be suspended or
19     terminated?
20        MR. BRESSACK: Objection. Form. Foundation.
21     Ambiguous. Calls for speculation. You can answer.
22        THE WITNESS: I'm one of the people. The
23     rules contemplate the Assistant Chief of Support
24     Operations being allowed to suspend for cause.
25     BY MR. DELDIN:

Page 64

1     Q. But you can't reinstate?
2     **A. I can suspend for calls and make recommendations.**
3     Q. What rec -- you said suspend for cause and make
4     recommendations?
5     **A. That's my understanding.**
6     Q. Is that recommendations based on the suspension for
7     cause or recommendations based on something else?
8        MR. BRESSACK: Form. Go ahead.
9        THE WITNESS: It would be wherever the
10     investigations or whatever the reason that I suspended
11     -- and, again, being and speaking in hypothetical, or
12     are we speaking specifically with this case?
13     BY MR. DELDIN:
14     Q. Let's speak specifically with this case?
15     **A. And the question is, who can reinstate?**
16     Q. Correct.
17     **A. Based on my investigation and the conclusion of my**
18     **investigation, I could make a recommendation to the**
19     **Board of Police Commissioners and they could**
20     **essentially, reinstate.**
21     Q. Okay. And you're basing that off of the towing rules?
22     **A. I'm basing that on my understanding of the tow rules**
23     **and the department that gave me the power to suspend,**
24     **initially.**
25     Q. Well, at one point you made contact with Chester Logan

Page 65

1     from Highland Park Police Department regarding James
2     McMahon?
3     A. Yes, sir.
4     Q. And what was the nature of your contact?
5     A. I sent Chester Logan a letter, and --
6     Q. Here, we'll mark this as Exhibit 5.
7        DEPOSITION EXHIBIT 5 WAS MARKED BY THE REPORTER
8        FOR IDENTIFICATION: Letter to Chief Logan
9        THE WITNESS: I sent Chester Logan a letter
10     regarding McMahon who was identified as his employee.
11     BY MR. DELDIN:
12     Q. Is that the letter that you had sent Chief Logan?
13     A. Yes, it is.
14     Q. Did you receive a response back from this?
15     A. I did not.
16     Q. Did you follow-up after?
17     A. I did.
18     Q. And did you get anything back?
19     A. Nothing.
20     Q. How did you follow-up; phone call?
21     A. I called.
22     Q. And you were unable to speak with him?
23     A. I called and asked the Internal Affairs Commander to
24     call and we both received the same response, "I'll call
25     you back."

17 (Pages 62 to 65)



# DETROIT POLICE DEPARTMENT

## 2015 Annual Report

Mike Duggan, *Mayor*  •  **James E. Craig**, *Chief of Police*

# 2015 Detroit Police Department Organizational Chart



**Board of Police Commissioners**

**Office of the Chief Investigator**
Chief Investigator
Pamela Davis Drake

**Office of the Chief**
Chief (Continued)

- Chief's Neighborhood Liaison
- Police Reserves
- Chaplain Corp
- PAL
- Traffic Safety
- Central Photo
- EPU
- City Council Security

**Human Resources**
Director Overdrive

- Recruiting
- Police Medical
- Personnel

**Budget Operations**
2nd DC Tolbert

- Central Timekeeping
- Grants & Contracts
- Payroll
- Fiscal Operations

**Resource Management**
Mgr. Ivolus

- Facilities
- Property Control
- Firearms Inventory
- Uniform Store
- Fleet Central
- ANTF

**Administrative Operations**
★★★★
A.C. James L. White

**Support Services**
Comdr. Irving

- Civil Rights
  Capt Sierdra
- DDC
  Capt
  Abou-Rasheed
- Prof Educ &
  Training Div.
- Training Center
- Firearms
  Training

**Communications Bureau**
Director Fleming

- Communications
  Capt Jarvis
- TCRU

**Planning & Deployment**

**Sec. Emp.**

**Technology Serv. Bureau**
Director Floyd's

- Tech Services
- M.A.S.

# 2015 Detroit Police Department Organizational Chart

Mayor
Michael E. Duggan

Chief of Police
James E. Craig

Senior Advisor
Ms. Swin

Office of the Chief
1st AC Lashinda T. Stair

Labor Relations
Mr. Bellamy

Legal Advisor
2nd AC Washington

Law Dept.

Media Relations

**Professional Standards**
Cmdr.Sims.

Internal Controls
Capt. Moussiguy

I.A.

F.I.

Risk Mgt.

Disciplinary Administration Unit

**Major Crimes**
Cmdr Wilson

Homicide
Capt.Slappey

S.A.U.

Crime Scene Services

Missing Persons

HQ Surv

**Organized Crime**
Cmdr.Thomas

Organized Crime
Capt. Solano

Major Viol.

CATS

NIS

CIU  Liq. Lic.

Forfeiture

PPU

**Detective Bureau**
DC Fitzgerald

T.F. Admin.

VCTF

DFAT

FIT

D.A.

JTTF

DEAIT

SEMCAC

Investigative Operations
Capt. Walton

Court Liaison

AVERT

Cease Fire
Capt. Cox

Gang Intel.

Crime Intelligence
Capt. Toque

CIU

CSTAT

NTCG

Records & Ident.

**Metro Division**
Cmdr.Barren

Metro Division
Capt. Williams

TRU

K-9 Unit

TEU

Mounted

Air Support

Harbor Master

Bomb Squad

SRT

City Wide Park Unit

**Enforcement Operations**
AC Steven G. Dolunt

**NPB-West**
DC Dorin

NPB-West
Cmdr.Gerevino

2nd Pct.
Capt.Rochon

4th Pct.
Capt.Chambers

6th Pct.
Capt.S. Watson

8th Pct.
Capt.Pritchett

10th Pct.
Capt.Prichett

12th Pct.
Capt.Barnkil

**NPB-East**
Cmdr.Malone

Downtown Serv
Capt.Perry

Gaming

3rd Pct.
Capt.Salkay

5th Pct.
Capt.Riss

7th Pct.
Capt.Hood

9th Pct.
Capt.Docker

11th Pct.
Capt.Leach



James

Tue, Jun 6, 1:18 PM

Where's DTE and GM?

Yep

Between Towing and this shit I am done in this this town!!

No way!!!

You are THE Fixer

Toast.  They wouldn't hire me to park Cars..

Tue, Jun 6, 3:06 PM

We are on the line

  

EXHIBIT 7

**Kenyatta Myers**
**9/29/2016**

Page 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MAINSTAY MOTORS, INC., (d/b/a

RED'S TOWING SERVICE),

               Plaintiff,

   vs.                     Case No. 2016-009203-AW

                               Hon. Leslie Kim Smith

CITY OF DETROIT,

               Defendant,

_____/

PAGE 1 TO 66

       The Deposition of KENYATTA MYERS,

       Taken at 2 Woodward Avenue, Suite 500,

       Detroit, Michigan,

       Commencing at 2:21 p.m.,

       Thursday, September 29, 2016,

       Before Cynthia Ann Chyla, RPR, CSR-0092.



Kenyatta Myers
9/29/2016

Page 52

```
 1   A.   Yes.

 2   Q.   But isn't it true that the existing permits all expired

 3        May 31st of 2016?

 4   A.   Yes, they did.

 5   Q.   So you would assume that the applicants would know when

 6        that expires?

 7             MR. DELDIN:  Object to foundation, form.

 8   A.   Yes.

 9   BY MR. GAABO:

10   Q.   So, in fact, isn't that the expiration date, isn't that

11        something that you relied on in setting the period when

12        the applicants had to have their information to the

13        city?

14   A.   Yes.

15   Q.   When towing companies paid administrative fees to the

16        city, who do they pay those to?

17   A.   The finance Treasury Department.

18   Q.   So they don't pay them directly to you?

19   A.   No, sir.

20   Q.   That's a finance function?

21   A.   Yes, sir.

22   Q.   When you were reviewing the various applications by

23        bidders for towing permits you reviewed them to see

24        whether each of them had submitted something similar to

25        what's marked as attachment 2 in Exhibit 4?
```



Kenyatta Myers
9/29/2016

Page 53

1              MR. DELDIN:  I'm going to object to the form

2      and you're mischaracterizing.  We're not bidders.

3              MR. GAABO:  We can call them applicants if

4      you'd like.

5  BY MR. GAABO:

6  Q.   In any event, did you look to see whether they had

7       submitted something similar to this document?

8  A.   Yes, sir.

9  Q.   With the exception of Washington Towing and Tri-County

10      Towing -- well, first, let me back up.

11              Did all of them submit something like this

12      that was signed by the city?

13 A.   With the exception of Washington and Tri-County.

14 Q.   Did you have any reason to doubt that the clearances

15      that were submitted by the other towers were inaccurate?

16 A.   No.

17 Q.   Did you have any reason at any point that the clearance

18      submitted by Red's Towing was inaccurate?

19 A.   Initially, no.

20 Q.   Did you subsequently have reason to believe that was

21      inaccurate?

22 A.   Yes.

23 Q.   When did that come about?

24 A.   When I was contacted by Miss Perry from the Treasury.

25 Q.   What did she tell you?



Kenyatta Myers
9/29/2016

Page 63

```
 1   A.   A week or so.

 2   Q.   So he got his license and he got back on?

 3   A.   Yes.

 4   Q.   So if Red's were to pay the administrative fees --

 5   A.   There's a difference.

 6   Q.   What's the difference?

 7   A.   His permit expired.

 8   Q.   Okay.  And why can't he apply for a new one?

 9   A.   He can in 2021.

10   Q.   Where does that say that in the rules?

11   A.   It didn't say it in the rules.

12   Q.   It doesn't?

13   A.   Unh-unh.

14   Q.   Is it -- do you think this is funny, because you've been

15        smirking?

16   A.   I can't sit here and smirk?  I'm like Donald Trump.  I

17        just made faces.  What's wrong with that?

18   Q.   I wouldn't say that.  You're much better than him, sir,

19        not by much but --

20   A.   I really appreciate your insults.

21   Q.   Where in the rules does it set a deadline for a tower to

22        submit an application?

23   A.   It doesn't in the rules.

24   Q.   And you didn't even set a deadline; right?

25   A.   The permit expired.
```



**Kenyatta Myers**
**9/29/2016**

Page 64

1   Q.  But you handed out in September about 9 months

2       beforehand and --

3   A.  I gave him time to get it all together.  I'm sure he

4       knew it expired May 31st, 2016.

5   Q.  So if somebody had given you their application on

6       May 31st, 2016 would that have been sufficient?

7   A.  No, that's not time -- there's not enough time for me to

8       --

9   Q.  How much time did you need?

10  A.  I need at least 30 days.

11  Q.  And you never communicated that to any of the towers;

12      right?

13  A.  Never been communicated.

14  Q.  They were just supposed to guess?

15  A.  Yeah, they guess.

16              MR. DELDIN:  I have no further questions.

17              MR. GAABO:  Just one final.

18  RE-EXAMINATION BY MR. GAABO:

19  Q.  We've been talking about these rules over and over.  Is

20      the purpose of these rules for the convenience of the

21      city or is it to give some kind of legal rights to

22      towers?

23  A.  Convenience of the city without a doubt.

24              MR. GAABO:  I have nothing further.

25



**Kenyatta Myers**
**9/29/2016**

Page 51

```
 1        a document?

 2   A.   No.

 3              MR. DELDIN:  Object to form and foundation.

 4   BY MR. GAABO:

 5   Q.   The same thing in regard to administrative fees, isn't

 6        it true that if an applicant owes administrative fees

 7        just as if they owe something else they would not be

 8        entitled to have this clearance?

 9   A.   Correct.

10   Q.   But the rules and the other documents that relate to the

11        application process, they don't specify every single

12        possible conceivable way that an applicant might owe

13        money to the city, do they?

14   A.   No, sir.

15   Q.   That would be unreasonable to try to list every single

16        way that that might happen, wouldn't it?

17   A.   Yes.

18   Q.   At one point you were asked about whether you had told

19        the applicants when they would have to have their

20        applications submitted.

21              Do you recall that?

22   A.   Yes.

23   Q.   And you said that when you sent them out you did not

24        tell them when they had to have the application packets

25        in the city; correct?
```



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313-567-8100

**Kenyatta Myers**
**9/29/2016**

Page 52

1   A.   Yes.

2   Q.   But isn't it true that the existing permits all expired

3        May 31st of 2016?

4   A.   Yes, they did.

5   Q.   So you would assume that the applicants would know when

6        that expires?

7                    MR. DELDIN:   Object to foundation, form.

8   A.   Yes.

9   BY MR. GAABO:

10  Q.   So, in fact, isn't that the expiration date, isn't that

11       something that you relied on in setting the period when

12       the applicants had to have their information to the

13       city?

14  A.   Yes.

15  Q.   When towing companies paid administrative fees to the

16       city, who do they pay those to?

17  A.   The finance Treasury Department.

18  Q.   So they don't pay them directly to you?

19  A.   No, sir.

20  Q.   That's a finance function?

21  A.   Yes, sir.

22  Q.   When you were reviewing the various applications by

23       bidders for towing permits you reviewed them to see

24       whether each of them had submitted something similar to

25       what's marked as attachment 2 in Exhibit 4?



.ıll Sprint 🗢          10:11 PM          ⌁ ✳ 24% ▢

New iMessage          Cancel

To: Kenyatta Myers

> When did packets go out?

December 1, 2015

> Did the 2011 packet look different from 2016 packet

> When were they told the deadline?

In April, around the first of May.  I told all of the towers.

Jul 21, 2016, 12:46 PM

           iMessage          

.ıl Sprint 🛜      10:11 PM      ⌁ ⁂ 24% ▭

**New iMessage**      Cancel

To: Kenyatta Myers

> He said he didn't get it

> Do we have proof?

> How did he get the packet

> Every one recd the checklist

Nothing is indefinite he knew that the permit expired on May 31, 2016

He's done this before. This isn't the first time he applied for a permit.

  iMessage 

 Sprint 🛜          **10:11 PM**          🡥 ᕼ 24% 🔋

**New iMessage**          Cancel

To: Kenyatta Myers

Jul 20, 2016, 3:40 PM

> Deldin is saying the application didnt have a deadline and didn't have a checklist. So no one knew what to submit!!!

There is a checklist with the application

Yes, everyone got the same application. By Fax.

Yes

> He said he didn't get it

  iMessage 

EXHIBIT 8

# DECLARATION OF OFFICER KENYATTA MYERS

Officer Kenyatta Myers states as follows for his declaration:

1. This declaration is made on my personal knowledge.

2. I have been a Detroit Police Officer for 32 years. I first became involved with tow activities in March 2014. At that time I was assigned to the resource management unit where I act as a liason between the Detroit Police Department (DPD) and tow companies.

3. I have no background, education, training or experience in procurement of services, other than my activities in 2016 as described below.

4. In 2016, Deputy Chief Ceila Washington ("DC Washington") was legal advisor to the DPD. DC Washington had previously been legal advisor to the Board of Police Commissioners (BOPC) and had, to my understanding, been involved with issuance of tow permits in 2011.

5. In 2016, there were, as I recall, 24 tow companies on the tow rotation list. The permits for those companies were due to expire May 31, 2016. DC Washington asked me to assist her in reviewing tow company applications for new permits.

6. We received applications from the 24 towers then on the tow rotation list. We did not engage in any process to solicit applications or invite bids from other towers.



1

We were contacted by some others towers not then on the list, and at least one them submitted an application packet, who expressed interest in bidding, but DC Washington elected not to entertain applications from those companies.

7.   I worked under the direction of DC Washington to assist in reviewing the applications for new permits.   We used the BOPC document issued in December 2010, copy attached as exhibit A.

8.  I did the best I could in attempting to ascertain if the towers met the requirements of exhibit A, but I was unable to make that determination for certain of the required criteria.  For example, page 8 of exhibit A, bullet point one states in part:

> "Authorized Towers which are cross owned on a basis which is greater than 10%, or under common ownership to an extent greater than 10% of which are owned by members f the same family (spouse, sibling, parent or child) will occupy only one position of the rotation roster and will receive towing assignments in succession. For purposes of this provision "cross ownership" refers to the ownership of one corporate entity by another.  "Common ownership" refers to the ownership of two or more corporate entities by a single person or corporation."

9.  It was widely believed that, contrary to that provision, several of the authorized tow companies were owned or controlled by Gasper Fiore and/or members of his family, and that those companies collectively received a greatly disproportionate share of DPD tow business.  However, I did not have the training, resources or experience to investigate that issue.  DC Washington did not express interest in investigating that issue.

2

10. I recall asking DC Washington about the use of permits, rather than contracts, for tow companies. DC Washington said that the BOPC had come up with the idea of using permits as being easier than contracts.

11. DC Washington ultimately asked that I sign permits for 21 of the 24 previously authorized towers. The other three towers were delinquent in payment of administrative fees to the City, but the BOPC later placed one of the three on the tow rotation list.

12. After I signed the permits, DC Washington took them to obtain signatures by the Chair of the BOPC. The signed permits were distributed to the tow companies.

13. It was my understanding that the BOPC had final authority to select qualified towers, as confirmed by the signature of the BOPC Chair on the certificate.

14. I have been advised that Nationwide's lawyer made statements in a recent Court filing dated October 4, 2017 seeking partial summary judgment, concerning my involvement in the 2016 permitting process. Those statements, at pages 3-4 of the brief, include that "Officer Myers is responsible for administering the police authorized towing program;" that "Officer Myers vets the applicants * * * [and they] become authorized towers;" that "Officer

3

Myers oversaw the application and selection process * * *." Those statements are not correct. As discussed above, DC Washington, whose rank was far higher than mine, had the lead role in this process. To my understanding, DC Washington and the BOPC determined the procedures and made the final determination of who was put on the tow rotation.

I declare under the penalty of perjury the foregoing is true and correct.

Officer Kenyatta Myers

Dated October 12, 2017

4

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONWIDE RECOVERY, INC.,
a Michigan corporation,

     Plaintiff/Counter-Defendant,

                                 Case No. 2:17-cv-12378
vs.                           Hon. Linda V. Parker
                                 Mag. Jdg. Stephanie Dawkins Davis
CITY OF DETROIT,

     Defendant/Counter-Plaintiff.

_____

CITY OF DETROIT,

     Third-Party Plaintiff,

vs.

JERRY PARKER, an individual, et al

     Third-Party Defendants.

_____

**DEFENDANT CITY OF DETROIT'S <u>CORRECTED</u> RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
PLAINTIFF'S DUE PROCESS CLAIM**

City of Detroit, pursuant to Fed. R. Civ. Pro. 56, and for the reasons stated in

the accompanying **corrected** brief, asks the Court to (1) deny plaintiff's motion for

partial summary judgment as to Count I of its complaint (due process), and (2) grant

1

the City cross-motion seeking summary judgment dismissing Count I of plaintiff's complaint.

The City's initial brief included a declaration from police officer Kenyatta Myers. The undersigned today received information that Officer Myers' declaration may not be accurate. The declaration is not material to the City's response and cross-motion. Both the declaration, and any reference to the statements therein, have been omitted from the corrected brief.

City of Detroit Law Department
Melvin Butch Hollowell, Jr.
Charles N. Raimi
/s/ Charles N. Raimi
2 Woodward Ave., suite 500
Detroit, Mi  48226
Phone 313 237 5037
E-mail raimic@detroitmi.gov

October 25, 2017

2

EXHIBIT 10

## APPLICATION PROCESS – PROSPECTIVE TOW COMPANY

### Goals in the Selection Process

The City of Detroit is responsible for maintaining clean, safe and functional streets for its citizen's use.  Citizens are entitled to a well-managed vehicle towing system that affords them a high level of customer service, convenience, courtesy, and professionalism. These are common goals shared by the Detroit Police Department ("the Department") and the Board of Police Commissioners ("the Board"). To that end, the selection process formulated by the City will result in awarding tow permits (including permits for the storage and disposal of abandoned and illegally parked vehicles) only to those tow companies who share in these goals.

### Application Packet

Each prospective tower applicant must furnish the Department with completed information contained in the tower application packet which must include:

- Completed Application
- Background clearances on all employees (at the tower's cost)
- A list of any and all civil cases (pending and closed) where the prospective tower is named as a defendant
- Insurance Information (attach Certificate of Liability Insurance)
- List of licenses held
- List of trucks owned or leased (attach registrations)
- List of special on-site equipment
- Property tax clearances to the primary and secondary location
- Vendor's income tax clearance
- Zoning clearances for all storage location
- A detailed listing of all tow companies where the owner / proprietor or family member of the owner / proprietor, has at least a 10% stake in the tow company(s).
- Proof of certification as a Detroit-based business
- Proof that private storage lot, yard or garage is located within the boundaries of the City of Detroit[1]

---

[1] Detroit Ordinance, § 55-15-1(4)

**Additional Applicant Requirements**

Applicants for permits must provide the following information with regard to **all** parents, subsidiaries, divisions, affiliates, partners and major stockholders or members (over 10%):

Name _____

Address _____

President/CEO_____

Relationship to Applicant _____

Percentage of Stock or other form of Ownership in Applicant

_____

**Background Check Certification**

At the time of application, and continuing thereafter on a yearly basis, the applicant must provide certification from an independent background check organization approved by the Department that the applicant and its employees are free of the following felony convictions for the past seven (7) years, including but not limited to:

- Any offense that pertains to alteration or removal of a vehicle's identification numbers, theft and/or damage to vehicles, unlawful possession of burglary tools, petty theft, grand theft, or robbery, arson, extortion, forgery and/or burglary;

- Any offense, the elements of which include inflicting bodily injury or death to a person or persons;

- Reckless driving or driving under the influence of any drug or intoxicating liquor, regardless of whether the incident resulted in bodily injury or death, hit and run, any conviction for drug use (possession or sale) and evading a police officer;

- Any offense for which an individual must register as a sex offender.

Selected tow companies will provide the City with annual background checks, proof of valid driver licenses and driving records for its employees.

**SELECTION CRITERIA**

Applicants must agree to be bound by all the terms and conditions of the Police Authorized Tower Permit with the City of Detroit.

The Department, at its discretion, shall identify a reasonable number of tow companies per district or precinct.  Each year, the Department will review the performance of each authorized tow company.

Selected tow companies must attend a mandatory Tower Orientation Session, which will include an overview of the requirements mandated by the Department, as well as the customer service/citizen complaint process.

The large number of vehicles within the City generates an intense demand for regulation of traffic flow that can only be met by a tow program that is efficient and capable of handling tow operations through the use of highly trained and properly equipped personnel and offices.  At a minimum, the tow company must have sufficient equipment to perform required tow services (e.g. tow trucks, properly zoned property for storage, and insurance for each).

**Insurance Requirements**

At all times a permit holder must maintain, at minimum and at its expense, the following insurance:

| | TYPE | AMOUNT NOT LESS THAN |
|---|---|---|
| (a) | Workers' Compensation | Michigan Statutory minimum |
| (b) | Employer's Liability | $500,000.00 minimum each disease<br>$500,000.00 minimum each person<br>$500,000.00 minimum each accident |
| (c) | Commercial General Liability Insurance | $1,000,000.00 each occurrence<br>$2,000,000.00 aggregate<br>Coverage is to include blanket contractual liability. |
| (d) | Garage Keeper's Legal Liability Insurance | $50,000.00 |
| (E) | Automobile Liability | $1,000,000.00 combined single Insurance (covering limit for bodily injury all owned, hired and property damage to non-owned vehicles with personal and protection insurance including residual liability insurance under Michigan No   Fault Insurance Law) |

To the extent that state and/or federal law imposes requirements in excess of those stated above, the tow company must comply with the requirements of the law. The City reserves the right to change the insurance requirements 30 days after written notice to the tow company. Each year, the tow company must provide current certificates of insurance to the City, naming the City as an additional insured. The City must be provided with a 30-day notice of any cancellations or nonrenewal of insurance coverage.

**Indemnification**

As a condition of holding its permit, a tow company must agree to be solely responsible for and indemnify, defend and hold harmless the City of Detroit from and against all losses, liability, claims, causes of action, damages or costs, including any related expenses and attorney fees, for or on account of injuries to or death of any person and/or any property damage alleged to have been sustained in connection with the tow company's performance or failure to perform.

And further as a condition of holding its permit, a police authorized tower acknowledges that it understands and expressly assumes all the risks and dangers of the activities authorized by a police authorized tower permit and by its application for such a permit it agrees that it releases, waives, discharges, and covenants not to sue the City of Detroit, the Detroit Police Department and their officers, agents, servants, and employees from all liability, claims, demands, actions, or causes of action whatsoever arising out of any damages, loss, or injury to the police authorized tower or to its property while participating in any of the activities authorized pursuant to a police authorized tower permit, whether such damage, loss, or injury results from the negligence of those released or from any other cause. A holder of a police authorized tower permit, by its application for such a permit, agrees to defend and indemnify and hold harmless the City and the Department from any loss, liability, damage, or costs, including court costs and attorneys' fees, that they may incur due to the activities of the tower as a police authorized tower, whether caused by the negligence of the persons or entities released or otherwise.

**Operation and Use of Facilities**

*Towing Equipment*

Selected tow companies may either own or lease their towing equipment, so long as the equipment is adequate and is properly insured.

*Storage Facility*

Selected tow companies must provide convenient, well-managed, and courteously operated storage facilities for vehicles towed pursuant to Detroit Traffic Codes, and other vehicles ordered towed by the Department.

The City shall have the right to enter the tow company's facilities at any time. The tow company shall maintain an office at each facility with sufficient space for all necessary business capabilities, i.e. computers with software capabilities to collect vehicle information and other data, telephones, facsimile machines for servicing the customer and the Department. Data on each vehicle shall be stored electronically and is subject to inspection and audit. Each yard/storage facility shall contain a digital camera recording system (with DVR backup). The tow company shall supply the necessary toilet facilities at each location. The tow company shall be responsible for securing the facilities, all vehicles located therein and for the safety and security of all towed vehicles, including without limitation, limiting access to authorized persons. The tow company shall operate and maintain the facilities in accordance with all applicable zoning requirements, local, state, and federal laws.

## Methods of Payment

All selected tow companies shall accept cash (and issue sequential cash receipts), and may accept any other tender at their own risk. Tow companies may provide on-site cash machines for the citizens' convenience. Any fees incurred by or loss from such transactions shall be processed in accordance with normal business practices and shall in no event be the responsibility of the City.

## Posting of Required Information

The Department will provide signage to each tow company (at the tow company's expense) which must be conspicuously displayed and easily visible at each storage lot, yard or garage which expressly states the following:

- The name and address of the tower's insurance broker handling the insurance coverage required by the permit.

- Schedule of all approved towing, storage and additional charges as specified by the City[2]. Tow companies are expressly prohibited from charging any fee or cost in excess of that specifically authorized by the City.

- A notice explaining the conditions and/or procedures under which a tow hearing may be requested from the City and the Detroit Police Department.

---

[2] The entire schedule of charges should appear on the customer's copy of receipt.

- Procedures for filing a claim for damages incurred to the vehicle or contents thereof as a result of the tow or while in storage.

- A list of the documents required by the tow company in order for a citizen to retrieve a towed vehicle.

- A statement that the registered owner shall not be charged for the initial viewing of a recovered vehicle.

- A notice explaining the Department's policy to pay police authorized tower(s) for each tow of a vehicle to a City auto pound(s), precinct or district for the processing of evidence for the victims of any crimes.

- A Department contact name and phone number.

### Tow Release Procedures

The Department shall provide the public with a Department telephone number to facilitate the retrieval of information on towed vehicles.

As a condition of holding a permit the City shall be held harmless by the permit holder from all claims arising out of the improper release of a vehicle. Responsibility for the release of a vehicle to a person without proper evidence of title devolves fully on the tower.

In the event that the towed vehicle has been identified as having a Police Hold (meaning that the Police have communicated in writing that the vehicle is to be placed on hold until released in writing), the tower shall not release the vehicle without written authorization from the Department.

If the tower tows a vehicle without an impound card, or releases, sells, auctions, or crushes a vehicle that is subject to a police hold, notwithstanding any criminal or civil penalties which may be levied by any court, there shall also be assessed a $1000 credit to the City per occurrence.  In addition, the tower shall pay the blue book value of the vehicle to the owner if the vehicle is no longer available. In the event the vehicle sustains damage while in the possession of the tower, the tower will be responsible. Receipt of any remedy required by these rules does not preclude the registered owner from taking legal action.

Any tow company with an unclaimed vehicle on its premises for seven (7) calendar days must notify the Department, TCRU and the Towing Monitor in

writing.  It shall be the tow company's responsibility to provide the Department with written notice every seven (7) days the vehicle remains unclaimed.

**Customer Service**

*Towing Response Time*

The City greatly values prompt courteous service to the public.  The Department shall create a Citizen Complaint Form to facilitate feedback on the performance of police authorized towers.  The Department and the Towing Monitor (should one be selected) will serve as the repository for the Citizen Complaint Forms. The Department shall implement a process whereby citizens can register written complaints.

The tow company must act in accordance with the highest industry standards and practices as approved by the City of Detroit. Therefore, the tow company must not cause the public unreasonable delay either on the phone or in person. Tow companies shall respond with the appropriate equipment to the designated point of tow within twenty (20) minutes of the dispatch.

All selected tow companies shall accommodate special tow programs such as abandoned vehicle sweeps and City-sponsored events.  The City will notify the tow company in advance to insure that a sufficient number of tow trucks are available.  The City shall state the number of tow operators required, the location and the time that they are to start.

In all contacts with the public, selected tow companies must promptly return vehicles when presented with sufficient proof of payment and ownership pursuant to applicable law and any guidelines provided by the City and designated department personnel.

*Hours of Service*

All tow companies must respond to all tow service calls with sufficient operational equipment to meet all towing services required at all times, 24-hours per day, seven days per week, including holidays.  In the event a tow company does not respond to a tow service call, that tow company will be skipped, and the next tow company in the rotation will be called for the service call. The hours of service must allow citizens to retrieve their vehicles from 7 a.m. – 7 p.m., seven (7) days a week.

**INTERNAL CONTROLS**

*Tower Rotation*

Unless the workload or new technology warrants change, the criteria for tower rotation are as follows:

- A maximum of six (6) authorized tow companies will be assigned to each District and a maximum of three (3) to each Precinct.

  Each Authorized Tower will tow on a rotational basis within the respective District or Precinct in which they are geographically located. Authorized Towers which are cross owned on a basis which is greater than 10%, or under common ownership to an extent greater than 10% or which are owned by members of the same family (spouse, sibling, parent or child), will occupy only one position on the rotation roster and will receive towing assignments in succession. For purposes of this provision "cross ownership" refers to the ownership of one corporate entity by another. "Common ownership" refers to the ownership of two or more corporate entities by a single person or corporation.

- Towing assignments which cannot be fulfilled by the permit holder originally called must be referred back to the Department for reassignment and may not be reassigned by the permit holder.

- Districts or Precincts lacking adequate authorized tow companies to cover their respective areas shall have towers assigned by Fiscal Management Bureau on the basis of their geographical distance to the **actual** District or Precinct.

- Authorized tow companies assigned to tow in the area of 36th District Court or for events are required to have a tow truck on stand-by in the downtown area for immediate towing. These tow companies shall tow on a weekly rotational basis.

- **Abandoned vehicle tow** requests shall be rotated among the tow companies capable of towing and storing abandoned vehicles within the respective District or Precinct. This rotation shall be separate from all other authorized tows. The rotation shall be on a vehicle by vehicle basis among those tow companies who are capable in order to insure that all abandoned tows are rotated fairly and equitably.

- **Heavy duty towing** shall be rotated among the tow companies having that capability. "Capability" shall mean those authorized tow

companies that: 1) possess heavy duty trucks and equipment on site; 2) employ drivers in possession of the required CDL license endorsement; and 3) possess the space to store semi-trucks. The heavy duty towers shall be separated from the regular authorized tower rotation.

Detroit Police officers (or any other public official who exercises any functions or responsibilities in the review and/or approval of police authorized tow companies under any towing permit with the City) shall be strictly prohibited from directly calling in tow companies for tow(s).   Detroit Police officers assigned to abandoned vehicles ("ABAN" officers) are also strictly prohibited from calling any tower directly for a tow.  If a tower fails to respond within twenty (20) minutes after receiving a call, the next tower in line for rotation will be contacted.  No vehicle shall be towed without authorization from the Detroit Police Department Dispatch Center. To ensure safety for the residents and the towers, no vehicles shall be towed that are in the presence of the owner, driver, or current occupier, without a Detroit Police Officer present.

### Record Keeping

All selected tow companies shall maintain, in accordance with generally accepted accounting principles, complete and accurate books of account and records relating to all items of income received and expenses incurred in regard to police authorized towing.  Such books of account shall be maintained at the site approved by the City.  Authorized tow companies will be required to provide the City with a copy of their annual financial statement.

### Annual Audit

All tow companies shall be required to provide the Department and the Towing Monitor with an annual financial and operational audit. The City and/or the Department reserve the right to audit the books and records of each tow company in order to ensure compliance with the Police Authorized Towing Permit and these Rules. This review may include, but may not be limited to, all monies collected by the tow company under the Police Authorized Towing Permit, auction procedures, and compliance with the Law Enforcement Information Network (L.E.I.N.) sale process.

### Monitoring Process

The Department, with input from the Board will monitor this process and may appoint a Towing Monitor.  If a Towing Monitor is appointed, such individual will select a team of civilian and sworn personnel who will serve as an investigation unit and liaison between all tow companies and the City of Detroit. This team will also be responsible for monitoring tow company performance by conducting site

visits and will report any apparent deficiencies or violations of these rules to the Board.

### Abandoned Vehicle Auctions

Tow companies will be required to cooperate with the Department and comply with the Department's Manual with regard to public abandoned vehicle auto auctions.

## LEGAL CONSIDERATIONS

### Conflicts of Interest

Selected tow companies must certify that no officer, agent, or employee of the City (including but not limited to police officers) or any other public official has any personal or financial interest, directly or indirectly in the selected tow company. Selected tow companies must also agree not to hire or retain the services of any member of the Department, agent, or Board member, while such person is a public employee or official or for a period of at least one year thereafter, and will not hire any person with an interest that could possibly conflict in any manner with the performance of an authorized tower's responsibilities pursuant to a towing permit.

As a condition of its selection for a towing permit each police authorized tower acknowledges that holding such a permit is not a guarantee that any particular number of tows will be assigned to it and agrees that neither it nor any person under its control or who acts as an agent for it will initiate any action against the City based on a claim that it has failed to receive any particular number or share of tows.

### Nontransferability and Termination

Any permit to provide towing services to the City cannot be transferred, sold or assigned to any other person or entity. Selected tow companies must notify the Department within ninety (90) days if the company sells, or in any manner transfers, the entire company, a substantial portion of its assets, or 10% or more of the outstanding stock, or if there is a change in any of the partners, owners, or officers of the tow company.

The City reserves the right to terminate any towing permit with a tow company in the event of a breach of the towing permit or any provision of the towing permit or of these Rules provided, however, that the permit holder shall be afforded an opportunity for a hearing before the Board of Commissioners or the Board's designee prior to the effective date of any such termination.

The City may immediately terminate any towing permit with a tow company for fraud or criminal conduct by the tow company or its employees, provided however, that as soon as practicable the permit holder shall be afforded an opportunity for a hearing before the Board of Commissioners or the Board's designee following which hearing the Board shall either affirm or rescind the termination.

Unless terminated earlier, a permit granted pursuant to these rules shall be valid for a period of five (5) years from the date of issuance. At any time within the last year an application for renewal may be made by the permit holder. An application for renewal shall include all the information and requirements of the original application.


_____        _____
Rev. Jerome Warfield, Chair               Adela Rivera, Vice Chair (*abstained*)


_____        _____
Toney Stewart, Commissioner               Rev. Michael Reeves, Commissioner


_____        _____
Mayor                                     Chief of Police


Dated: ___DEC 1 5 2010_____

# How Duggan created a costly towing scandal that helps a Kwame crony

*By Steve Neavling on November 29, 2018 · 4 Comments*



Anthony Soave (left), Mayor Duggan (right)

Mayor Duggan is waging an expensive and legally murky campaign to remove select tow companies from doing business with the city, potentially benefiting one of his largest contributors and raising questions about retaliation.

In the latest salvo, the city brazenly banned five tow companies and several of their employees earlier this month from doing work with the city for up to 15 years. Some of those companies had previously sued the city for denying them work without the right to due process.

The move raised eyebrows among legal experts and some city council members because municipalities can only blacklist companies and individuals if they create a present danger to taxpayers. That does not appear to be the case with the towers.

Under a newly created debarment ordinance, the city's Inspector General blacklisted the companies and employees about 11 months after towing magnate Gasper Fiore was convicted in a public corruption case in Macomb County.

Even though Fiore is no longer connected to the company, Boulevard & Trumbull, the Inspector General's office banned the firm and four others over tenuous affiliations with Fiore. In some of the cases, the companies' only connection to Fiore is that his former company shared resources such as impound lots, which is common in the towing industry. In another case, Joan Fiore and her company, Javion & Sam's 24 Hour Towing, were debarred for 15 years because she's the ex-wife of Gasper Fiore. Never mind that Joan Fiore had been divorced and lived in Florida when her ex-husband was accused of soliciting a bribe.

The debarments, which are being appealed to city council, are good news for Anthony Soave, who owns a tow company that does business with the city and several impound lots in Detroit. Soave and his business partners have donated tens of thousands of dollars to Duggan's political campaigns and played a major role in Duggan's successful write-in campaign.

With fewer towers in the rotation, Soave stands to get more business.

Trouble is, Soave's conduct in the past is far more egregious than anything related to the debarred tow companies.

According to court records, Soave admitted he gave convicted former Mayor Kwame Kilpatrick about $400,000 worth of private flights and a Rolex watch while getting lucrative contracts from the city.

So if the city is debarring companies and individuals because they allegedly pose a risk to taxpayers, why is Soave still getting work from the city?

Duggan's relationship with Soave dates back to the 1990s when the mayor worked as a deputy Wayne County executive under Ed McNamara. While Soave had contracts with the county, he offered McNamara a condo on the west coast of Florida at no charge in 1989. At the time, one of Soave's companies was under an FBI investigation over a trash-hauling contract with the city of Warren.

Six years ago, Soave testified that he let then-mayor Kwame Kilpatrick and his entourage make 20 jaunts on some of his three private jets at a cost of $389,000. Soave also admitted he bought Kilpatrick an $800 pair of shoes and a $1,200 purse, along with a $6,000 Cartier watch for Kilpatrick's father, Bernard Kilpatrick.

Despite the admission, Soave was never spent a day in jail and continued doing business with Detroit, especially under Duggan.

Duggan's office denied treating the towers unfairly and dismissed Soave's misdeeds.

"The independent office of the inspector general made a determination based on the facts of a specific complaint before it related to Gasper Fiore, who was convicted of bribery, and his interests in other tow companies," Duggan spokesman John Roach told *Motor City Muckraker*. "The administration follows the IG's recommendation."

But what Roach didn't mention is that Duggan personally told city lawyers to go after the tow companies, according to in-court testimony involving a lawsuit filed by Joan Fiore. The city's law department complied and asked the IG to investigate.

Deputy Corporation Counsel Charles Raimi testified that Duggan "made that perfectly clear to me" that the "city would not be doing business with companies that are not of high integrity"

He continued: "Not of good integrity or that have been involved in issues such as what the Fiore companies have been involved in. He does not want to do business with those sorts of companies."

When pressed, Raimi said he was unsure if the companies did anything illegal or if they pose a risk to taxpayers.

Joan Fiore's attorney David Fraser then asked why the city wasn't going after Soave, and Raimi claims he hasn't "heard of that name" and knew nothing of flights and gifts that Soave gave Kilpatrick, despite numerous media coverage at the time.

But when asked whether it would be a problem to let Soave work with the city in light of the misdeeds, Raimi admitted, "It probably would be a problem."

Fraser asked, "Has the Mayor announced a general campaign against bribery or is it a campaign against cleaning up anybody associated with Mr. Gasper Fiore?"

Ramie responded, "You have to ask the Mayor about his political statements. I'm just telling you what he told me" about the Fiores.

Raimi also had trouble justifying why the city would debar companies with tenuous, past ties to Gasper Fiore.

Duggan's office suggested that Soave's misdeeds don't rise to the level of debarment.

"Those issues with Soave occurred long before this administration (separated by two mayors and one emergency manager)," Roach told Muckraker. "We are not aware of any more recent or current complaint. Fiore, however, has been sentenced to prison after being convicted of bribing an official in this administration."

Another close friend of Duggan's, Dennis Archer Jr., who receives contracts from the city, is under an FBI investigation for allegedly giving Councilman Gabe Leland money for help acquiring property, according to depositions in a separate case.

Fraser told *Motor City Muckraker* that the debarments of the towers raise serious questions about fairness and favoritism.

"They are running the best dog and pony show without a dog and pony," Fraser said.

Duggan's fight with the towers is expected to cost taxpayers in excess of $2 million, according to city documents.

It's also unlikely that the city will prevail in court because most debarments rarely last longer than three years. According to state and federal law, debarment is a last measure after all other remedies are exhausted.

In the case of the towers, the city never tried to work out a deal to ensure taxpayers aren't at risk. Courts often throw out debarments if they are considered arbitrary, capricious or an abuse of discretion.

Local and federal debarment rules require authorities to determine whether the companies are still a risk and have taken the proper steps in correcting problems. In those cases, the failure to consider mitigating factors provides a basis to challenge the debarment as arbitrary.

Many municipalities work with contractors to make the appropriate changes to reduce the debarment period. And some cities will reach a "coordinated settlement."

Detroit did none of that.

In fact, before the debarments began, the city misled elected officials and the public, violated ordinances and placed taxpayers at risk by hastily entering the towing business in September. The move enraged city council members, who were never told it was happening. The council placed towing contracts on hold while they investigate the role Duggan's administration played in secretly plotting to take over towing.

It all took place behind closed doors between Duggan, Police Chief James Craig and the mayor's allies on the Board of Commissioners, which is supposed to serve as an independent watchdog for the public, not the mayor.

"This whole thing stinks and is as dirty as Flint's water," Police Commissioner Willie Burton told *Motor City Muckraker.* "The chair of the commission has been meeting with the mayor and police chief and not reporting back to the commission."

One councilman told *Motor City Muckraker* on condition of anonymity that it appears Duggan wants to give more business to Soave. The council is investigating.

Just two days after *Muckraker* exposed the brewing towing scandal in October, Conrad Mallett Jr., a longtime political ally of Duggan, abruptly resigned from the Board of Police Commissioners.

Mallet, the former campaign chairman of Duggan's mayoral campaign in 2012 and 2013, took the unusual position of removing police oversight over towing.

With less than a day's notice on Sept. 20, the commission voted 7-2 to allow the police department to take over up to half of the towing operations, a move that puts the cash-strapped police department at risk of losing money.

"The City is operating two illegal enterprises: a towing company whose trucks fail to comply with state law; and multiple impound facilities that violate the Zoning ordinance, and complementary ordinance that authorizes the Chief to establish pounds," according to a lawsuit filed by Detroit Auto Recovery.

The city's history with towing is abysmal and places taxpayers at risk.

The city stopped paying rent on an impound lot where more than 1,000 cars were stored as evidence for crimes. The business that owns the lot, Realty Company, evicted the city, but police failed to retrieve the cars, potentially jeopardizing evidence in criminal cases.

*Motor City Muckraker is an independent watchdog without advertisements. Your donations help us continue providing vigorous, nonpartisan investigations.*

🏷 anthony soave, Board of Police Commissioners, City hall, joan fiore, mayor duggan, scam, towing

*How Duggan created a costly towing scandal that helps a Kwame crony added by* **Steve Neavling** *on November 29, 2018*

**View all posts by Steve Neavling →**



## Steve Neavling

Steve Neavling lives and works in Detroit as an investigative journalist. His stories have uncovered corruption, led to arrests and reforms and prompted FBI investigations.



**4 Comments**   Motor City Muckraker                                    Login

♡ Recommend      Tweet      f Share                                 Sort by Best



Join the discussion...

?? SIGN UP WITH DISQUS

Name

---

**montkathy** · 4 months ago
This is infuriating and obviously corrupt!!!
· Reply · Share ›

**Donald E. Hodge** · 4 months ago
This Mayor is no different then the evil corrupting Mayors before him. Just look at who is benefiting from his time in office. Is it you? Is your life and your family's better. Is our EMS, Fire and Police Departments better? Our School system's All of us need to demand more from Downtown. When Law Enforcement. officials Break the law, there is no law and the Mayor is an official of the Law Enforcement. Most of us agree that there is nothing that Stinks more then the smell of crooked Politicians. Ask questions, Demand more! Drag this Asshole into the Light. Expose him. It's the only way.
· Reply · Share ›

   **Bob Johnson** → Donald E. Hodge · 3 months ago
   You need a fix junkie.
   · Reply · Share ›

**Steve** · 1 month ago
When it's all said and done, this money issue is going to be worst than "y'alls boy". Just keep track of it and see what media outlet is going to be first to say it.
· Reply · Share ›

---

ALSO ON **MOTOR CITY MUCKRAKER**

**Abdul El-Sayed, 17 others sentenced for 'disorderly conduct' during Detroit protest**
2 comments • 4 months ago
   BloggerDave — Many argue that other skilled professions don't make $15 so why should unskilled workers. Comparisons like this …

**Flint water insult, state Dem boss out, anti-Semite gets house arrest: …**
1 comment • 4 months ago
   Rich Gibson — Great job as usual, Steve. Much appreciated.

**Detroit police chief looks for revenge after fire union boss blows whistle**
4 comments • 4 months ago
   Bob Johnson — The majority of crime in detroit goes unreported, because it is well known nothing will happen, no one gets …

**Really, Nolan Finley? DPD union prez ousted, murder of transgender woman: …**
3 comments • 4 months ago
   drbpor — Finley is a hack

Subscribe   Add Disqus to your siteAdd DisqusAdd   Disqus' Privacy PolicyPrivacy PolicyPrivacy

# City council accuses Detroit police of plotting towing takeover

<u>George Hunter and Christine Ferretti</u>, The Detroit News   Published 6:17 p.m. ET Sept. 26, 2018 | Updated 11:40 a.m. ET Sept. 27, 2018



Detroit City Council members are accusing Detroit police of plotting behind their backs to take over the city's towing operations — an allegation the police chief disputes.

The Detroit Board of Police Commissioners <u>last week passed a resolution 7-2 (/story/news/local/detroit-city/2018/09/20/detroit-police-take-over-part-city-towing-operations/1367990002/)</u>allowing Detroit Police to provide towing service. The board will have oversight of the towing process.

*(Photo: Detroit News file)*

The department purchased six tow trucks at $575,000 from its fleet budget, and allocated four city-owned lots where impounded vehicles will be stored, Detroit Police officials told the commissioners at Thursday's meeting. The six trucks will join three other trucks already used by the police department.

During a contentious Monday meeting of the City Council's Public Health and Safety Committee, members lambasted police officials, claiming they secretly planned to take over the towing operation without informing the council.

"When we sat here and DPD did your complete and total presentation of your budget, not one time was it mentioned about DPD doing towing, switching into towing, looking at a tow trucks ... none of that was mentioned, ever," Councilwoman Janeé Ayers told Deputy Chief David LeValley, Deputy Chief Todd Bettison, and Trisha Stein, the police department's director of administrative operations.

Stein replied: "I don't understand why (the tow truck purchase) wasn't included (in budget talks). I know in our fleet replacement plan ... we had tow trucks. They were approved; they were part of our plan."

Ayers told Stein that she was being "continuously disingenuous" about the issue and asked Stein why she didn't come to the council table to discuss it.

"Take some ownership and responsibility about it," Ayers said during the Monday session. "You dropped the ball and you want me to pick it up. I have the right mind to kick it down the field. That's how I feel right now because it's not fair."

On Wednesday, Detroit Police Chief James Craig told The Detroit News that the decision to take over part of the towing operation — an option officials had been exploring since last fall — was made in large part because of rampant towing problems that go back years, including lawsuits, federal corruption probes and allegations of cronyism.

"It's no secret we've had towing challenges that predate me, as evidenced by indictments by the FBI," Craig said. "A year ago, we started looking at what we could do differently. That's not a criticism of every tow company, because some of them do a good job. But we wanted to look at best practices and replicate them."

The police towing operation is already under way, he said.

"We started towing over the weekend," Craig said. "We're still in training mode, but our trucks are deployed and we're towing."

The department plans to hire 15 civilians to drive the trucks and run the impound lots. Drivers will be required to hold a commercial driver's license.

Among the changes with the police taking over towing: Citizens whose vehicles are towed will be able to petition the police board for a hardship waiver if they can't afford towing and storage fees. The department also will stop the longstanding practice by tow companies of accepting cash only.

Police officials told the board last week the department will likely handle from 30 to 50 percent of the city's tows. The police trucks will get priority for tows, and if there are more jobs than they can handle, the contracted private towers would pick them up.

During Monday's committee meeting, Councilman Scott Benson argued the move will hurt private towers.

"I do not want to be a part of closing down businesses and taking food out of people's mouths because we want to inject ourselves in that situation," Benson said. "Now, the city of Detroit should have the ability to do tows. We should be a safety valve; if they can't get the tow done, we should be the tow company of last resort. We should not be the first tow company. And at 30 to 50 percent, we're looking at taking possibly half of all tows in-house. So I'm concerned about that."

Ayers suggested the department rushed to start towing before a new law kicks in Oct. 1 preventing municipalities from getting into the towing business.

"What I want to know ... is who made the arbitrary decision that we're going to get into the tow business and then make it come and be pushed down everybody's throat?" Ayers asked. "Because you have a deadline you have to meet in order to be grandfathered in."

Craig told The Detroit News on Wednesday that officials began exploring the idea of taking over part of the city's towing operations in September 2017.

"If we had just started thinking about it because of this new law, I don't think we could've done it," he said. "There wasn't enough time. But we were already down the road with it, and we didn't even know such a law was being introduced."

Craig said word of the department's plans likely leaked out to the "towing lobby," which worked to get the law passed. He also denied trying to keep the department's plans from the city council.

 "I wouldn't agree with that characterization that we did this in secret, although there are a lot of initiatives we launch which we don't as a matter of routine discuss with everyone," he said. "We were in the research phase of this. But we have had ongoing talks with the mayor's office and the chairman of the board (Willie Bell)."

Bell said there have been ongoing talks with the mayor and police chief about towing issues, although he said he only recently found out for certain the police planned to take over towing.

"There was some indication of it, but I didn't get confirmation until just prior to (Thursday's vote)," Bell said.

Craig said he told Bell six months ago during meetings with Mayor Mike Duggan that the police department planned on going into the towing business. "Maybe I didn't give him an exact date, but we talked about it," he said.

Craig said police officials looked at 23 cities, and found 21 of them towed vehicles.

"What did we do wrong? We can tow; is that a bad thing for the city? We're going to evaluate the effectiveness and see if it's going to generate revenue for the city," Craig said.

Detroit Chief Operating Officer Dave Massaron said in a statement provided Wednesday to The News that every aspect of the towing change went through the necessary approvals.

"This change was necessary to bring order and consistency to an important city function that has been badly broken for years. With DPD in charge of all aspects of towing and impound, the public at last will have a professional and uniform system and uniform fees. Individuals whose vehicles have been towed and impounded also will have, for the first time, the ability to have some fees waived if they are able to demonstrate financial need."

After last week's board meeting, Craig promised to meet with private towers to discuss how to coexist with them. The first meeting was held Wednesday.

Craig said the department is committed to sitting down with towers monthly for the next few months "so communication is open."

Julie Semma, owner of Seven D's Towing, was one of 16 tow company representatives to meet Wednesday with Craig.

"We all discussed our issues, and the chief said he'll have an open dialogue with us," she said. "Our main concern is not being put out of business, and I commend the chief for allowing us to have this meeting. There's a way we can grow and do business with each other, and the chief seemed to agree with that."

ghunter@detroitnews.com
(313) 222-2134
Twitter: @GeorgeHunter_DN

Read or Share this story: https://detne.ws/2N76TMq

Susan Dixson

5/4/2018 6:22 PM

WAYNE COUNTY CLERK

Cathy M. Garrett

FILED IN MY OFFICE

17-010371-AW

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3  United States of America,

4              Plaintiff,
                           Case No. 17-20662
5    -v-

6  Celia Washington,

7              Defendant.
  _____/
8                PLEA HEARING
9
      BEFORE THE HONORABLE DAVID M. LAWSON
10         United States District Judge
    Theodore Levin United States Courthouse
11      231 West Lafayette Boulevard
          Detroit, Michigan
12          January 2, 2018

13  APPEARANCES:

14  FOR THE PLAINTIFF:   MICHAEL BULLOTTA
                    DAVID GARDEY
15                 United States Attorney's Office
                 211 West Fort Street, Suite 2001
16                Detroit, Michigan  48226

17  FOR THE DEFENDANT:   ARNOLD E. REED
                    PAMELA RICE
18                 Arnold E. Reed & Associates
                 17515 West Nine Mile Road, Suite 425
19                Southfield, Michigan  48075

20

21

22

23

24      To Obtain a Certified Transcript Contact:
      Rene L. Twedt, CSR-2907, CRR, RMR, RDR
25         www.transcriptorders.com

Plea Hearing - January 2, 2018                                    2

1                       <u>TABLE OF CONTENTS</u>

2       <u>MATTER</u>                                        <u>PAGE</u>

3       PLEA HEARING............................................   3

4       CERTIFICATE OF COURT REPORTER..........................  49

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    Detroit, Michigan

2    January 2, 2018

3    10:17 a.m.

4                        *       *       *

5              THE CLERK:  All rise.  The United States District

6    Court for the Eastern District of Michigan is now in session.

7    The Honorable David M. Lawson presiding.

8              THE COURT:  You may be seated.

9              THE CLERK:  Now calling the case of the United States

10   of America versus Celia Washington, Case Number 17-20662.

11             THE COURT:  Good morning, counsel.  Would you put

12   your appearances on the record, please.

13             MR. BULLOTTA:  Good morning, your Honor.  Michael

14   Bullotta for the United States.

15             MR. GARDEY:  Good morning, your Honor.  David Gardey

16   on behalf of the United States.

17             MR. REED:  Good morning, your Honor.  Arnold Reed on

18   behalf of Ms. Washington.

19             MS. RICE:  Good morning, your Honor.  Pamela Rice

20   appearing on behalf of Ms. Washington.

21             THE COURT:  All right.  Good morning, Ms. Washington.

22             THE DEFENDANT:  Good morning, your Honor.

23             THE COURT:  The matter is before the Court for a

24   hearing.  I understand that the parties have reached an

25   agreement and have submitted the Court -- to the Court a
```

Susan Dixson   5/4/2018 6:22 PM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   17-010371-AW

1   Rule 11 agreement or a plea agreement under Rule 11 of the

2   Federal Rules of Criminal Procedure.

3          Before we address that, however, I believe there's

4   date discrepancies that the government wishes to address with

5   a motion, is that correct, Mr. Bullotta?

6          MR. BULLOTTA: Yes, your Honor.  The government would

7   make a motion to amend the indictment to expand the time frame

8   to include 2015.

9          So it would be on page 3 of the indictment under

10  Count 1.  It should state from "in or about February 2015"

11  instead of 2016, to encompass the year 2015.

12         And then on page 4 of the indictment, under overt

13  acts, overt acts one and two, we would change that to "in or

14  about February of 2015" as opposed to 2016.

15         THE COURT:  All right.  Do you have any objection,

16  Mr. Reed?

17         MR. REED:  None whatsoever, your Honor.

18         THE COURT:  Ms. Washington, do you understand that

19  even though this is a relatively minor correction to the

20  indictment, you have a right to go back, to have the

21  government go back to the Grand Jury and issue a superseding

22  indictment.  Do you understand that?

23         THE DEFENDANT:  I do, your Honor.

24         THE COURT:  And did you wish to waive that right so

25  we can proceed today?

UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN

NATIONWIDE RECOVERY, INC.,          Case No. 4:17-cv-12378
                                    Hon. Linda V. Parker
      Plaintiff,                 Mag. Jdg. Stephanie Dawkins Davis

vs.

CITY OF DETROIT,

      Defendant.

---

### AFFIDAVIT OF SAM HUSSEIN

Hussein Hussein (a/k/a Sam Hussein) states:

1.     My name is Hussein Hussein and I am also known as Sam Hussein. I acquired a majority interest in Nationwide Recovery in early 2016. While I am the majority owner, I do not have much involvement in the day-to-day affairs. My brother, Louay Hussein, runs Nationwide's operations.

2.     Since 2009, my primary occupation and source of income has been as the owner and President of Metrotech Auto Sales, LLC ("Metrotech"), which is a licensed motor vehicle repair facility. The overwhelming majority of my business is repairing motor vehicles. Metrotech is located just off of Michigan Avenue in Corktown. It is the largest repair facility in the downtown Detroit area and we repair more than 1,000 vehicles per year. Detroit residents and people that work downtown dominate my customer base.

1

# EXHIBIT C

3.    After the Detroit Police Department relocated its headquarters to the former MGM Casino, I noticed an increase in the number of police officers that frequented Metrotech for vehicle repairs. I attribute this to the DPD's Headquarters being practically next door to Metrotech.

4.    I first met Assistant Chief James White Jr. ("AC White") in late summer 2015 at an announcement for the launch of DPD's Neighborhood Police Officer Program.[1] The Program aims to improve neighborhoods through having police officers drive scout cars home. Earlier that year, Metrotech donated labor and parts to repair old scout cars in DPD's fleet for use through this program. (Ex. ____, Chief's Community Recognition Award dated 5/7/2015); *See* Gus Burns, *Detroit Giving Lemon Police Cars New Life*, MLive (September 2, 2015).[2]

5.    Since meeting AC White in 2015 we have had frequent conversations on the phone and via text message. I consider him to be a friend.

6.    On July 19, 2017, the City suspended Nationwide Recovery's towing permit and removed us from the list of towing companies. Nationwide never received written notification of the reasons or an opportunity for a hearing prior to or after this action.

7.    On July 24, 2017, Nationwide filed this lawsuit.

---

[1] http://www.detroitmi.gov/How-Do-I/Neighborhood-Police-Officer-NPO-program
[2] http://www.mlive.com/news/detroit/index.ssf/2015/09/detroit_giving_lemon_police_ca.html

2

# EXHIBIT C

8.     On August 10, 2017, at 5:44 PM, I received a text message from AC White stating "Disposition forthcoming."

Thu, Aug 10, 5:44 PM

Disposition forthcoming.

In a subsequent conversation, AC White told me that the City's Law Department had stopped him from presenting the findings of his investigation at the Board of Police Commissioners' Community Meeting that evening.

9.     On August 20, 2017, I inquired with AC White as to the status of the investigation and when he would present his findings to the Board. AC White responded that once the City's lawyers got involved his "investigation became inconsequential."

Good morning Sam, hey man let me say once again I'm sorry about all this. I got a number of complaints that I investigated. I followed the rules in the protocol for that investigation. I just want you to know from a friend standpoint that I never targeted you or your brother's company. I think you're a stand-up guy Sam and you've always been straight with me. You've helped the department you've helped the city this was not personal. Unfortunately once the lawyers got involved it got out of my hands and my investigation became inconsequential. After this is resolved I hope we can have a

3

# EXHIBIT C

10.     On September 11, 2017, in response to my inquiry, AC White told me

that this lawsuit took his investigation "out of DPD's hands [but the] truth is the

truth."

> (1/3)  Sam.This lawsuit has
> gotten so serious that I am
> under direct orders not to
> speak about it. I am sorry "we"
> you and me are being dragged.
> Allegations are
>
> (2/3)  being made about me
> too. The truth will come out.
> Hanng in there jusr know that I
> will always speak the truth and
> never lie. The lawsuit took it out
> of D
>
> (3/3) PD's hands butbthey
> truth is the truth.

11.     AC White told me that the investigation into Nationwide Recovery

that he referenced at the July 20, 2017, Board of Police Commissioners has

concluded. However, he has never told me the findings or outcome of that

investigation. He indicated that my lawyer would have to go through the City's

lawyers to get that information.

12.     My life hasn't been the same since the City retaliated against me for

filing this lawsuit.

13.     I make this affidavit based on my personal knowledge and if called as

a witness, I can competently testify to the facts that I state in this Affidavit.

4

# EXHIBIT C

I declare under penalty of perjury that the foregoing is true and correct.
Executed on November 13, 2018.

/s/ _____

Hussein Hussein (a/k/a Sam Hussein)

# EXHIBIT C

**EXHIBIT 14**

Sentencing Hearing - April 18, 2018                                      38

1      process would have gone a lot smoother.

2                THE COURT:  Well, it sounds to me as if the factual

3      basis for paragraph 31 depends entirely on the credibility of

4      Mr. Fiore; fair?

5                MR. BULLOTTA:  Yes.

6                THE COURT:  All right.  And he, of course, engaged

7      in other conduct for which he is being investigated and

8      prosecuted, I assume; correct?

9                MR. BULLOTTA:  Yes.

10               THE COURT:  And the circumstances may or may not

11     support his credibility with respect to this statement that he

12     made, but without any independent evidence, I don't find that

13     this allegation is established by a preponderance of the

14     evidence, so I'll sustain that objection.  Objection number

15     four is sustained.

16               I don't believe that the -- that there are any

17     further objections; correct, Mr. Reed?

18               MR. REED:  That's correct, your Honor.

19               THE COURT:  All right.  So allocution by the

20     government?

21               MR. BULLOTTA:  Yes, your Honor.  Thank you.

22               The defendant Ms. Washington was the Deputy Civilian

23     Chief of Police of the City of Detroit.  That puts her at

24     either the fourth or the fifth highest ranking official.  And

25     as such, the City of Detroit and its citizens were right to

Susan Dixson   5/4/2018 6:22 PM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   17-010371-AW

**EXHIBIT 15**

Available upon Request



CITY OF DETROIT
LAW DEPARTMENT

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 500
DETROIT, MICHIGAN 48226-3535
PHONE 313•224•4550
FAX 313•224•5505
WWW.DETROITMI.GOV

March 31, 2014

TO:        Honorable Detroit City Council

FROM:     James Edwards
             Senior Assistant Corporation Counsel

DATE:     March 31, 2014

**Re:        Opinion Regarding Abandoned Vehicle Towing Issues**

At a meeting of the Public Health and Safety Committee of the Detroit City Council ("Council") on March 3, 2014 the Council requested responses to questions that were later forwarded to the Office of the City of Detroit Corporation Counsel by Mr. David Whitaker, Director of the Council's Legislative Policy Division.

The questions posed by the Council arose in connection with its consideration of approval of certain proposed vehicle towing contracts as requested by the City's Municipal Parking Department ("MPD"). MPD desires to enter into these contracts to utilize one or more City owned vehicle impound lots as destinations for abandoned vehicles that are removed from City streets and other City locations by private towing contractors at the City's request. The questions are listed below along with, in each case, a response from the City Law Department on behalf of the Corporation Counsel.

1. **What is the legal status of the 5-year "permits" that the police authorized towers were granted pursuant to the procedural rules established by the Board of Police Commissioners, particularly where the "permits" set forth contractual arrangements between the City and the towers through a procedure that doesn't allow for traditional City approvals, including the approval of the City Council pursuant to Sec. 4-122 of the Charter?**

Response:

First, we must clarify that the City has issued the Police Authorized Towers permits and not contracts. We have reviewed the permits and have found no contractual arrangements in them. The general legal definition of a permit is "a certificate evidencing permission; a license." See <u>Black's Law Dictionary</u>, p. 1160, Seventh Edition, edited by Bryan A. Garner (1999). A license is defined as a "revocable



permission to commit some act that would otherwise be unlawful...." See <u>Black's Law Dictionary</u>, supra, p. 931.

Consistent with these definitions, with the Police Authorized Tower permit, the City has merely given to the towers permission to have their names entered onto a list to tow abandoned vehicles or other vehicles and then only when called on to do so by the Detroit Police Department. These permits were issued pursuant to a process under which each applicant had to demonstrate that it fulfilled the qualifications required by the ordinance and the rules. There was no competition for the issuance of the permits as generally would have been required for the issuance of a contract pursuant to the requirements of the City Purchasing Ordinance.

Upon reviewing the recent history of the permits, we find that the permits were issued by the City under rules adopted by the Board of Police Commissioners on December 15, 2010 (see attachment A). During 2011, on various dates, permits were issued under these rules to approximately 27 police authorized towers. The rules state that, "a permit granted pursuant to these rules shall be valid for a period of 5 years from the date of issuance." In general, these permits remain valid until the date in 2016 when each one would expire. The rules further require that during the period of one year prior to expiration, a permit holder may make an application for renewal. So, in summary, each permit granted during 2011, could remain valid until that date in 2016 when that permit expires as a result of having been in effect for 5 years. Consequently, the Police Authorized Towers are authorized to participate in the towing of vehicles during the term of their particular permit, and not more, at the City's discretion.

The permits allow those who hold them to participate in the police authorized towing program and to be paid fixed rates as specified under a procedure established by ordinance. The towers made no payment to the City in order to be included among Police Authorized Towers. Under these circumstances it is clear that the permits are not contractual in nature, but rather are an exercise of the City's authority to form a list of qualified police towers as prescribed by Chapter 55 of the Detroit City Code (See Detroit City Code of 1984, Section 55-15-8(a). While the towers have no contractual right to tow abandoned vehicles resulting from the Police Authorized Tower permit it is also true that the City remains free to enter into a contractual arrangement with them regarding the towing of abandoned vehicles as it proposes to do pursuant to the agreements that are now before the Council for approval.

A further indication that the Police Authorized Tower permit is not a contract is the fact that the Police Authorized Tower permits were neither approved as contracts by the City Law Department nor by the Council, as would be required for a valid and enforceable contract to exist in accordance with Sections 4-122 and 7.5-206 of the 2012 Detroit City Charter.

Michigan law distinguishes permits and licenses, such as the Police Authorized Tower permits, from contracts, as can be seen in the case of <u>Midwest Teen Centers v City of</u>



Roseville, 316 Mich App 627 (1971). In Midwest Teen Centers, the Michigan Court of Appeals indicated that even a wrongful revocation of a license does not result in monetary damages being awarded to the person whose license was revoked since such a license is not contractual. This ruling supports the conclusion that Police Authorized Tower license or permit granted by the City is not a contract and that towers designated as Police Authorized Towers have not acquired any vested or property rights as a result of the permit though they may have a right to a hearing if the permit were to be revoked. In this case however, rather than revoking the towing permits, the City has acted to increase the rate which the towers will be paid for towing abandoned vehicles at the City's request. Since the City is not revoking any towing permits at this time, the towers would appear to have no legal basis for recourse in the courts.

Based on the above discussion, it is our opinion that Police Authorized Tower permits are currently valid and serve to allow the towers to participate in the towing program at the request of the Detroit Police Department. The permits provide procedures to follow when such participation is requested by the DPD. However, these procedures do not grant any contractual rights to the towers. See Midwest Teen Centers, supra.

**2. If the ABAN contracts are approved, will the non-ABAN towing companies with "permits" have a legally cognizable basis to sue the City?**

Response:

While no one can predict the outcome of any litigation, we believe that the probability of ABAN towing companies having a legally cognizable basis to sue the City is low. First of all, as a condition of holding a Police Authorized Tower permit, each permit holder has agreed to hold harmless and indemnify the City and has entered into a covenant not to sue the City. Second, as stated in our response to Question 1 above, the permit is not a contract and does not require the City to use the services of Police Authorized Towers to any particular extent. Rather the rules governing the issuance of the permit describe the conditions and procedures to be used by the City in the event that a decision is made by the City to avail itself of the services of a Police Authorized Tower. In short, the City is not required to call a Police Authorized Tower to provide even one tow of an abandoned vehicle during the term of the permit. Thus, there could be no legal reliance on an expectation of even one tow, or any profit resulting from a tow, during the term of the Police Authorized Tower permit.

In support of the above analysis, the Police Authorized Tower rules specify that "[a]s a condition of its selection for a towing permit each Police Authorized Tower acknowledges that holding such a permit is not a guarantee that any particular number of tows will be assigned to it and agrees that neither it nor any person under its control or who acts as an agent for it will initiate any action against the City based on a claim that it has failed to receive any particular number or share of tows."



Under these circumstances it seems unlikely to the Law Department that a Police Authorized Tower would have an interest arising out the permit that would allow the tower to successfully litigate and impose liability on the City as a result of the City's decision to enter into contracts with towers for the towing of abandoned vehicles.

3. **What are the general strengths and weaknesses of the City's position in such a lawsuit and the likelihood of success?**

Response:

See the response to Item 2 above. Beyond these comments it would not be advisable to expand on what might be strengths and weaknesses in the City's position.

4. **To what extent would the rejection of offered contracts by the non-ABAN towing companies with "permits" impact the answer to Question 3?**

Response:

See the response to Question 3 above.

5. **In the absence of PA 436, how can the City justify its departure from the process set forth in Chapter 55 of the City Code as well as the requirements of the Board of Police Commissioners and Chief of Police? How does the presence of an Emergency manager shift this analysis?**

Response:

The City's position with regard to the pending contracts does not depend on the provisions of 2012 PA 436. The proposed contracts have been initiated at the request of the Municipal Parking Division and the Police Department by a procedure analogous to the requirements of the purchasing ordinance. We are advised that all of the current Police Authorized Towers were afforded the opportunity to enter into towing contracts with MPD. None were excluded. While these contracts must be approved by the Emergency Manager under the terms of Emergency Manager Order No. 3, their validity does not depend on the extraordinary powers granted to an Emergency Manager in Public Act 436.

To assist the council further in its consideration of these questions and bearing in mind that membership of the Council has changed following the recent elections, we also attach to this opinion copies of additional opinions that were drafted by the Law Department to respond to similar questions in September and October of 2012 (See attachment B) as well as Interim Police Chief Chester L. Logan's letter to the Board of Police Commissioners dated December 20th, 2012 (attachment C). These materials address the question of the authority of the Chief of Police to designate and utilize an impoundment facility operated by the Municipal Parking Department and point out that

{G:\DOCS\CONTRACT\EDW.A.J\A32000\OPINION\JE2879.DOC}



such utilization is already authorized by ordinance and requires no further approval of the City Council or the Board of Police Commissioners.

Respectfully submitted

James M. Edwards
Senior Assistant Corporation Counsel

Approved:

Melvin B. Hollowell
Corporation Counsel

Ex. E

## AFFIDAVIT OF ADELA RIVERA

State of Michigan)
           )ss
County of  Wayne)

      I, Adela Rivera, swear and affirm that if called upon to testify, I will testify to the following including but not limited to:

1.      I was on the Board of Police Commissioners, during the tenure of Celia Banks Washington who served as Legal Advisor to the Board of Police Commissioners and subsequently was promoted to Deputy Police Chief in 2014.

2.      That Celia Banks Washington, did not come up with the idea to change from Contracts to Tow Permits. She had no authority or input in this decision. This idea originated from the Office of The Corporation Counsel and their employees. In fact, no one on the Board of Police Commissioners was responsible for changing from Contracts to Towing Permits.

3.      That when Corporation Counsel recommended that permits be issued instead of contracts, it was a collaborative effort of the Police Authorized Towing Task Force to adopt the Law Department's recommendation. Police Authorized Towing Task Force included, but not limited to, The Mayor's Office, The City of Detroit Law Department, Chief of Police, City Council, Auditor General and the Research and Analysis Division of the City Council and other entities and individuals.

4.      That Celia Banks Washington was not able to change or set rotations for any towing company. The way the rules were designed, this would be impossible for her to do, changing rotations was the responsibility of Resource Management which Ms. Washington was not a part of.

5.      That Celia Banks Washington, could not and had no power to assist towers with obtaining Permits and/or placing them in the Towing Rotations Order.

      Further Affiant saith not.

Dated: October 27, 2017

_Adela Rivera_
Adela Rivera

GLORIA A. TRUSS
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jul 7, 2022
ACTING IN COUNTY OF Oakland

Subscribed and sworn before me this 27th day of October 2017.
Notary Public _____
My Commission Expires _July 7 2022_
_Wayne County acting in Oakland_

COUNTT OF _Oakland_

**EXHIBIT 17**

Transcript of wiretap conversation protected by court order.

Transcript of wiretap conversation protected
by court order



 ‖ Sprint 🛜                7:50 PM                ↗ ⁎ 15% 🔋

**Done**              **4 of 4**

 ‖ Sprint 🛜 ⁎               7:48 PM               ↗ ⁎ 15% 🔋

 ⟨               **October 17, 2017**               Edit
                      1:09 PM

| All Mailboxes | Current Mailbox |

● **CLE Director, Rossdale CLE**    8/29/17  ›
        Mastering LLC Formations, Choice of E...
    If you are having trouble viewing this email,
    click here. Mastering LLC Formations, Choic...

● **Celia Banks Washington**    7/23/17  ›
    No Subject
    Excellent. Here is my issue to share with him: I
    was invited in to speak with them under fals...

*UNREAD*  ● **Jennifer Fiore**    5/9/16  ›
        please review
    Good afternoon, Currently, the following
    companies occupy the following precincts t...

    **EstateSales.NET**    10/18/14  ›
        Estate Sales Near Birmingham, MI

● **EstateSales.NÉT**    10/17/14
        Estate Sales Near Birmingham, MI

               

**EXHIBIT 20**

Transcript of wiretap conversation
protected by court order.

EXHIBIT 21

2-22-17

Nick Buchana

586 - 491 - 3372

Regarding 7800 Dix

DC Banks Washington

Mr. Buchana is the

Landlord of 7800 Dix,

and AC White wanted

you to telephone him.

| | |
|---|---|
| 9/7/15 | Called into meeting with AC White and his staff (Hollins, Miles, etc.) re 2121 Fort Street |

- City's position was to eliminate leases
- City owned property at Mt. Elliott (preferred location - $150,000 to renovate for car storage office space)
- White was willing to walk away from 2121 and 7800 Dix
- **White asked me to get with Gasper and/or his attorney (Nick Bachand) to negotiate a 2 year renewal with 3 year option)**

| | |
|---|---|
| 1/6/16 | Called into a meeting with AC White, Myers and Stokes re officers using private non police authorized tow companies for ABAN tows. |

- Myers advised that he was aware of a pending IA investigation of 2 officers (insurance fraud)
- White approved Ewing "re-flashing" teletype admonishing officers to refrain from this practice.

| | |
|---|---|
| 1/19/16 | AC White requested that I speak with Gasper and his attorney (Nick Bachand) re status of lease renewal at 2121 Fort Street, as well as unpaid ($10,517) invoices (Jan 16, 2014 – January 2016). |
| 2/22/16 | Directed to follow-up re 1/19/16 inquiry. |
| 2/25/16 | Called into a meeting with AC White, Don Hollins, Johnny Thomas, Octavius Miles and Brian Mounsey re 2121 Fort Street and 7800 Dix properties.  $45,000/mo each |

- Discussed necessary buildout of Mt. Elliott and Grinnell (est cost $3-4 million)
- White was advised that it would take a couple years to complete
- White directed his staff to prepare a Cost Business Analysis (Fiore property v city-owned property)
- I was directed to meet with Gasper and/or his attorney re additional space at 2121 Fort Street

| | |
|---|---|
| 2/25/16 | I called a meeting with Commissioners Willie Bell and Lisa Carter, (Linda Bernard joined meeting later) re police authorized towing.  Also present was Kenyatta Myers and Steve Miles.  Myers discussed the selection of towers, status of the application process, impoundment fees, and tow rate commission. **Handed my police authorized towing file to the BOPC.** |
| 3/2/16 | Called into a meeting with AC White, Chief Investigator Drake, Commissioners Bell and Carter re CATS officers (Robinson and Tonti) and the ABAN vehicle/collision shop complaints.  White and I subsequently met with Chief, who suggested reach out to Attorney General Shute, FBI and US Postal Inspector. |
| 3/11/16 | Councilmember Andre Spivey's birthday party at the Atheneum.  Chief and Executive Staff attended party.  Gasper approached Chief re expired lease and past due rent. **Chief directed Gasper to speak with me.  Gasper mentioned it to me at the party, and I advised that I would have to speak with AC White.  Chief Craig followed up to see if I had talked to Gasper about his concerns.** |

| | |
|---|---|
| 3/16/16 | Follow-up to meeting on 3/2/16. |
| 4/12/16 | Follow-up to 3/2/16 and 3/16/16 meeting -Asked to attend a meeting with Commander Sims (Internal Affairs) and her staff at the FBI office (David Porter) re tow case involving 6 police officers and collision shop (Dabbish and Livernois Collision) employees. |

- Officers approached FBI informants.
- AGs office already involved
- Officers were dealing with tow companies and collision shop

| | |
|---|---|
| 4/22/16 | Myers asked to meet re status of application process.  He advised: |

- 24 existing towers
- 16 had re-applied as of 4/22
- 1 new tower applied (Gosh & Sons) – Per Myers, this tower had too much bad press and lawsuits.
- Nick Bachand was holding B&G, Javion, Gene's, B&T – not yet submitted yet
- Myers advised that follow-up with the remaining existing towers.

| | |
|---|---|
| 5/3/16 | City Council approved lease renewal for 2121 Fort, with additional space and conditions as requested by AC White.  (See attached City Council Agenda d/ 5-3-16) |
| 5/9/16 | AC White asked me to "**get with Gasper**" because the Department needed a room at 2121 Fort Street for firearm testing. |
| 6/22/16 | Met with Lisa Jones (Agency CFO) at her request.  Also present was Sean Stokes (Jones' assistant), Purpose of the meeting was to discuss $10,000 owed to Gene's Towing and the manner in which Gene's had been paid (outside of a contract).  Ms. Jones advised that any contract agreement over 2 years required FRC and council approval.  Follow-up meeting with Purchasing Director was scheduled. |
| 6/24/16 | AC White requested a follow-up meeting.  Boise Jackson and Don Bryant of Purchasing were present, as well as Myers and Lisa Jones.  Boise and Don were advised that the Law Department recommended permits in 2010. (A copy of Edwards' opinion was provided).  $80,000 was owed to Gene's.  Boise proposed that this amount be paid via a "non PO".  But that going forward there would be a 2 year "sole source provider" contract with Gene's.  AC White advised Myers to prepare "Scope of Services" language re Gene's Towing and forward it to Boise Jackson. |
| 7/19/16 | In response to Tara Defoe's call from the Mayor's office, re Parker's request for additional spots, I set up a meeting with Louay Hussein, Jerry Parker, Kenyatta Myers and Greg Hicks (BOPC Secretary).  <u>We advised Louay and Parker that there would be no change to the rotation in light of litigation and lack of BOPC review.</u> |
| 7/20/16 | Chris Ammerman and I met with Marc Deldin re Red's Towing's failure to pay administrative fees before suit filed. |
| 12/13/16 | AC White called me into a meeting with Nick Bachand and Mike Parish and Lisa Jones (CFO) in re: overdue payment to Gene's. |

2/22/17     At AC White's request met with Nick Bachand re expiration of Dix lease.  (See attached handwritten note)  No payment for January or February 2017.  Nick asked that the Dix lease be extended to match up with Fort lease.  Nick received an email from a broker with a lease offer.  Nick countered.  **AC White asked me to contact Nick again to counter ($12,500 w/ repairs, 24 month contract, improvements included).  Nick said that he followed up with AC White re: broker.  White said he shouldn't have to pay a broker.**

EXHIBIT 22

Washington's phone records confirming calls made to and
from Myers, Nick Bauchand (Fiore's attorney), and
Fiore are available upon request.

Exhibit 23

BOARD OF POLICE COMMISSIONER MINUTES AVAILABLE
ON CITY OF DETROIT WEBSITE

Transcript obtained prior to court order.

EXHIBIT 24



GF: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ You think he would do me one more favor?

GF: I think Vince just gotta let the mayor say something to the chief and the chief says something to Celia Washington which is... she is the new lawyer for the chief. I don't know if you know her. She was... used to be a lawyer...

GF: Anyways, she is kind of heading it up and I have been trying to talk to her in a round about way and I think she is telling me no on E&G but but I think I need to go over her head on that issue if the chief says something to her it will be done. I am trying to get it done today because after the meeting today it is going to be too hard to do.

GF: All he would have to do is tell  him You know put in chief's ear to tell Celia the... you know add E&G whatever.

GF: And that would mean a lot to me ok I am going to the dentist for an hour.

6/2/2016:



Transcript of wiretap protected by court order.

EXHIBIT 26

Available upon request.



Phone .ull 3G  8:21 AM  86%

23  TD  (i)

Tara

Text Message
Jul 20, 2016, 6:07 AM

Good morning! This is Celia. Could I possibly get 5-10 minutes on yours and Mr Mayor's calendar today re adding nationwide towing to a precinct? I have a plan, and it's fair.

Nationwide also went to spivey. Mayor needs to know that.

As you know dealing with towers can quickly turn into a political nightmare.

Text Message



New iMessage                    Cancel

To: LOUIE

I just read page three it's
right sorry

I understand it now

Jul 19, 2016, 10:38 AM

3 pm or 3:30 pm today
at headquarters ?

*Meeting per Mayor's Request*

I think 330

Read 7/19/16

Ok see u then

                     

Exhibit 28

WXYZ news report link provided upon request

Exhibit 29

13135965189          Resource MGMT.                                    10:34:34 a.m.     09-10-2015          Attachment 7

TOWING VENDOR APPLICATION FORM                                                Page 2

1. Business can adequately store (how many) _1200_ vehicles.
2. Business operates 7 days, 24 hour service? ☒yes ☐no
3. Hours during which vehicles can be released to vehicle owner. _7 Am_ to _7 PM_
4. Direct radio contact with all trucks? ☒yes ☐no
5. Is proposed storage area fenced? ☒yes ☐no
6. State for which precinct (s) you want to be considered as a complete service tower to tow for in general. _2_, _4_, _3_, _10_
7. Do you wish to tow abandoned vehicles? ☒yes ☐no. If yes, list the police precinct for which you would like to be considered as an abandoned tower. _2 4 3 10_
8. Are you capable of performing heavy duty towing? ☐yes ☐no

### LIST ON-SITE SPECIAL EQUIPMENT TO BE USED FOR HEAVY DUTY TOWING:

1. _FRONT END LOADER_
2. _LOW BOY TRAILER_
3. _GL FREIGHTLINER_
4. _____
5. _____
6. _____

### PROPERTY TAX ON BUSINESS:
(Attach property tax clearance)

1. NAME OF OWNER OF PROPERTY _GANASH GOYENDER_
2. LOT SIZE: _____ ACRE or _____ SQUARE FEET.

## ADDITIONAL OWNERS /EMPLOYEES:

| 1. | | |
|---|---|---|
| (☐ OWNER     ☐ EMPLOYEE) | | (ADDRESS) |
| (PHONE #)          (DOB) | | (MICH. DRIVER'S LIC #) |

| 2. | | |
|---|---|---|
| (☐ OWNER     ☐ EMPLOYEE) | | (ADDRESS) |
| (PHONE #)          (DOB) | | (MICH. DRIVER'S LIC #) |

| 3. | | |
|---|---|---|
| (☐ OWNER     ☐ EMPLOYEE) | | (ADDRESS) |
| (PHONE #)          (DOB) | | (MICH. DRIVER'S LIC #) |

Revised 12/00 L. Stinson

DETROIT POLICE DEPARTMENT
RESOURCE MANAGEMENT
TOW ROTATION
BLIND DRAW SHEET

SOUTHWEST DISTRICT                    12/7/2011

| NO. | TOW CO. NAME | REPRESENTATIVE NAME (PRINT) | SIGNATURE | BALL # |
|-----|--------------|------------------------------|-----------|--------|
| 1 | J&C Recovery | Kevin Bowers | | 1 |
| 2 | City Auto Impound | Billy Wild | | 2 |
| 3 | Detroit Auto Recovery | Dan Dorosenski | | 3 |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |

POSITIONS AVAILABLE

5  J&C Recovery

6  City Auto Impound

DRAWER NAME (PRINT)    Roland Clark

SIGNATURE              Roland Clark

Plea Hearing - January 2, 2018                              19

Susan Dixson    5/4/2018 6:22 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    17-010371-AW

1    in a one-year period either before or after the time of the

2    offense.

3            Do you understand all of those elements?

4            THE DEFENDANT:  Your Honor, I do understand the

5    elements.

6            THE COURT:  All right.  Do you believe if you went to

7    trial the government could prove those elements beyond a

8    reasonable doubt?

9            THE DEFENDANT:  If I may consult with counsel just a

10   moment, please?

11           THE COURT:  Of course.

12     (Discussion held off the record at 10:33 a.m.)

13           THE DEFENDANT:  Thank you for your patience, your

14   Honor.

15           Your Honor, I do understand the elements of the

16   crime.  I have some concern, but I do --

17           THE COURT:  Well, let me restate my question and

18   maybe you could respond to it.

19           THE DEFENDANT:  I'm struggling, your Honor.  I

20   appreciate your patience.

21           THE COURT:  Do you believe if you went to trial the

22   government could prove these elements with the evidence that

23   they have beyond a reasonable doubt?

24           THE DEFENDANT:  I believe that it would be a question

25   for the jury in terms -- but in terms --

Plea Hearing – January 2, 2018

22

17-010371-AW   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/4/2018 6:22 PM   Susan Dixson

1    THE COURT:  Around that time --

2    THE DEFENDANT:  Yes, sir.

3    THE COURT:  -- were you employed?

4    THE DEFENDANT:  Yes, sir, I was.

5    THE COURT:  And what were you doing?

6    THE DEFENDANT:  The City of Detroit Police

7  Department, Civilian Deputy Chief of Police.

8    THE COURT:  All right.  And either before or after

9  that particular period of time you understood the City of

10  Detroit to have received more than $10,000 in federal

11  assistance, is that correct?

12    THE DEFENDANT:  Yes, sir.  I have come to learn that.

13    THE COURT:  Within that one-year window?

14    THE DEFENDANT: I have come to learn that, yes, sir.

15    THE COURT:  All right.  Now, what is it that you did

16  in relation to this charge; that is, what was your position

17  with the City of Detroit then?

18    THE DEFENDANT:  A Civilian Deputy Chief of Police,

19  Legal Advisor.

20    THE COURT:  And what did you do?

21    THE DEFENDANT:  I was responsible for advising the

22  Chief of Police.  I was responsible for policy.  I was

23  responsible for advising different levels of different ranks

24  of officers as to proper protocol, procedure.  Included in

25  that I was called upon with questions as it related to the

1  towing rotation for the City of Detroit for police-authorized

2  towing.

3          THE COURT:  Right.  And what do you understand to

4  be -- the towing rotation to mean?

5          THE DEFENDANT:  The towing rotation is the equitable

6  distribution of tow opportunities to a number of different tow

7  companies on the list.

8          THE COURT:  All right.  So you have an approved list?

9          THE DEFENDANT:  There -- the City --

10         THE COURT:  I mean, the City has an approved list?

11         THE DEFENDANT:  The City has an approved list of

12  authorized towers.

13         THE COURT:  And based upon the workload, and the size

14  of the companies, and their performance and so forth, there is

15  a rotation as to when an assignment comes up, somebody next in

16  line gets the call; is that sort of how it works?

17         THE DEFENDANT:  Yes, your Honor.  Resource

18  Management, that unit is responsible for vetting those

19  companies on the list, if you will, and determining the

20  qualifications, along with the Board of Police Commissioners.

21  I had no involvement in that part of the process.

22         I was called upon with regard to my advice as it

23  related to the rules, your Honor.

24         THE COURT:  All right.  Now, did you come in contact

25  with an individual that paid you some money?

17-010371-AW   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/4/2018 6:22 PM   Susan Dixson

Susan Dixson   5/4/2018 6:22 PM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   17-010371-AW

1          THE DEFENDANT:  I came in contact with an individual

2     who I did borrow some money from, your Honor.

3          THE COURT:  And was that individual an operator of a

4     towing company?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And did that individual pay you some cash?

7          THE DEFENDANT:  That individual gave me an envelope.

8     I didn't know at the time how much was in the envelope.

9          THE COURT:  Well, you knew it was cash?

10          THE DEFENDANT:  But I knew that it was cash.

11          THE COURT:  All right.  And that occurred sometime in

12     early to mid-2015?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  And that occurred -- and that was within

15     the City of Detroit?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  And did you understand that the purpose

18     of that payment over to you, whether you reviewed it as a loan

19     or some other act of kindness, was because that individual

20     sought to influence whatever authority that you might have in

21     determining his place in the towing rotation?

22          THE DEFENDANT:  Your Honor, if I may?

23          THE COURT:  Yeah.

24          THE DEFENDANT:  At the time that I accepted the

25     envelope, that was absolutely not my understanding, but I

Plea Hearing - January 2, 2018

25

1    certainly came to realize it shortly thereafter, that that was

2    his intent.

3         THE COURT:  And I take it you were not in a position

4    to influence that towing rotation?

5         THE DEFENDANT:  Not at all, your Honor.

6         THE COURT:  But he intended to pay you the cash so

7    that -- because he thought that you might have that influence,

8    is that correct?

9         THE DEFENDANT:  That -- that is apparently correct,

10   your Honor.

11        THE COURT:  Well, is it correct or not?

12        THE DEFENDANT:  It is correct.

13        THE COURT:  All right.  Now, a single towing rotation

14   in the City of Detroit can be quite lucrative to the towing

15   company, is that correct?

16        THE DEFENDANT:  It could possibly be.

17        THE COURT:  And is it worth in excess of $5,000 in a

18   calendar year?

19        THE DEFENDANT:  It could possibly be.

20        THE COURT:  All right.  In this case, was it?

21        THE DEFENDANT:  I don't have that firsthand

22   knowledge, your Honor, but I do know that just because a tower

23   has a permit does not guarantee them an amount, so I can't

24   speak to the amount, sir.

25        THE COURT:  Well, they need to work to get the money,

Susan Dixson    5/4/2018 6:22 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    17-010371-AW

Plea Hearing - January 2, 2018                    26

1       right?

2               THE DEFENDANT:  Right, they do.

3               THE COURT:  Which is why they want to come up in the

4       rotation as much as possible.

5               THE DEFENDANT:  My only point, your Honor, is that

6       there are some towers that have a permit that have not made

7       $5,000 in a calendar year.

8               THE COURT:  All right.

9               THE DEFENDANT:  And it's just the nature of the way

10      Resource Management has set up the -- the program.

11              THE COURT:  But would you agree that there are some

12      towing companies that have made in excess of that in the --

13      $5,000 in a calendar year?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  When -- the individual that paid you the

16      money -- who was that individual, by the way?

17              THE DEFENDANT:  That was Gasper Fiori, sir.

18              THE COURT:  Did Mr. Fiori have any prior relationship

19      with you, in terms of prior financial relationship with you?

20              THE DEFENDANT:  Absolutely not, sir.

21              THE COURT:  So this payment of cash that you treated

22      as a loan was not the result of prior financial negotiations

23      or anything?

24              THE DEFENDANT:  Absolutely no conversation ever in

25      the ten years, nine years that I have known him, your Honor.

USA v Washington - 17-20662

Susan Dixson    5/4/2018 6:22 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    17-010371-AW

1    THE COURT:  All right.  And so he paid you cash in an

2    envelope, which ended up to be, what, about $3,000 or $4,000?

3        THE DEFENDANT:  As I understand, yes, sir.

4    THE COURT:  Well --

5    THE DEFENDANT:  Yes, sir.

6    THE COURT:  Did you open the envelope?

7    THE DEFENDANT:  I did eventually, sir.

8    THE COURT:  And then you learned about the amount,

9    right?

10   THE DEFENDANT:  Yes, sir.  That's correct, sir.

11   THE COURT:  And the -- and you agreed to accept that

12   amount from him, correct?

13   THE DEFENDANT:  I agreed to accept the loan with the

14   understanding that it would be paid back, your Honor.

15   THE COURT:  All right.  Did you ever pay it back?

16   THE DEFENDANT:  Your Honor, he would not accept the

17   money when I attempted to pay it back.

18   THE COURT:  And do you know if he enjoyed any

19   advantage as far as the towing rotation was concerned

20   thereafter?

21   THE DEFENDANT:  He did not, sir.  The rotation, as I

22   said, I did not have the authority to tamper with it.  I made

23   it very clear to everyone who asked about the rotation and

24   changing, because we were at the end of a permitting, a

25   five-year permitting period, and everybody was anxious to

1    change their spot.

2              As part of the application process, your Honor,

3    the towers had been asked to prepare a questionnaire which

4    essentially was a wish list, what -- where would you like to

5    tow.  I was not a party to any of that.  I was not a party to

6    accepting the applications or vetting.  And the rotation did

7    not change, your Honor.

8              So the rotation that was approved five years prior

9    by the City Law Department, by the City of Detroit, by the

10   Detroit Police Department, was the same rotation that went

11   into effect in June of 2016.  There was no change.

12             THE COURT:  Did you view your acceptance of the

13   envelope with cash in it to be illegal?

14             THE DEFENDANT:  I did not, sir.  And that's the

15   biggest problem, your Honor.  And I apologize if that's not

16   the right answer.  I knew what I had said so Mr. --

17             THE COURT:  Well, the right answer, Ms. Washington,

18   is what you believe to be the truth.

19             THE DEFENDANT:  And that's -- I absolutely did not

20   know that it was criminal, your Honor.

21             THE COURT:  All right.

22             THE DEFENDANT:  I did not know that it was criminal,

23   your Honor.

24             THE COURT:  Mr. Bullotta, where do we go from here?

25   I don't think a factual basis has been established, do you?

17-010371-AW   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/4/2018 6:22 PM   Susan Dixson

Case 2:17-cr-20662-DML-EAS   ECF No. 49   filed 04/29/19   PageID.938   Page 145 of 208
2:17-cr-20662-DML-EAS   Doc # 32   Filed 01/10/18   Pg 29 of 49   Pg ID 426
Plea Hearing - January 2, 2018                                          29

1       MR. BULLOTTA:  Could I ask some questions?

2       THE COURT:  You can ask me to ask some questions.

3       MR. BULLOTTA:  Can you ask, I would ask the defendant

4   whether or not she knew at the time that she received the

5   money that Mr. Fiori was attempting to influence her, because

6   I think the evidence shows that.

7       THE COURT:  Oh, well, in receiving this money which

8   you characterize as a loan --

9       THE DEFENDANT:  Yes, sir.

10      THE COURT:  -- without any prior financial

11  relationship with Mr. Fiori, and this loan, this money coming

12  out of the blue, did you believe that he was trying to soften

13  the ground a little bit by currying favor with you?

14      THE DEFENDANT:  Your Honor, I came soon to recognize

15  that.  I thought it was a harmless interaction between two

16  people who purported to be friends.  And I can understand

17  Mr. Bullotta and I -- I know now that -- I mean, I'm sorry,

18  I need to direct my comments to you.  I know now that that was

19  the intent.  I know now that that was the intent, your Honor.

20      MR. BULLOTTA:   Can you ask -- can you follow up and

21  ask Ms. Washington whether she proceeded, after she took the

22  money, to have conversations with Mr. Fiori, some of which

23  were captured on a wiretap which she has heard where she gave

24  Mr. Fiori the impression that she was going to help him with

25  his towing rotations?

Susan Dixson   5/4/2018 6:22 PM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   17-010371-AW

Susan Dixson    5/4/2018 6:22 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    17-010371-AW

1    THE COURT:  After you got the money from Mr. Fiori

2    and learned that it was his intent to curry favor and obtain

3    influence through you, did you keep the cash?

4    THE DEFENDANT:  I did, because he would not accept it

5    back, your Honor.

6    THE COURT:  Right.  And did you have any

7    conversations with him in which it might have been suggested

8    that you could help him out?

9    THE DEFENDANT:  Your Honor, I was asked by Officer

10   Kenyatta Myers to reach out to Mr. Fiori, April of 2016,

11   because he had not, along with two other towers, had not yet

12   submitted their application for the permit.  And I did, your

13   Honor, reach out.  And that is the conversation that the

14   Assistant U.S. Attorney is referring to.

15   THE COURT:  And what did you say?

16   THE DEFENDANT:  I said, "Are you going to get your

17   stuff in on time?"  But apparently, my casual conversation

18   started out with something that sounded to the government to

19   be suspect, because I said -- literally, I had just hung up

20   from Kenyatta Myers, and I said -- and I'm sure he has got the

21   transcript there, "Between me and you, are you going to get

22   your application in on time?"

23   Kenyatta Myers had called -- there were three towers,

24   three tow companies.  As a matter of courtesy to those

25   companies who had been on the list, it was a follow-up call.

Plea Hearing - January 2, 2018                              31

1    We had made a number of calls to Mr. Fiori's attorney, to Nick

2    Bachand, and he had not answered the phone.  Kenyatta Myers

3    called me and asked me to -- would I please reach out and try,

4    because the dates were coming.  And I did that.  I reached

5    out to Mr. Bachand.  He didn't answer.  I reached out to

6    Mr. Fiori.  Yes, sir.

7            MR. BULLOTTA:  Can you ask Ms. Washington if in May

8    of 2016 she solicited information from Mr. Fiori and his

9    family to find out which towing rotations they wanted and

10   asked that that information be conveyed to her on her personal

11   e-mail rather than her work e-mail?

12           THE COURT:  Can you respond to that question?

13           THE DEFENDANT:  Absolutely.  So the instance that

14   Mr. Bullotta is referring to is a conversation, Mr. Fiori and

15   I were at lunch.  And he wanted to show me again the document

16   that had been requested by Kenyatta Myers as part of the

17   application process, which is, where would you like to tow?

18           I wasn't aware of the questionnaire.  I wasn't aware

19   of the --

20           THE COURT:  Where would you like to tow, meaning a

21   geographical region?

22           THE DEFENDANT:  Geographic.  Would you like to

23   expand?  Where would you like to tow?

24           When Mr. Fiori asked me -- when Mr. Fiori asked me to

25   take a look at a document, I refused to take a look at the

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  This is a hearing in which you are

3  professing to plead guilty to a conspiracy charge.  I have to

4  determine that what you're doing is understandingly done.

5    THE DEFENDANT:  I understand, sir.

6    THE COURT:  And that the plea is voluntary and that

7  it's accurate.

8    THE DEFENDANT:  Your Honor, if I may.

9    THE COURT:  I -- based upon your statements to me,

10  you have not acknowledged guilt of a federal crime.  And the

11  question I have is, why are you pleading guilty if you don't

12  think you are guilty?

13    THE DEFENDANT:  May I?

14    THE COURT:  Yes.  Answer my question.

15    THE DEFENDANT:  If I may first of all say that I

16  do appreciate the fact that the Assistant U.S. Attorney

17  included in my factual basis for my plea the following:  That

18  I maintain that I accepted the money from the owner of a tow

19  company as a loan that I intended to pay back.  The defendant

20  further maintains that when she accepted the money from the

21  owner she never intended to assist the towing owner with his

22  rotations.

23    And your Honor, the most important words in that

24  factual basis is that, "she did not do so."

25    I can stand here, your Honor, in front of you, and

Susan Dixson    5/4/2018 6:22 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    17-010371-AW

1    say that that is true.  I am in a position at this point

2    where I -- and I appreciate the cons -- I appreciate you being

3    patient with me and explaining to me.

4         I have had -- I have struggled with these options,

5    your Honor.  I understand under 666 what I didn't think was

6    criminal can be construed as criminal, because somebody had an

7    impression, or that I gave somebody the impression, whether

8    false, mistakenly, or intentionally, that I could help them.

9         But I told them that I couldn't help them, your

10   Honor, and I did not do so.

11        So I -- I cannot risk -- your Honor, I can't risk

12   going to a trial.  I can't risk a jury trying to reach into my

13   head and determine my intent.  I can't rely on a jury using

14   circumstantial evidence and innuendo and whatever else a jury

15   brings into the jury box, when I am at risk of being away from

16   my two children for a very long time.

17        I'm at a point where I cannot afford, whether

18   financially or emotionally, to go forward with this.  And I'm

19   asking you, your Honor, to please accept the plea because I

20   cannot risk.

21        Of course, I would love to be vindicated because I

22   didn't know that it was a crime.  But I can't risk, Judge,

23   being away from my children.  I can't.  I can't.

24        Thank you, your Honor, for listening.

25        So I was faced with two evils, Judge.

Plea Hearing - January 2, 2018                              40

1    able to put E&G onto the towing rotations.  So that was

2    consistent with giving him the personal e-mail and doing the

3    other things.

4            There is more, but I'm not going to -- if

5    Ms. Washington is not prepared to admit that she knew she was

6    either leading him on or misleading him or whatever it may be,

7    that she was going to help him, and that's why he was giving

8    her money, if she can't admit that, then I agree with the

9    Court.

10           THE DEFENDANT:  Not to dispute.  Actually, that --

11   what Mr. Bullotta just mentioned, E&G, your Honor, had held a

12   permit for five years prior.  I wasn't familiar enough with

13   E&G or any of the others to know who was on, who had held a

14   permit.  Apparently, they held a permit for five years.  I

15   did not say, "I'm sorry that I couldn't help you."

16           THE COURT:  At this point in the proceeding,

17   Ms. Washington, I think it would be better that you not speak

18   any further about it.

19           May I see counsel at the bench for a moment, please?

20       (Discussion held off the record at 11:02 a.m.)

21           THE COURT:  Ms. Washington, I'm not going to accept

22   a plea from someone who is not pleading guilty because she

23   believes she is guilty.  I will continue the proceedings,

24   though, for a little while, and give you an opportunity to

25   consult with your attorneys and perhaps the government lawyers

**Exhibit 31**

Available upon request

Detroit City Council
New Business Agenda
Tuesday, May 3, 2016

4

30th for a period of three years (3) from the date of your Honorable Body's approval.)

# PUBLIC HEALTH AND SAFETY STANDING COMMITTEE

## THE FOLLOWING ITEM(S) ARE TO BE REFERRED TO THE PUBLIC HEALTH AND SAFETY STANDING COMMITTEE:

## MAYOR'S OFFICE

13. Submitting Mayor's Office Coordinator's Report relative to Petition of Boy Scouts of America (#996), request to hold "Cub Scout Cub Mobile Derby" at 1903 Wilkens St. on July 11, 2016 from 9:00 am to 2:00 pm with temporary street closures. (The Mayor's Office and all other City departments RECOMMEND APPROVAL of this petition.)

14. Submitting Mayor's Office Coordinator's Report relative to Petition of Congress for the New Urbanism (#841), request to hold the "Congress for the New Urbanism 24" around downtown Detroit from June 7 – 11, 2016 from 8:00 am to 5:00 pm. Set up begins 6/5/16 with tear down 6/11/15. (The Mayor's Office and all other City departments RECOMMEND APPROVAL of this petition.)

## FINANCE DEPARTMENT/PURCHASING DIVISION

Submitting the following **Finance Department/Purchasing Division Contracts:**

15. Submitting reso. autho. Contract No. 2752095 – 100% Other (Forfeiture Funds) – To Provide a Lease Agreement for Property at 2121 W. Fort St., Detroit, MI – Contractor: The Realty Company, Location: 2411 Vinewood, Detroit, MI 48216 – Contract Period: January 1, 2016 through December 31, 2018 – Contract Increase: $1,746,000.00 – Total Contract Amount: $7,566,000.00. POLICE (*This Amendment #2 is for increase of funds only. Original contract amount is $5,820,000.00.*)

Gray = Rotation Shaded

**Revised 06-24-11**

| NORTHWEST | | SOUTHWEST | | CENTRAL | | EASTERN | | NORTHEASTERN | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VXF | NWD | BXF | SWD | AC TOW | SWD | HRLAND | CD | 7D'S | ED | BOBBY'S | NED | 7D'S | 2.7 |
| MARS | NWD | LXMON & SAMS | SWD | | | ELITE | CD | NEW EXECUTIVE | ED | | NED | NEW EXECUTIVE | 3.5 |
| MUSCAT | NWD | EAGLE | SWD | BXF | | | CD | TRI COUNTY | | CITYWIDE | NED | BXF | 3.5 |
| ABA | | CITYWIDE | SWD | CITYWIDE | SWD | BXF | CD | WAYNE'S | | BXF | NED | | |
| DETROIT AUTO | 3.3 | GENES | SWD | BXF | | TROY AUTO LOANS | | LUBS | | GENES | NED | BOBBY'S | 3.5 |
| | | | | TROY AUTO LOANS | | JAVMON & SAMS | | | | | | | |
| | | REDS | SWD | JAVMON & SAMS | SWD | BXF | | BXF | | AC TOW | NED | | |
| JKC | 3.3 | BOBBY'S | SWD | BXF | | GENE'S | | TROY AUTO LOANS | | | NED | | 3.8 |
| | | | | | | | | BXF | | | NED | | |
| CITYAUTO | 3.3 | DETROIT AUTO | SWD | LUBS | | LUBS | | JAVMON & SAMS | 2.7 | | NED | | |
| INDEP BROKERS | 3.3 | JKC | SWD | REDS | | NEW EXECUTIVE | 3.4 | GENES | 3.9 | | NED | | |
| | | CITY AUTO | SWD | TRI COUNTY | | WAYNE'S | 5.3 | | 4.4 | | | | |
| | | | | 7D'S | | | 5.4 | | | | | | |

**Revised 07-21-11**

| NORTHWEST | | SOUTHWEST | | CENTRAL | | EASTERN | | NORTHEASTERN | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VXF | NWD | BXF | SWD | AC TOW | SWD | HRLAND | CD | 7D'S | ED | BOBBY'S | NED | 7D'S | 2.7 |
| MARS | NWD | JAVMON & SAMS | SWD | | | ELITE | CD | NEW EXECUTIVE | ED | | NED | NEW EXECUTIVE | 3.5 |
| MUSCAT | NWD | EAGLE | SWD | BXF | | | CD | TRI COUNTY | ED | CITYWIDE | NED | | 3.5 |
| ABA | 3.3 | | | TROY AUTO LOANS | | BXF | | WAYNE'S | | GENES | NED | BOBBY'S | 3.5 |
| DETROIT AUTO | 3.3 | REDS | SWD | JAVMON & SAMS | SWD | BXF | | LUBS | ED | | NED | | |
| | | BOBBY'S | SWD | BXF | | TROY AUTO LOANS | | | | BXF | | | |
| | | | | | | JAVMON & SAMS | | TROY AUTO LOANS | NED | | | | |
| JKC | | DETROIT AUTO | SWD | CITYWIDE | SWD | | | BXF | NED | | | | 3.8 |
| | | | | GENES | SWD | GENES | CD | JAVMON & SAMS | NED | | | | |
| CITYAUTO | 3.3 | CITY AUTO | SWD | | | | CD | | | AC TOW | NED | | |
| INDEP BROKERS | 3.3 | | | BXK | | BXG | 3.9 | | | | NED | | |
| | | | | LUBS | | LUBS | 3.2 | | | | | | |
| | | | | BXG | | | 1.5 | | | | | | |
| | | GENES | SWD | REDS | SWD | NEW EXECUTIVE | 5.2 | BXG | 3.9 | | NED | | |
| | | CITYWIDE | SWD | TRI COUNTY | | WAYNE'S | 5. | GENES | 4.4 | | NED | | |
| | | | | 7D'S | | | 6 | | | | | | |

REVISED 06-24-11

REVISED 12-07-11

REVISED 2-21-12

*[Rotated tables — transcribed as read]*

**Revised 06-24-11**

| NORTHWEST | | SOUTHWEST | | CENTRAL | | EASTERN | | NORTHEASTERN | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V&F | NWD | BXT | SWD | AC TOW | | HB LAND | CD | 70'S | ED | BOBBY'S | NED | 70'S | 2.7 |
| MARS | NWD | JAVION & SAMS | SWD | | | ELITE | CD | NEW EXECUTIVE | ED | CITYWIDE | NED | NEW EXECUTIVE | 3.5 |
| MUSCAT | NWD | B&G | SWD | BXT | CD | | | TRI COUNTY | 2 | BXT | NED | | 3.5 |
| ABA | 3.3 | CITYWIDE | SWD | CITYWIDE | CD | BXG | CD | WAYNES | 2 | GENE'S | NED | BOBBY'S | 3.5 |
| DETROIT AUTO | 3.3 | | | GENE'S | CD | TROY AUTO & BANS | CD | LUBS | 2 | | | | |
| | | RED'S | SWD | BXG | 3.6 | BXT | CD | | | AG TOW | NED | | |
| JRC | 3.3 | BOBBY'S | SWD | TROY AUTO & BANS | 4.6 | JAVION & SAMS | 4.6 | B&G | 2 | | | AG TOW | 3.8 |
| | | | | JAVION & SAMS | 4.6 | GENE'S | 4.6 | TROY AUTO & BANS | 2 | BXT | NED | | |
| CITY AUTO | 3.3 | DETROIT AUTO | SWD | B&G | 5 | | 5 | BXT | | | NED | | |
| INDEP BROKERS | 3.3 | JRC | SWD | LUBS | 3.4 | LUBS | 3.4 | JAVION & SAMS | 2.7 | | NED | | |
| | | CITY AUTO | SWD | RED'S | 5.3 | NEW EXECUTIVE | 5.3 | GENE'S | 3.9 | | | | |
| | | | | TRI COUNTY | 5.4 | WAYNES | 5.3 | | 4.3 | | | | 4.3 |
| | | | | 70'S | | | 5.4 | | | | | | 4.8 |
| | | | | | | | 6 | | | | | | 5.1 |

**Revised 07-21-11**

| NORTHWEST | | SOUTHWEST | | CENTRAL | | EASTERN | | NORTHEASTERN | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V&F | NWD | BXT | SWD | AC TOW | | HB LAND | CD | 70'S | ED | BOBBY'S | NED | 70'S | 2.7 |
| MARS | NWD | JAVION & SAMS | SWD | | | ELITE | CD | NEW EXECUTIVE | ED | CITYWIDE | NED | NEW EXECUTIVE | 3.5 |
| MUSCAT | NWD | B&G | SWD | BXT | CD | BXT | 4.6 | TRI COUNTY | | CITYWIDE | NED | | 3.5 |
| ABA | 3.3 | | | TROY AUTO & BANS | | BXG | 4.6 | WAYNES | ED | GENE'S | NED | BOBBY'S | |
| DETROIT AUTO | 3.3 | RED'S | SWD | JAVION & SAMS | | TROY AUTO & BANS | 5 | LUBS | ED | | NED | | 3.5 |
| | | BOBBY'S | SWD | B&G | | JAVION & SAMS | | | 2 | BXT | | | |
| JRC | 3.3 | | | CITYWIDE In-COW | SWD | | | TROY AUTO & BANS | | | NED | | |
| | | DETROIT AUTO | SWD | GENE'S | SWD | HERPES | CD | BXT | CD | | NED | | |
| CITY AUTO | 3.3 | JRC | SWD | | | | | JAVION & SAMS | | | NED | | |
| INDEP BROKERS | 3.3 | CITY AUTO | SWD | BBK | 1.2 | B&G | 1.2 | | 2 | | | | |
| | | | | LUBS | 3.4 | LUBS | 3.4 | | 2.7 | | | | |
| | | | | B&G | 4.6 | | 4.6 | | | | | | |
| | | GENE'S | SWD | RED'S | | NEW EXECUTIVE | 5.3 | B&G | 3.9 | AC TOW | NED | | 3.8 |
| | | CITYWIDE | SWD | TRI COUNTY | | WAYNES | 5.4 | GENE'S | 4.4 | | NED | | |
| | | | | 70'S | | | 6 | | | | | | |

## REVISED 06-24-11

| NORTHWEST | | | SOUTHWEST | | | CENTRAL | | | EASTERN | | | NORTHEASTERN | | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V&F | 1 | NWD | | 1 | SWD | AC TOW | 1 | CD | HB LAND | 1 | ED | | 1 | NED | BOBBY'S | | 70'S | 2.7 |
| MARS | 2 | NWD | | 2 | SWD | B&T | 2 | CD | ELITE | 2 | ED | NEW EXECUTIVE | 2 | NED | | | NEW EXE | 3.5 |
| MUSCAT | 3 | NWD | | 3 | SWD | | 3 | CD | | 3 | | TRI COUNTY | 3 | NED | | | | 3.5 |
| | | | GENES | 4 | SWD | | 4 | CD | | 4 | | WAYNES | 4 | NED | | | BOBBY'S | 3.5 |
| ABA | 3.3 | | | 5 | SWD | | 5 | 4.6 | | 5 | | LUBS | 5 | NED | | | | |
| DETROIT AUTO | 3.3 | | | 6 | SWD | | 6 | 4.6 | | 6 | | | 6 | NED | | | | |
| | | | RED'S | | SWD | | | 4.6 | | | | | | NED | AC TOW | | | 3.8 |
| J&C | 3.3 | BOBBY'S | | | SWD | | | 5 | | | | | | NED | | | | |
| CITY AUTO | 3.3 | DETROIT AUTO | | | SWD | | | | LUBS | | 2.7 | | | NED | | | | |
| | 3.3 | J&C | | | SWD | LUBS | | 3.4 | NEW EXECUTIVE | | 3.9 | | | NED | | | | |
| | | CITY AUTO | | | SWD | RED'S | | 5.3 | WAYNES | | 4.4 | | | | | | | |
| | | | | | | TRI COUNTY | | 5.4 | | | | | | | | | 4.3 | |
| | | | | | | 70'S | | 6 | | | | | | | | | 4.8 | |
| | | | | | | | | | | | | | | | | | 5.1 | |

## REVISED 12-07-11

| NORTHWEST | | | SOUTHWEST | | | CENTRAL | | | EASTERN | | | NORTHEASTERN | | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V&F | 1 | NWD | B&T | 1 | SWD | AC TOW | 1 | CD | HB LAND | 1 | ED | 70'S | 1 | NED | BOBBY'S | 1 | 70'S | 2.7 |
| MARS | 2 | NWD | RED'S | 2 | SWD | B&T | 2 | CD | ELITE | 2 | ED | NEW EXECUTIVE | 2 | NED | B&T | 2 | NEW EXE | 3.5 |
| DETROIT AUTO | 3.3 | NWD | BOBBY'S | 3 | SWD | GENES | 3 | CD | NATIONWIDE | 3 | ED | TRI-COUNTY | 3 | NED | AC TOWING | 3 | BOBBY'S | 3.5 |
| ABA | 3.3 | | GENES | 4 | SWD | WASHINGTON | 4 | CD | TROY'S | 4 | | WAYNES | 4 | NED | | | | |
| CITY AUTO | 3.3 | J&C | 5 | SWD | BBK | 5 | | JAVION & SAMS | 5 | | LUBS | 5 | NED | | | | | |
| BOBBY'S | 6 | | CITY AUTO | 6 | SWD | LUBS | 6 | | B&G | 6 | | B&G | 6 | NED | | | | | |
| | | | | | | | | | GENES | | | | | NED | | | | |
| | | | | | | | | 3.4 | | | 1.1 | | | | | | 4.3 | |
| | | | | 4.6 | | | | | | | 2 | | | | | | 4.8 | |
| | | | | | | | | | | | | | | | | | 5.1 | |

## REVISED 2-21-12

| NORTHWEST | | | SOUTHWEST | | | CENTRAL | | | EASTERN | | | NORTHEASTERN | | | 10PCT | | 12PCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V&F | 1 | | B&T | 1 | SWD | AC TOW | 1 | CD | HB LAND | 1 | ED | 70'S | 1 | NED | BOBBY'S | 1 | 70'S | 2.7 |
| | 2 | | RED'S | 2 | SWD | B&T | 2 | CD | ELITE | 2 | ED | NEW EXECUTIVE | 2 | NED | B&T | 2 | NEW EXE | 3.5 |
| ABA | 3 | | BOBBY'S | 3 | SWD | GENES | 3 | CD | NATIONWIDE | 3 | ED | TRI-COUNTY | 3 | NED | AC TOWING | 3 | BOBBY'S | 3.5 |
| Detroit Auto | 3.3 | GENES | 4 | SWD | WASHINGTON | 4 | | TROY'S GUYARD | 4 | | WAYNES | 4 | NED | | | | | |
| City Auto | 3.3 | J&C | 5 | SWD | BBK | 5 | | JAVION & SAMS | 5 | | LUBS | 5 | NED | | | | | 4.3 |
| | 4 | | CITY AUTO | 6 | SWD | LUBS | 6 | | B&G | 3.4 | | B&G | 6 | NED | | | | 4.8 |
| J & C | 5 | 3.3 | | | | | | | | | | | | | | | | 5.1 |
| Bobby's | 6 | 4.6 | | | | | | | | | | | | | | | | |



## TOW COMPANY INSPECTION RESULTS

| NAME OF COMPANY | Exterior Fencing | Exterior Cameras | Vehicles Organized | Impound/ Card File | Posted Sign with Tow Fees | Towing Permit Posted | Surveillance Cameras | Lobby Area for the Citizens | Proper Storage on the Trucks and Business |
|---|---|---|---|---|---|---|---|---|---|
| AC TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| ABA TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | NO |
| BBK TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| B & G TOWING | GOOD | YES | YES | YES | YES | YES | YES | YES | YES |
| B & T TOWING | GOOD | YES | YES | YES | YES | YES | YES | YES | YES |
| BOBBY'S TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| CITY AUTO | GOOD | YES | YES | YES | YES | NO | YES | YES | NO |
| DETROIT AUTO REC. | GOOD | YES | YES | YES | YES | NO | YES | YES | NO |
| ELITE TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| EXECUTIVE TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| GENE'S TOWING | GOOD | YES | YES | YES | YES | YES | YES | YES | YES |
| GOCH & SONS TOW | GOOD | YES | YES | NO | NO | NO | YES | YES | YES |
| H & B LAND TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| JAVION & SAMS | GOOD | YES | YES | YES | YES | YES | YES | YES | YES |
| J & C TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | NO |
| L.I.J.B.S. ENTERPRISE | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| MICHIGAN AUTO REC. | GOOD | YES | YES | YES | YES | YES | YES | YES | YES* |
| NATIONWIDE TOW | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| RED'S TOW | NOT | OPEN | TO | INSPECTION | | | | | |
| SEVEN D'S TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| TRI-COUNTY TOWING | GOOD | NONE | YES | YES | NO | NO | NONE | YES | NO |
| TROY'S TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |
| V & F TOWING | GOOD | YES | NO | NO | YES | NO | YES | NO | YES |
| WASHINGTON TOW | GOOD | NONE | YES | NO | NO | NO | NONE | YES | YES |
| WAYNE'S TOWING | GOOD | YES | YES | YES | YES | NO | YES | YES | YES |

**ADDENDUM**

NAME:              CELIA WASHINGTON

DOCKET NO.:        0645 2:17CR20662-001

DATE:              March 21, 2018

Controverted Item #   1

Page   #5          Paragraph #8              Line(s) 1-4

**Section I:      Defendant's Position:**

At no time was WASHINGTON responsible for overseeing the police department's licensing, regulation and use of private towing companies. WASHINGTON has never been responsible for the police department's licensing, regulation, use or selection of police authorized towing companies OR private towing companies. The Detroit Police Department only regulates police authorized towing; not private tows.

From 2014-2017, Police Officer Kenyatta Myers, was assigned to Resource Management Unit, and was responsible for all towing matters for the Detroit Police Department. **(Exhibit B –** *Deposition Transcript of Kenyatta Myers dated September 29, 2016, in the matter of Mainstay Motors, Inc. d/b/a Red's Towing Service v City of Detroit, Docket No. 2016-009203-AW – page numbers 2, 8-11, 14, 15-16, 17, 18-19, 21, 27, 39, 45 and 46).*

This is an important correction primarily to avoid any upward departures based on the assumption that Ms. Washington possessed more authority than she had as the Chief's legal advisor. Further, this information was provided under the Offense Paragraph.

_____          _____
Counsel's Signature              Defendant's Signature

**Section II:  Probation Department's Position**

                    _____
                    U. S. Probation Officer

**ADDENDUM**

NAME:            CELIA WASHINGTON

DOCKET NO.:      0645 2:17CR20662-001

DATE:            March 21, 2018

Controverted Item #   2

Page  #5          Paragraph #8          Line(s) 2-4

**Section I:      Defendant's Position:**

The Police Authorized Towing Rules were promulgated by the Board of Police Commissioners with input from the Mayor's Office, the Law Department, City Council, Research & Analysis Division, the Purchasing Department, the Auditor General's Office and the Detroit Police Department.

The Rules did not prohibit a towing owner from having more than one company in each police district or precinct towing rotation, but the rules provided the following:

Each Authorized Tower will tow on a rotational basis within the respective District or Precinct in which they are geographically located. Authorized Towers which are cross owned on a basis which is greater than 10%, or under common ownership to an extent greater than 10% or which are owned by members of the same family (spouse, sibling, parent or child), *will occupy only one position on the rotation roster and will received towing assignments in succession.* For Purposes of this provision "cross ownership" refers to the ownership of one corporate entity by another. "Common ownership" refers to the ownerships of two or more corporate entities by a single person or corporation. [Emphasis Added].  (**Exhibit C -** *Police Authorized Towing Rules*)

As evidenced in the July 25, 2011 Interoffice Memorandum from Resource Management, originally City -Wide Towing, B&G Towing, B&T, Javion and Sam's and E&G all received permits for towing; however, they shared one position in the towing rotation.  (**Exhibit D –** *July 25, 2011 Interoffice Memorandum from Resource Management*)  In other words, all the companies were treated as a single company in the rotation.  However, once these entities were sold to individuals outside of the Fiore family, they became eligible to receive its own position in the towing rotation.

Further, in a lawsuit filed in Wayne County Circuit Court, *City Wide Towing, Inc et. al v City of Detroit and Detroit Police Department*, Case # 11-007055-CZ, the City of Detroit's attorney confirmed that all the companies owned by the Fiore family were allowed a permit and were placed in the same precinct; however, they were treated as one single company in the rotation. (**Exhibit E1 –** *First Amended Complaint*, **Exhibit E2 –** *Plaintiff's Motion for Partial Summary Disposition*, and **Exhibit E3 –** *Defendant's Brief Opposing Partial Summary Disposition and Requesting Summary Disposition* in the matter of *City Wide Towing et al v City of Detroit and Detroit Police Department*, Case no. 11-007055-CZ).

In the *City Wide* case, the City conceded that at that time, Paul Ott became 100% owner of Genes Towing and City -Wide towing. Further, the Fiore Family's interest in B&G Towing was transferred to Anthony Thomas. Based on this, the City agreed that Genes Towing and its wholly owned subsidiary, City Wide Towing was entitled to a single separate rotation.

Further, B&G Towing was entitled to a separate rotation. Importantly, the City recognized that the rotation at that time, was legal and in accordance to the towing rules. The 2016 rotation remained the same, therefore, the rotation, according to the City of Detroit, remained legal.

As the Fiore family sold its companies, each company becomes eligible for a single rotation position.

The legality of the towing rotation is important to ensure that this is not included in any decisions made by the court for an upward departure or to deny a downward departure. This should not be viewed as additional wrongful conduct against WASHINGTON for purposes of sentencing.

| | |
|---|---|
| _____ | _____ |
| Counsel's Signature | Defendant's Signature |

**Section II: Probation Department's Position**

_____

U. S. Probation Officer

# ADDENDUM

NAME:         CELIA WASHINGTON
DOCKET NO.:   0645 2:17CR20662-001
DATE:         March 21, 2018

Controverted Item #  3

Page  #5-6        Paragraph #11        Line(s) 4-6

**Section I:**   **Defendant's Position:**

WASHINGTON did not have the authority to distribute permits. (**Exhibit F** – *Sample Police Authorized Towing Permits signed by PO Kenyatta Myers and Lisa Carter, Police Commission Chair).* Fiore was aware that Resource Management and others, asked WASHINGTON questions regarding towing and hoped she would help advocate for him to get E&G on the towing rotation.

From 2014-2017, Police Officer Kenyatta Myers, was assigned to the Resource Management Unit, and was responsible for all towing matters for the Detroit Police Department. (**Exhibit B** – *Deposition Transcript of Kenyatta Myers dated September 29, 2016, in the matter of Mainstay Motors, Inc. d/b/a Red's Towing Service v City of Detroit, Docket No. 2016-009203-AW – page numbers 2, 8-11, 14, 15-16, 17, 18-19, 21, 27, 39, 45 and 46).*

_____        _____
Counsel's Signature              Defendant's Signature

**Section II:  Probation Department's Position**

_____
U. S. Probation Officer

**ADDENDUM**

NAME:            CELIA WASHINGTON
DOCKET NO.:      0645 2:17CR20662-001
DATE:            March 21, 2018

Controverted Item #   4

Page   #7          Paragraph #30          Line(s) 1-7
                                                 9-12

**Section I:     Defendant's Position:**

In December 2014, WASHINGTON was looking to purchase a used vehicle, and asked Fiore for suggestions. Fiore directed WASHINGTON to Metrotech Collision. WASHINGTON purchased a 2008 Ford Fusion from Metrotech Collision on January 12, 2015 (**Exhibit G** – *Cashier's check in the amount of $5,592.40.*)

Ms. Washington used funds from a referral fee paid to her to purchase the 2008 Ford Fusion. (**Exhibit H** – *Referral Fee Letter*)

On January 15, 2015, almost immediately after WASHINGTON purchased the Ford Fusion, the vehicle started malfunctioning, so she decided to trade the vehicle in for a used 2010 Infiniti with high mileage. (**Exhibit I**- *Purchase Documents from Sellers Bowman Auto Center, Clarkston*). Therefore, there was no Ford Fusion "*several weeks later*" for her to complain to Fiore about nor could she "keep a car" she no longer owned. Lastly, WASHINGTON still had money left from the referral fee she received as she only paid $5,592.40 for the Ford Fusion. The only money received from Fiore in 2015 was the loan WASHINGTON pled to.

_____          _____
Counsel's Signature                  Defendant's Signature

**Section II:  Probation Department's Position**


                         _____
                         U. S. Probation Officer

Exhibit 36

## DETROIT POLICE AUTHORIZED TOWERS = 17            JUNE 2018

| | COMPANY NAME | COMPANY ADDRESS | CONTACT INFORMATION | OWNERS NAME | FAX NUMBER | EMAIL |
|---|---|---|---|---|---|---|
| 1 | AC TOWING | 2126 MERRICK 48208 | 895-9595 B 926-2876 E | ANTHONY DAVIS SR. | 895-3535 | ACTOWINGDETROIT@GMAIL.COM |
| 2 | ABA TOWING | 14201 JOY RD. 48228 | 838-0430 B 582-0310 E 350-8395 E | JACK MORTON | 581-4146 | |
| 3 | BBK TOWING | 1821 TROMBLY 48211 | 874-3730 B | DENNIS BROCK | 874-4536 | BBK.TOWING@YAHOO.COM |
| 4 | BOBBY'S TOWING | 10807 LYNDON 48238 | 933-9305 B | ROBERT HARDISON | 931-9263 | BOBBYS_TOWING@YAHOO.COM |
| 5 | CITY AUTO | 14201 JOY RD. 48228 | 945-6690 B | BILLY WILD | 361-6703 | |
| 6 | DETROIT AUTO RECOVERY | 14201 JOY RD. 48228 | 581-4271 B 743-8197 E | JACK MORTON | 581-4146 | COOLEY579@GMAIL.COM |
| 7 | ELITE TOWING | 13020 E. MCNICHOLS | 839-8883 B 815-4801 E | STEVEN LAND | 371-5580 | ELITETOW2009@YAHOO.COM |
| 8 | EXECUTIVE TOWING | 6445 HILEDALE | 526-7733 B 461-7546 E | DAVID SMITH | 526-5088 | NEWEXECUTIVETOWING@YAHOO.COM |
| 9 | H&B LAND TOWING | 13000 E. MCNICHOLS | 371-5580 B 815-4801 E | BENNY MCGUIRE | 371-4080 | HBTOW2009@YAHOO.COM |
| 10 | J & C TOWING | 14201 JOY RD. 48228 | 273-2006 B 581-0425 E 350-8395 E | ALEXANDER DEBAY | 581-4146 | COOLEY579@GMAIL.COM |
| 11 | L.I.J.B.S. ENTERPRISES | 6380 MARCUS 48211 | 925-1210 B 461-7546 E | BARRY FOSTER | 925-0828 | WWW.LIJBS.COM |
| 12 | MICHIGAN AUTO RECOVERY | 8850 SOUTHFIELD | 272-5800 B 461-7546 E | GREGORY ERRIGO | 272-8530 | RECOVERYDPD@GMAIL.COM |
| 13 | RED'S TOWING | 7301 CLAYTON | 843-2000 B 215-2821 E | GENASEN GOVENDER | | GOVENDER@AOL.COM |
| 14 | 7D'S TOWING | 5700 NEVADA 48234 | 891-1640 B 248-790-1723 E 248-790-1722 E | JOSEPH SEMA | 891-7088 | JOEGESEMA@GMAIL.COM |
| 15 | TROY'S TOWING | 9615 GRINNEL 48234 | 579-1869 B 248-790-1723 E 248-790-1722 E | TROY GINYARD | 579-1880 | TROY@TROYSTOWING.NET |
| 16 | V&F TOWING | 19109 JOY RD. 48228 | 582-8280 B 584-3960 E 589-3960 E | FRANK SPADAFORA | 584-9794 | VANDFTOWING@ATT.NET |
| 17 | WAYNE'S TOWING | 20495 SHERWOOD | 368-3254 B 810-397-4857 E | DWAYNE HERTZ | 368-0280 | SRICHARD.WAYNES@SBCGLOBAL.NET |
| 18 | B & G TOWING | 8100 LYNCH RD | 579-9670 B | ANTHONY THOMAS | | |
| 19 | B & T TOWING | 2411 VINEWOOD 48216 | 841-1700 B | GASPER FIORE | 841-6744 | |
| 20 | JAVION & SONS | 2411 VINEWOOD | 841-6744 B | JOAN FIORE | | |
| 21 | GENE'S TOWING | 7700 DIX | 841-5236 B | PAUL OTT | | |
| 22 | NATIONWIDE | 420 LYCASTE 48214 | 870-9227 B | JERRY PARKER | 822-2222 | |

TREVIS ANDERSON
Sergeant
Assets and Licensing

| DETROIT POLICE AUTHORIZED TOWERS | | | June 1, 2016 | |
|---|---|---|---|---|
| | | | | |
| **NAME OF TOW COMPANY** | **ADDRESS** | **PHONE** | **OWNERS NAME** | **FAX** |
| 1 | AC TOWING | 2126 MERRICK 48208 | 895-9595 | ANTHONY DAVIS SR. | 895-3535 |
| 2 | ABA TOWING | 14201 JOY RD. 48228 | 838-0430 | JACK MORTON | 581-4146 |
| 3 | BBK TOWING | 1821 TROMBLY 48211 | 874-3730 | DENNIS BROCK | 874-4536 |
| 4 | B & G TOWING | 8100 LYNCH RD. 48234 | 579-9670 | ANTHONY THOMAS | 9224418 |
| 5 | BOBBY'S TOWING | 10807 LYNDON 48238 | 933-9305 | ROBERT HARDISON | 931-9263 |
| 6 | CITY AUTO | 14201 JOY RD. 48228 | 581-4271 | BILLY WILD | 361-6703 |
| 7 | B & T TOWING | 2411 VINEWOOD 48216 | 841-1700 | GASPER FIORE | 841-6744 |
| 8 | DETROIT AUTO RECOVERY | 14201 JOY RD. 48228 | 581-4271 | JACK MORTON | 581-4146 |
| 9 | ELITE TOWING | 13020 E. MCNICHOLS | 839-8883 | STEVEN LAND | 371-4080 |
| 10 | EXECUTIVE TOWING | 6445 HILLDALE | 526-6004 | DAVID SMITH | 526-5088 |
| 11 | GENE'S TOWING | 7800 DIX (EVID. YARD) | 841-5236 | PAUL OTT | 841-8084 |
| 12 | H & B LAND TOWING | 13000 E. MCNICHOLS | 371-5580 | BENNY MCGUIRE | 371-4080 |
| 13 | J & C TOWING | 14201 JOY RD. 48228 | 273-2006 | ALEXANDER DEBAY | 581-4146 |
| 14 | JAVION & SAMS | 2411 VINEWOOD 48216 | 841-6744 | JOAN FIORE | 841-6744 |
| 15 | L.I.J.B.S. ENTERPRISES | 6380 MARCUS 48211 | 925-1122 | BARRY FOSTER | 925-0828 |
| 16 | MICHIGAN AUTO RECOVERY | 8850 SOUTHFIELD | 272-5800 | GREGORY ERRIGO | 272-8530 |
| 17 | NATIONWIDE TOWING | 420 LYCASTE 48214 | 870-9227 | JERRY PARKER | 822-2222 |
| 18 | Red's Towing | 7301 Clayton | 843-5000 | Genasen Govender | |
| 19 | SEVEN D'S TOWING | 5700 NEVADA 48234 | 891-1640 | JOSEPH SEMA | 891-7088 |
| 20 | TROY'S TOWING | 9615 GRINNELL 48234 | 579-1869 | TROY GINYARD | 579-1880 |
| 21 | V & F TOWING | 19109 JOY RD. 48228 | 582-8280 | FRANK SPADAFORA | 584-9794 |
| 22 | WAYNE'S TOWING | 20495 SHERWOOD | 368-3254 | DWAYNE HERTZ | 368-0280 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | **DETROIT POLICE AUTHORIZED TOWERS** | | | **August 1, 2017** | |
|---|---|---|---|---|---|
| | | | | | |
| | **NAME OF TOW COMPANY** | **ADDRESS** | **PHONE** | **OWNERS NAME** | **FAX** |
| 1 | AC TOWING | 2126 MERRICK 48208 | 895-9595 | ANTHONY DAVIS SR. | 895-3535 |
| 2 | ABA TOWING | 14201 JOY RD. 48228 | 838-0430 | JACK MORTON | 581-4146 |
| 3 | BBK TOWING | 1821 TROMBLY 48211 | 874-3730 | DENNIS BROCK | 874-4536 |
| 4 | B & G TOWING | 8100 LYNCH RD. 48234 | 579-9670 | ANTHONY THOMAS | 9224418 |
| 5 | BOBBY'S TOWING | 10807 LYNDON 48238 | 933-9305 | ROBERT HARDISON | 931-9263 |
| 6 | CITY AUTO | 14201 JOY RD. 48228 | 581-4271 | BILLY WILD | 361-6703 |
| 7 | ~~B & T TOWING~~ | ~~2411 VINEWOOD 48216~~ | ~~841-1700~~ | ~~GASPER FIORE~~ | ~~841-6744~~ |
| 8 | DETROIT AUTO RECOVERY | 14201 JOY RD. 48228 | 581-4271 | JACK MORTON | 581-4146 |
| 9 | ELITE TOWING | 13020 E. MCNICHOLS | 839-8883 | STEVEN LAND | 371-4080 |
| 10 | EXECUTIVE TOWING | 6445 HILLDALE | 526-6004 | DAVID SMITH | 526-5088 |
| 11 | GENE'S TOWING | 7800 DIX (EVID. YARD) | 841-5236 | PAUL OTT | 841-8084 |
| 12 | H & B LAND TOWING | 13000 E. MCNICHOLS | 371-5580 | BENNY MCGUIRE | 371-4080 |
| 13 | J & C TOWING | 14201 JOY RD. 48228 | 273-2006 | ALEXANDER DEBAY | 581-4146 |
| 14 | JAVION & SAMS | 2411 VINEWOOD 48216 | 841-6744 | JOAN FIORE | 841-6744 |
| 15 | L.I.J.B.S. ENTERPRISES | 6380 MARCUS 48211 | 925-1122 | BARRY FOSTER | 925-0828 |
| 16 | MICHIGAN AUTO RECOVERY | 8850 SOUTHFIELD | 272-5800 | GREGORY ERRIGO | 272-8530 |
| 17 | ~~NATIONWIDE TOWING~~ | ~~420 LYCASTE 48214~~ | ~~870-9227~~ | ~~JERRY PARKER~~ | ~~822-2222~~ |
| 18 | RED'S TOWING | 7301 CLAYTON | 843-5000 | Genasen Govender | |
| 19 | SEVEN D'S TOWING | 5700 NEVADA 48234 | 891-1640 | JOSEPH SEMA | 891-7088 |
| 20 | TROY'S TOWING | 9615 GRINNELL 48234 | 579-1869 | TROY GINYARD | 579-1880 |
| 21 | V & F TOWING | 19109 JOY RD. 48228 | 582-8280 | FRANK SPADAFORA | 584-9794 |
| 22 | WAYNE'S TOWING | 20495 SHERWOOD | 368-3254 | DWAYNE HERTZ | 368-0280 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | DETROIT POLICE AUTHORIZED TOWERS | | | June 1, 2016 | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | NAME OF TOW COMPANY | ADDRESS | PHONE | OWNERS NAME | FAX |
| 1 | AC TOWING | 2126 MERRICK 48208 | 895-9595 | ANTHONY DAVIS SR. | 895-3535 |
| 2 | ABA TOWING | 14201 JOY RD. 48228 | 838-0430 | JACK MORTON | 581-4146 |
| 3 | BBK TOWING | 1821 TROMBLY 48211 | 874-3730 | DENNIS BROCK | 874-4536 |
| 4 | B & G TOWING | 8100 LYNCH RD. 48234 | 579-9670 | ANTHONY THOMAS | 9224418 |
| 5 | BOBBY'S TOWING | 10807 LYNDON 48238 | 933-9305 | ROBERT HARDISON | 931-9263 |
| 6 | CITY AUTO | 14201 JOY RD. 48228 | 581-4271 | BILLY WILD | 361-6703 |
| 7 | ~~B & T TOWING~~ | ~~2411 VINEWOOD 48216~~ | ~~841-1700~~ | ~~GASPER FIORE~~ | ~~841-6744~~ |
| 8 | DETROIT AUTO RECOVERY | 14201 JOY RD. 48228 | 581-4271 | JACK MORTON | 581-4146 |
| 9 | ELITE TOWING | 13020 E. MCNICHOLS | 839-8883 | STEVEN LAND | 371-4080 |
| 10 | EXECUTIVE TOWING | 6445 HILLDALE | 526-6004 | DAVID SMITH | 526-5088 |
| 11 | GENE'S TOWING | 7800 DIX (EVID. YARD) | 841-5236 | PAUL OTT | 841-8084 |
| 12 | H & B LAND TOWING | 13000 E. MCNICHOLS | 371-5580 | BENNY MCGUIRE | 371-4080 |
| 13 | J & C TOWING | 14201 JOY RD. 48228 | 273-2006 | ALEXANDER DEBAY | 581-4146 |
| 14 | JAVION & SAMS | 2411 VINEWOOD 48216 | 841-6744 | JOAN FIORE | 841-6744 |
| 15 | L.I.J.B.S. ENTERPRISES | 6380 MARCUS 48211 | 925-1122 | BARRY FOSTER | 925-0828 |
| 16 | MICHIGAN AUTO RECOVERY | 8850 SOUTHFIELD | 272-5800 | GREGORY ERRIGO | 272-8530 |
| 17 | ~~NATIONWIDE TOWING~~ | ~~420 LYCASTE 48214~~ | ~~870-9227~~ | ~~JERRY PARKER~~ | ~~822-2222~~ |
| 18 | RED'S TOWING | 7301 CLAYTON | 843-5000 | Genasen Govender | |
| 19 | SEVEN D'S TOWING | 5700 NEVADA 48234 | 891-1640 | JOSEPH SEMA | 891-7088 |
| 20 | TROY'S TOWING | 9615 GRINNELL 48234 | 579-1869 | TROY GINYARD | 579-1880 |
| 21 | V & F TOWING | 19109 JOY RD. 48228 | 582-8280 | FRANK SPADAFORA | 584-9794 |
| 22 | WAYNE'S TOWING | 20495 SHERWOOD | 368-3254 | DWAYNE HERTZ | 368-0280 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## DETROIT POLICE AUTHORIZED TOWERS BY PRECINCT 2016

| NAME OF TOW COMPANY | ADDRESS | PHONE | OWNERS NAME | FAX |
|---|---|---|---|---|
| | | | | |
| **2ND PRECINCT** | | | | |
| Boulevard & Trumbull | 2411 Vinewood | 841-1700 | Gasper Fiore | |
| Bobby's Towing | 10401 Lyndon | 933-9305 | Robert Hardison | |
| City Auto | 14201 Joy Rd | 581-4271 | Billy Wild | |
| Gene's Towing | 14201 Joy Rd | 273-2006 | Alexander Debay | |
| J & C Towing | 14201 Joy Rd | 273-2006 | Alexander Debay | |
| Red's Towing | 7301 Clayton | 843-5000 | Genasen Govender | |
| **3RD PRECINCT** | | | | |
| A.C. Towing | 2126 Merrick | 895-9595 | Tamekia Kimble | |
| BBK Towing | 1821 Trombly | 874-3730 | Dennis Brock | |
| Boulevard & Trumbull | 2411 Vinewood | 841-1700 | Gasper Fiore | |
| Gene's Towing | 7700 Dix | 841-5236 | Paul Ott | |
| L.I.J.B.S. Enterprises | 6380 Marcus | 925-1122 | Barry Foster | |
| | | | | |
| **4TH PRECINCT** | | | | |
| Boulevard & Trumbull | 2411 Vinewood | 841-1700 | Gasper Fiore | |
| Bobby's Towing | 10401 Lyndon | 933-9305 | Robert Hardison | |
| City Auto | 14201 Joy Rd | 581-4271 | Billy Wild | |
| Gene's Towing | 7700 Dix | 841-5236 | Paul Ott | |
| Red's Towing | 7301 Clayton | 843-5000 | Genasen Govender | |
| J & C Towing | 14201 Joy Rd | 273-2006 | Alexander Debay | |
| **5TH PRECINCT** | | | | |
| Elite Towing | 13020 E. McNichols | 839-8883 | Steven Land | |
| B & G Towing | 8100 Lynch Rd. | 579-9670 | Anthony Thomas | |
| Nationwide Towing | 420 Lycaste | 870-9227 | Hussein Hussein | |
| H & B Land | 13000 E. McNichols | 371-5580 | Benny McGuire | |
| Troy's Towing | 9615 Grinnell | 579-1869 | Troy Ginyard | |
| Gene's Towing | 7700 Dix | 841-5236 | Paul Ott | |
| Javion & Sams | 2411 Vinewood | 841-6744 | Joan Fiore | |
| **6TH PRECINCT** | | | | |
| Bobby's Tow | 10401 Lyndon | 933-9305 | Robert Hardison | |
| J & C Towing | 14201 Joy Rd | 273-2006 | Alexander Debay | |
| Michigan Auto Recovery | 8850 Southfield | 272-5800 | Gregory Errigo | |
| V & F Towing | 19109 Joy Rd. | 582-8280 | Frank Spadafora | |
| City Auto | 14201 Joy Rd | 581-4271 | Billy Wild | |
| Detroit Auto Recovery | 14201 Joy Rd | 581-4271 | Kevin Savage | |
| ABA Towing | 14201 Joy Rd | 838-0420 | Jack Morton | |

## DETROIT POLICE AUTHORIZED TOWERS BY PRECINCT

| NAME OF TOW COMPANY | ADDRESS | PHONE | OWNERS NAME | FAX |
|---|---|---|---|---|
| **7TH PRECINCT** | | | | |
| L.I.J.B.S. Enterprises | 6380 Marcus | 925-1122 | Barry Foster | |
| B & G Towing | 8100 Lynch | 579-9670 | Anthony Thomas | |
| New Executive Towing | 6445 Hilldale | 526-6004 | Dave Smith | |
| Wayne's Towing | 20496 Sherwood | 368-3254 | Dwayne Hertz | |
| 7D's Towing | 5700 E. Nevada | 891-1640 | Joseph Sema | |
| | | | | |
| **8TH PRECINCT** | | | | |
| Bobby's Tow | 10401 Lyndon | 933-9305 | Robert Hardison | |
| J & C Towing | 14201 Joy Rd | 273-2006 | Alexander Debay | |
| Michigan Auto Recovery | 8850 Southfield | 272-5800 | Gregory Errigo | |
| V & F Towing | 19109 Joy Rd. | 582-8280 | Frank Spadafora | |
| City Auto | 14201 Joy Rd | 581-4271 | Billy Wild | |
| Detroit Auto Recovery | 14201 Joy Rd | 581-4271 | Kevin Savage | |
| ABA Towing | 14201 Joy Rd | 838-0420 | Jack Morton | |
| **9TH PRECINCT** | | | | |
| Elite Towing | 13020 E. McNichols | 839-8883 | Steven Land | |
| B & G Towing | 8100 Lynch Rd. | 579-9670 | Anthony Thomas | |
| Nationwide Towing | 420 Lycaste | 870-9227 | Hussein Hussein | |
| H & B Land | 13000 E. McNichols | 371-5580 | Benny McGuire | |
| Troy's Towing | 9615 Grinnell | 579-1869 | Troy Ginyard | |
| Gene's Towing | 7700 Dix | 841-5236 | Paul Ott | |
| Javion & Sams | 2411 Vinewood | 841-6744 | Joan Fiore | |
| **10TH PRECINCT** | | | | |
| A.C. Towing | 2126 Merrick | 895-3535 | Tamekia Kimble | |
| Bobby's Tow | 10401 Lyndon | 933-9305 | Robert Hardison | |
| Boulevard & Trumbull | 2411 Vinewood | 841-1700 | Gasper Fiore | |
| | | | | |
| aaaaaaaa | | | | |
| **11TH PRECINCT** | | | | |
| B & G Towing | 8100 Lynch Rd. | 579-9670 | Anthony Thomas | |
| L.I.J.B.S. Enterprises | 6380 Marcus | 925-1122 | Barry Foster | |
| New Executive Towing | 6445 Hilldale | 526-6004 | Dave Smith | |
| 7D's Towing | 5700 E. Nevada | 891-1640 | Joseph Sema | |
| Wayne's Towing | 20496 Sherwood | 368-3254 | Dwayne Hertz | |

## DETROIT POLICE AUTHORIZED TOWERS BY PRECINCT

| NAME OF TOW COMPANY | ADDRESS | PHONE | OWNERS NAME | FAX |
|---|---|---|---|---|
| | | | | |
| **12TH PRECINCT** | | | | |
| Bobby's Tow | 10401 Lyndon | 933-9305 | Robert Hardison | |
| 7D's Towing | 5700 E. Nevada | 891-1640 | Joseph Sema | |
| New Executive Towing | 6445 Hilldale | 526-6004 | Dave Smith | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit 37

# MARC A. DELDIN
## Attorney at Law
2411 Vinewood
Detroit, MI 48216
(313) 228-0860 (Tel.)

September 19, 2012

Commander James Suchowski
DPD – Resource Management
1300 Beaubien, 2nd Floor
Detroit, MI 48226

RE:   **Detroit Police Department Towing Permits**
**My clients: City Wide Towing, E&G Towing, Troy Auto-Bans**

Dear Commander Suchowski:

I represent City Wide Towing, E&G Towing, and Troy Auto-Bans relative to their police authorized towing permits. My clients demand to be placed on the towing rotation, should the DPD make any changes to the rotation.

On June 1, 2011, the DPD issued the following towing permits to my clients:

- Tow Permit 11-005 to Troy Auto-Bans (owned by **Gasper Fiore**) for 8100 Lynch,
- Tow Permit 11-006 to E&G Towing (owned by **Philip Sakalian**) for 2411 Vinewood,
- Tow Permit 11-007 to City Wide Towing (owned by Gene's **Towing/Paul Ott**) for 2760 W. Warren, and
- Tow Permit 11-008 to City Wide Towing for 7900 Dix.

My clients have a property interest in these towing permits. It is undeniable that not a single one of these permits have been terminated, suspended, or revoked. However, the DPD's list of authorized towing companies does not include any of my clients, which is contrary to City Code § 55-15-8.

It is my understanding that the DPD does not intend to change the towing rotation until the board of police commissioners modifies the towing rules. Should the DPD change the rotation before or after the towing rules are modified (if they are modified), the DPD is legally obligated to place my clients on the towing rotation, as they are qualified under the rules and have a legal right to tow for the DPD.

Please contact me if you have any questions.

Sincerely,

Marc A. Deldin

Encl.

c. Board of Police Commissioners (fax: (313) 596-1831)

 Sprint 🛜     **12:28 AM**     📍 59% 🔋

   

James



*Re: Law Dept Opinion*

you soon.

> Raimi and Ellen suggested that the department follow the BOPCs tow rules and make the recommendation to the Board asap

Ok will do.

Thu, Jun 1, 7:22 AM

> Good morning sir! Just as an FYI after my extensive call with Jim Noseda (Sr Corp Counsel) last night, I've set up a 9a conf call

           

Sprint 📶   12:28 AM   🕐 59% 🔋

< 37

James

ⓘ

Ok will do.

Thu, Jun 1, 7:22 AM

Good morning sir! Just as an FYI after my extensive call with Jim Noseda (Sr Corp Counsel) last night, I've set up a 9a conf call with Jim, Parish, and possibly Raimi on the issue.

*Re: Law Dept opinion advising AGAINST TAKING Permits w/o Due process BOPC hearing req'd*

Good morning thanks.

Thu, Jun 1, 1:14 PM



Fyi

                     

Sprint 📶   12:30 AM   📍 59% 🔋

‹ 37   James   ⓘ

Thu, Jun 1, 8:17 PM

OMG!! 😮😮😮😮😮😮



*[handwritten annotation:]* Law Dept Opinion Advising Against TAKING Permits without due process BOAC hearing re rules

**Right**

**I have the opinion I'll send you the preview copy as soon as I get home sir**

I got it..Please don't forget the Board notification on that picture

**Yes sir**

Got a question for you later

    

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

       Plaintiff,

-v-

                             Case No. 17-20662

Celia Washington,

       Defendant/Movant.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF MOVANT'S PETITION UNDER 28 U.S.C. §2255

Celia Washington
In Pro Per
With the Assistance
Of Counsel
Alderson FPC
Box A
Alderson, WV  24910

# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Table of Authorities | ii |
| I.   Brief Legal Background | 1 |
| II.   Factual Background | 1 |
| A.   Grand Jury Testimony | 1 |
| B.   The Indictment | 2 |
| C.   Repetitive False Testimony of Police Officer Kenyatta Myers and Lieutenant Michael Parish | 4 |
| III.   Legal Argument | 10 |
| A.   Standard of Review | 10 |
| B.   The factual change related to the towing rules was a substantial variance in the Indictment and a Due Process violation | 12 |
| 1.   The government's argument at sentencing | 12 |
| 2.   No validity to the government's new arguments | 13 |
| C.   Based on the Revised Facts in the Indictment the Elements of Bribery Cannot Be Satisfied Thus the Wrongful Conviction of Washington | 16 |
| 1.   Federal Bribery Statute $5,000 Threshold | 16 |
| 2.   The government cannot prove Washington had corrupt intent. | 21 |
| IV.   Conclusion | 29 |
| Certificate of Service | 30 |
| Exhibits 1 - 38   (Copies of additional exhibits are available upon request) |  |

## TABLE OF AUTHORITIES

**Cases**                                                              **Page No.**

Bousley v. United States, 523 U.S. 614 (1998)                          11

Brady v. United States, 397 U.S. 742 (1970)                            10,11

Gall v. United States, 21 F.3d 107 (6th Cir. 1994)                     10

Griffin v. United States, 330 F.3d 733 (6th Cir. 2003)                 10

Jeffers v. United States, 392 F.2d 749 (1968)                          12

McMann v. Richardson, 397 U.S. 759 (1970 )                             11

Mesarosh v. United States, 352 U.S. 1 (1956)                           7

Napue v. Illinois, 360 U.S. 264 (1959)                                 15

New York ex rel. Whitman v Wilson, 318 U.S. 688 (1943)                 11

Parker v. North Carolina, 397 U.S. 790 (1970)                          11

Smith v. O'Grady, 312 U.S. 329  (    )                                 10,11

Stirone v. United States, 361 U.S. 212 (1960)                          10

United States v. Aguilar, 515 U.S. 593 (1995)                          21

United States v. Garcia-Paz, 282 F.3d 1212 (9th Cir. 2002)             12

United States v. Mills, 140 F.3d 630 (6th Cir. 1998 )                  18, 19, 28

United States v. Owens, 697 F.3d 657 (2012)                            17, 18, 19

United States v. Tillmon, 2019, U.S. App LEXIS 5621*
    F.3d     (4th Cir. 2019)                                           16

White v. Ragen, 324 U.S. 760 (1945)                                    11


**Statutes**

18 U.S.C. §371                                                         passim.

18 U.S.C. §666 et seq.                                                 passim.

28 U.S.C. §2255                                                        passim.

**Ordinances**

City of Detroit Ordinance §55-15-8                                     22

## I.   BRIEF LEGAL BACKGROUND

On October 11, 2017, Defendant, Celia Washington ("Washington") was charged with a two-count Indictment: Count One – Bribery Conspiracy Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. §371 and 666(a); and Count Two – Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. §666(a).   On January 2, 2018, Washington pled guilty to Count One of the amended Indictment and Count Two was dismissed. On April 18, 2018, Washington was sentenced to the Bureau of Prisons to be imprisoned for a term of one year plus one day.

As shown below, this case warrants 28 U.S.C. §2255 review because the record shows that the Indictment was based on plainly false testimony regarding Washington's (Petitioner's) authority, or intent to take a bribe in exchange for favorable disposition of police towing business.   Similarly, contrary to record evidence and the plain meaning of the towing ownership rules, the Grand Jury was led to believe that Washington assisted in the violation of these rules when, in fact, no violation occurred.   Washington can demonstrate that there is a reasonable likelihood that the improper use of false testimony in this case adversely affected her outcome. In addition, the government's presentation of a new theory at sentencing that was never submitted to a Grand Jury supports Washington's claim of a Due Process violation.   §2255 is the appropriate procedural vehicle in which to review these issues. In particular, this Court sustained one of Washington's objections to the misapplication of the towing rules only at sentencing, without review of the implication of this objection to the case.   Petitioner, Washington respectfully suggests to this Honorable Court that now be the time.

## II.   FACTUAL BACKGROUND

On October 11, 2017, the Grand Jury convened.   During that time, the Grand Jury heard testimony from Police Officer Kenyatta Myers and Lieutenant Michael Parish.   Pertinent to this motion Officer Myers ("Myers") and Lieutenant Parish ("Parish") testified that Washington was involved in the selection of both the 2011 and 2016 towing rotations. Further, both Myers and Parish testified that Washington helped Fiore get a permit and get on the rotation although it was against the rules. In sum, Myers testified that there should not be four companies directly or indirectly controlled or owned by one person in the tow rotation. He testified that Gasper Fiore was breaking the rules

by being allowed to be on the rotation, and by owning or
controlling more than one company.  [Exhibit _I_, Myers GJ
testimony P.7]  He also testified that if Washington wanted to
change the rotation, the application deadline, or any other
portion of the towing process, she could have because she ranked
higher than him in the police department.

Parish attempted to corroborate Myers' testimony by
claiming that **he was told** that Washington, while the attorney for
the Board of Police Commissioners, helped select the towing
rotation in 2011.  As such, she would have known that Mr. Fiore
was violating the towing rules.  [Exhibit _V_, Parish GJ testimony
P.11]  Further, that by keeping the rotation the same as it was in
2011, she continued to help him break the rules in 2016 because she
allowed him to have more than one towing permit.  [Exhibit _V_, Parish
GJ testimony, P.12]

**B.   The Indictment**

Based primarily on this testimony, on October 11, 2017,
Washington was charged with a two-count Indictment:  Count One –
Bribery Conspiracy Concerning Programs Receiving Federal Funds,
in violation of 18 U.S.C. Sections 371 and 666(a); and Count Two –
Bribery Concerning Programs Receiving Federal Funds, in violation
of 18 U.S.C. §666(a).

The following general allegations formed the basis for
the two-count Indictment:

2

1. At all times relevant to the Indictment, defendant CELIA WASHINGTON was an agent of the City of Detroit, Michigan, in that she was employed as a legal advisor to the Chief of the Detroit Police Department with the title of Deputy Chief of Police. Part of her job responsibilities included overseeing the Detroit Police Department's licensing, regulation, and use of private tows.

2. At all times relevant to this Indictment, Detroit, Michigan was a local government entity that received federal assistance in excess of $10,000.00 during each of calendar years 2016 and 2017.

3. All of the overt acts in this Indictment occurred in the Eastern District of Michigan.

4. At all times relevant to this Indictment, the total potential yearly revenue for towing companies receiving City of Detroit tows exceeded two million dollars.

5. At all times relevant to this Indictment, City of Detroit towing rules were in place prohibiting a towing owner from having more than one towing company in each police district or precinct towing rotation.

6. At all times relevant to this Indictment, CELIA WASHINGTON was aware that the owner of several towing companies ("the owner") had controlling ownership interest in multiple towing companies that

3

had been placed in a single police district or precinct towing rotation, in violation of the City of Detroit towing rules.  [Exhibit 3, Indictment]

## C.  Repetitive False Testimony Given By Myers and Parish and the Sentencing Proceedings

On January 2, 2018, during the plea hearing in which this court twice told the prosecution that the factual basis was lacking, Washington pled guilty to Count One of the amended Indictment.  Count Two of the Indictment was dismissed.  The sentencing hearing was later held on April 18, 2018.  After obtaining the presentencing report, Washington objected to various portions of the report that pertained to the relevant conduct in the Indictment.

First, Washington denied that she was the overseer of towing, and that she made any final decisions related to the 2011 or 2016 towing rotation.  Washington argued that during 2011, she was employed with the Board of Police Commissioners, and was present during the creation of the towing rules as the scribe, but was not involved in the towing selection in any manner.  In 2011, the Resource Management Unit ("formerly known as the "Management Services Bureau") of the Detroit Police Department ("DPD") was solely responsible for vetting all towing applications and selecting the tow companies that received permits and tow rotations.[1]  Washington, at that time, was not an employee of the Office of the Chief of Police of the Detroit Police Department.  However, in 2013, Washington was hired as the legal advisor to

---

[1] Interoffice memo from Lt. Adams of Resource Management explained the rotation to his superior Deputy Chief Ben Lee.  [Exhibit 4, Interoffice Memo]

4

the Chief of Police, James Craig ("Chief").  According to the Chief, Washington's job description did not include overseeing towing.  On June 7, 2017, Chief Craig explained to the government that people often came to her with towing questions because she was considered to be the most knowledgeable based on her prior tenure with the Board of Police Commissioners.  The Chief provided the following to the government:

> **When Washington came to the Chief's Office, she stayed connected to the Board of Police Commissioners (BOPC).  Chief Craig told Washington that she should not have anything to do with towing.  She was never given towing as part of her responsibilities while working for Craig.  She did labor law.  People who had responsibility for towing in the police department looked at Washington as an expert because she was the former legal advisor to the BOPC.  [Exhibit 5 , Chief's Statement to the FBI]**

Essentially, Washington was hired by Chief Craig who was her direct command, and he did not give her authority over towing but had no problem with those who were assigned to towing to ask her questions as the legal advisor.  Not to mention that, Officer Myers previously testified under oath in a deposition and in a DPD Internal Affairs investigation interview that Washington had nothing to do with his decisions in the 2016 towing rotation and application process, and that Assistant Chief White was his direct command.[2]  Assistant Chief White also admitted in a February 9,

---

[2] Mainstay Motors d/b/a Red's Towing vs. City of Detroit, Case # 2016-009203-AW. Moreover, he also provided this same information in an Internal Investigation interview with the Detroit Police Department held on November 2, 2016 at the Academy where Washington was exonerated.

2018 deposition that he was the overseer of towing and Washington was not under him. [Exhibit 6 , Deposition White, P.10,21] However, Myers did acknowledge that he sent out and vetted all applications and not Washington. [Exhibit 7 ] Therefore, assuming arguendo that there were any towing violation, he would be responsible. Certainly, this would explain why Myers attempted a complete about-face and claim Washington was the overseer to avoid responsibility. Ironically, since Myers testified before the Grand Jury, Myers attempted to continue the lies regarding Washington's position in towing in an Affidavit drafted by the City of Detroit in order to defend itself in a federal civil lawsuit. [Exhibit 8 , Affidavit] However, the City admitted that Myers civil Affidavit and thus the grand jury testimony "may not be accurate" and requested that Myers' Affidavit be removed from the court file of the civil proceeding. [Exhibit 9 , Def Corrected Response] Thus, it would appear that the City of Detroit seeks to rely on Washington's guilty plea to abscribe blame, yet refuses to rely on knowingly false testimony that Washington had authority. Similarly, the government should be aware by now that the City of Detroit has declined to rely on their own employee's false testimony which was key to convicting Washington.

Nontheless, this court determined that it could not sustain the objection of Washington because Parish attempted to corroborate the testimony of Myers, along with other circumstantial evidence.

6

The law has long inferred that a witness who will lie about one fact will lie about others.  _Mesarosh v. United States_, 352 U.S. 1, 13-14 (1956) (refusing to credit witness' testimony in defendant's trial because of witness's false testimony in other settings).  As such, a conviction premised on Myers' refuted testimony regarding Washington's position in towing should be reviewed and cannot stand. This is precisely what occurred with both Myers' and Parish's testimony, and is a clear representation of the Court's holding in _Mesarosh_.  Parish and Myers lied about Washington being the overseer of towing, and more pertinent to this Motion, Parish and Myers lied about the towing rule prohibitions.  At the time of sentencing, Washington also objected to the portion of the presentencing report that recites the Indictment alleging that Washington helped Fiore break the towing rules.  Washington based this objection entirely on the actual, plain meaning, black and white, interpretation of the towing rule which provided, in relevant part:

> Authorized Towers which are cross owned on a basis which is greater than 10% or under common ownership to an extent greater than 10% or which are owned by members of the same family (spouse, sibling, parent or child), will occupy only one position on the rotation roster and will receive towing assignments in succession... [Exhibit _10_, Tow Rules]

In sum, and contrary to the Indictment, it was **not** against the towing rules to have commonly owned or cross owned tow trucks in the same district or precinct.  The rules provided that, if this occurred, those companies would be required to share the same "spot", and rotate towing dispatches within the one spot.

In fact, there is no rule that prohibits an owner from owning more than one towing company and position on the rotation with a non-family member. The ownership interest, however, cannot be greater than 10%. So, arguendo, if Mr. Fiore did own more than one tow company, there was no prohibition. In fact, it is common knowledge to the City of Detroit and to the Detroit Police Department that Anthony Soave is affiliated with four towing companies that occupy the rotation - Detroit Auto, City Auto, J&C and ABA Towing.[3] A review of the Detroit Police Department towing files would also reveal that the four companies mentioned above (J&C Towing, ABA Towing, City Auto and Detroit Auto [Recovery]) **did not own** towing trucks at the time of permit renewal. Myers gave those companies a "temporary permit" and gave them 90 days to come into compliance with the rules. Once they showed compliance, Myers gave them a permit and allowed them to tow, thus using the rules as convenient.

The government responded to Washington's objection regarding the ownership provisions of the tow rules by attaching the grand jury testimony of Myers and Parish as its basis for this allegation in the Indictment, but failed to refer to the actual rules themselves. Prior to the government's response to the objection, Washington was unaware that Parish and Myers had testified in this manner.

After hearing arguments on Washington's objection regarding the ownership provision, **the court agreed** that the towing rules **did not** prohibit what the government alleged in the Indictment, and as copied in the presentencing report. At the hearing, the government maintained that it believed the interpretation of the rules cited in the Indictment, as well as Myers' and Parish's interpretation. Since Washington's sentencing hearing, Washington has been able to obtain documents verifying that the Detroit Police Department's interpretation of the towing ownership provision of the towing rules was, and in fact still is, the same as Washington's

---

[3]See Article, <u>How Duggan Created a Costly Towing Scandal That Helps Kwame Crony</u>, by Steve Neavling. November 29, 2018 [**Exhibit __11__** ]

objection and this court's interpretation.[4]  The companies with common ownerships were allowed to share rotational positions in the same district.  Fiore's family was not the only company that shared positions on the rotation.  [Exhibit 33 ]

As set forth below, this court's decision to sustain Washington's objection regarding the ownership provision of the tow rules during the sentencing proceedings, constituted a significant, "fatal" variance from the offense alleged in the Indictment, thereby violating Washington's Fifth Amendment right to be charged by a grand jury.  Moreover, this information provided and used by the prosecution was based on perjured testimony which also constitutes a due process violation. Additionally, this substantial factual change would prevent the government from satisfying the requirements of conviction under 18 U.S.C. §666.  Although it is unclear whether this court was aware that this was a factual statement cited directly from the Indictment, this court did, however, recognize this fundamental right to have factual amendments to the Indictment return to the Grand Jury. [Exhibit 12, Plea Hearing p 4 ]  Therefore, this substantial change in the Indictment, coupled with the perjured testimony of Detroit Police Department officers, entitled Washington to a dismissal of the Indictment or, at a minimum, the issuance of a superceding indictment.  Neither of which occurred,

---

4 In an effort to ensure the interpretation of the rules, and prior to the sentencing hearing, Washington's attorney, Pamela Rice-Campbell sent a Freedom of Information Act Request to the City of Detroit requesting, among other documents, the tow rotation lists. However, the City under now IG Attorney Ellen Ha failed and/or refused to disclose the requested information but cashed the check issued for the information prompting a lawsuit Case No. 18-006433-CZ. After the lawsuit was filed, the City voluntarily disclosed the rotation list along with other pertinent information confirming that there were commonly owned companies owned by the Fiore family, they shared a rotation spot. Unfortunately, this was six months after Ms. Washington was sentenced so this information was unavailable at the time of sentencing. It appears in later rotations that some of the companies were sold to the satisfaction of the Detroit Police Department prior to Washington's employment with DPD. It is unclear what if any interest Mr. Fiore had in these companies. However, the rules did not require that he give up all interest in any sold companies to be a part of another rotation position.

thereby offering evidence to this Honorable court that Washington was unfairly convicted and a miscarriage of justice has occurred.

## III.  LEGAL ARGUMENT

### A.  Standard of Review

In order to prevail under 28 U.S.C. §2255,"a defendant must show a "fundamental defect" in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." Gall v. United States, 21 F. 3d 107, 109 (6th Cir. 1994). "A federal district court may grant relief to a prisoner in custody only if the petitioner can 'demonstrate the existence of an error of constitutional magnitude' which had a substantial and injurious effect or influence on the guilty plea..." Griffin v United States, 330 F.3d 733, 736 (6th Cir. 2003).

If there is a variance from the offense alleged in the indictment, it is a violation of a Defendant's Fifth Amendment right to be charged by a grand jury. See Stirone v United States, 361 U.S. 212, 217-18, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960). Also it bears repeating that this Honorable Court has recognized that even a relatively minor correction to the indictment, would require the government to go backto the grand jury and issue a superceding indictment. [Exhibit 12, Plea transcript, P.4].

Only a voluntary and intelligent guilty plea is constitutionally valid. Brady v. United States, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 90 S. Ct. 1463. A plea is not intelligent unless a defendant first receives real notice of the nature of the charge against him. Smith v. O'Grady, 312 U.S. 329, 334,

85 L. Ed. 859, 61 S. Ct. 572.  Petitioner's plea would be contrary to the Eighth Circuit's view, constitutionally invalid if he proved that the district court misinformed him as to the elements of the offense.  Brady v. United States, supra, McMann v. Richardson, 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441, and Parker v. North Carolina, 397 U.S. 790, 25 L. Ed. 785, 90 S. Ct. 1458, distinguished. Pp. 3-5.

In Bousley v. United States, 523 U.S. 614, 118 S. Ct. 1604; 140 L. Ed. 2d 828 (1998), the Court held that although his claim was procedurally defaulted, petitioner might be entitled to a hearing on the merits if he made the necessary showing to relieve the default.  The Court's decision that held that a substantive federal criminal statute did not reach certain conduct necessarily carried a significant risk that the petitioner stood convicted of an act that the law did not make criminal.  The Court also held that a petitioner's claim might still be reviewed if he could establish that the constitutional error in his plea colloquy resulted in the conviction of one who was actually innocent.  Petitioner must demonstrate that in light of all the evidence it is more likely than not that no reasonable juror would have convicted him.

Lastly, the Supreme Court has long been committed to the principle that due process forbids the government from obtaining a conviction through the use of false testimony.  Through a long line of cases, the Court has condemned the prosecution's use of false testimony.  See, e.g., White v. Ragen, 324 U.S. 760, 764 (1945) (acknowledging that obtaining conviction through knowing use of perjury violates due process); New York ex rel. Whitman v. Wilson, 318 U.S. 688, 689 (1943).

11

**B.   The factual change  related to the towing rules was a substantial variance in the Indictment and a Due Process violation.**

**1.   The government's argument at sentencing**

After the objection regarding the subject tow rule was sustained, the government simply argued that Washington "brought to the office with her a propensity to commit bribery offense that she, time and time again, accepted things of value from people whom she knew were attempting to influence her with respect to towing." [Exhibit __, Sentencing Hearing]  Moreover, in its sentencing memorandum, the government alleged that **"Fiore gave Washington the cash in order to receive favorable treatment from Washington, as he was aware that new towing permits would be issued later that year and there was a potential to either lose or gain towing rotation[s]."** This alleged pattern and practice argument was clearly _not_ the reason the Grand Jury indicted Washington, nor was the vague potential for Fiore to lose or gain a position on the rotation. So, as a result, it was not the basis for Washington's plea.  See United States v. Garcia-Paz, 282 F.3d 1212, 1216-17 (9th Cir. 2002) (stating that cases holding variance fatal were those where conviction was permitted on _different behavior_ from that alleged in indictment), cert. denied, ___ U.S. ___, 154 L. Ed. 2d 242, 123 S. Ct. 47, 2002 U.S. LEXIS 7314 (Oct. 7, 2002); Jeffers v. United States 392 F.2d 749, 751-52 (9th Cir. 1968) (finding a fatal variance where the indictment charged that donations from followers of a religious group were used for non-religious purposes, but the evidence showed only that the money was used in ways contrary to the representations made when collecting).

12

## 2. No validity to the government's new arguments.

Because allegations related to "other people" giving things of value to influence her related to towing outside of Mr. Fiore was a part of the Indictment, Washington was not given the opportunity to have those allegations go before a grand jury or properly object at the time of sentencing. Additionally, the Indictment was not based on Washington taking cash because the towing rotation was coming up and he had the potential to lose or gain towing rotations. The government's purported new argument was prejudicial and should not have been considered.

This new argument prevented Washington from adequately defending herself and/or from making a "knowingly, intelligently and voluntary" plea in this case. Washington should have been given the opportunity to advise the court that the "other people" to whom they referenced did not take ownership of a towing company until 2016. [Exhibit $\beta$, Affidavit] So, in fact, the purported oil changes and "other repairs" alleged by the government occurred before this individual even had an ownership interest in a towing company, and certainly before Washington helped Myers with towing questions. Perhaps most important is the fact that the Detroit Police Department ("DPD") was well aware that the owner of this company, provided these services for free or at a discounted rate to all members of the Detroit Police Department. Specifically, Assistant Chief James White, overseer of the Administrative Operations portfolio including the Resource Management Unit, was aware of this person providing

these services to DPD members and had a friendship with the owner. Id. This person provided DPD with free vehicles for the neighborhood police program as noted in the Affidavit and corroborated by prior news articles. In a proffered statement to the government, it was also known that this person offered collision repairs to DPD squad cars for a reduced cost. In fact, a closer look at this owner will show that he has generously and continously provided and offered to provide services for the City of Detroit as a whole, and not just to Washington. This again is referenced in a text message in the Affidavit of Assistant Chief James White along with a text message received from Washington. [Exhibit 13, Text Message]

Further, after receiving knowledge that this "other company" owned a towing company, Washington immediately advised Assistant Chief White who was the overseer of towing and admitted this in a recent deposition. [Exhibit 6 - Deposition of White, P.20,22].

Unfortunately, the City of Detroit and the Detroit Police Department were obviously aware that these services were rendered to DPD, as set forth in the Affidavit, but has deliberately and maliciously allowed these false narratives, as it has with Myers, in order to continue to insulate itself from all the current civil litigation against it due to its negligent handling of towing matters.

Additionally, as it pertains to any other "things of value" related to Mr. Fiore, according to the government, Mr. Fiore claimed that he paid Washington $5000 for a Ford Fusion three years prior to December 22, 2017 (which would have been approximately 2014.) Washington objected to the government's argument, and the court agreed that such an allegation could not be corroborated. [Exhibit 14]

According to the testimony given by the government's star witness, Officer Myers testified that he did not meet Washington until late 2015 or early 2016. Yet, he has been the liason between the City of Detroit Police Department and the towing companies since 2014, running the day to day operations of towing without any involvement from Washington.‡ [Exhibit __, GJ transcript] Thus, it is safe to presume that prior to at least the end of 2015 early 2016, Mr. Fiore talked to Myers regarding towing matters and not Washington. Therefore, it would be illogical to believe that any "overt act" was allegedly done based on an intent to be influenced. Particularly in light of the fact that Washington was not recognized as being connected to towing until the end of 2015 or early 2016.

Clearly, this plea was not knowingly, intelligently and voluntarily made, as Washington was not sentenced based on the Indictment referenced in her plea hearing, but rather based on a variation or unilaterally amended indictment. Further, this indictment was premised on testimony that is beyond mere inconsistency, but perjury. The Supreme Court has long-since held that the due process clause protects against convictions based on testimony that the prosecutor knew or should have known was false. Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d. 1217 (1959). The testimony offered by both Myers and Parish was found to be false based on easily ascertainable evidence which violated Defendant's Due Process rights and required a dismissal of the Indictment, or at a minimum the issuance of a superseding one.

---

‡ In addition, there were three companies that did not pay administrative fees to the City-Tri County, Washington Towing and Red's Towing (aka Mainstay Motors). Myers did not give them a permit. Red's Towing sued the City and was allowed back on the rotation. Further, MARS Towing allowed its State license to expire, essentially towing without permission from the State. Myers was notified by the Michigan State Police. Myers testified in a deposition that he, on his own (without BOPC approval) suspended MARS, but reinstated MARS immediately after they regained their license. None of these companies were affiliated with Fiore.

C.   **Based on the revised facts in the Indictment, the elements of Bribery cannot be satisfied.   Thus, Washington was wrongfully convicted and a miscarriage of justice has occurred.**

1.   **Federal Bribery Statute $5,000 Threshold**

The Federal program bribery statute prohibits "agents of federally funded entities from soliciting or accepting "anything of value" intending to be influenced... in connection with any business, transaction, or series of transactions...involving anything of value of $5,000 or more[.]" 18 U.S.C. §666(a)(1)(B). There have been varying approaches in valuing the $5,000. The statutory language reveals that this element requires proof of the value of whatever was exchanged for the bribe.  This has led other circuits to describe this requisite proof as identifying the value of the "subject matter" of the bribe.[5]

Recognizing that using the alleged bribe amount would not satisfy the statutory threshold, the government, as indicated during the sentencing hearing, could not rely on the alleged bribe to value the alleged transaction.  So, the government attempted to meet the $5000 threshold by looking at the profit a tower could make by having a permit or position on the rotation. This approach has been called the benefit-of-the bribe approach. Id.  The government argued that the towing companies could make upward of two million dollars if they received a permit and position on the rotation.  So, in this case, if Mr. Fiore was not entitled to be placed on the towing rotation but Washington assisted him in renewing his permit and/or rotation position, he

---

[5] United States v Tillmon 2019, U.S. App LEXIS 5621* _F.3d_ ( 4th Cir. 2019)

could benefit by profiting up to two-million dollars.  This profit
is what was used to establish the $5000 threshold.  However, the
"benefit" would **only** apply **if** Mr. Fiore was violating the rules
as proposed in the Indictment.  However, this argument is flawed
in many ways.  As more fully discussed below, the court's ruling
that Mr. Fiore did not violate the towing rules takes away the
government's ability to use the benefit of the bribe theory.
Based on this court's ruling that the rules were not violated,
this transaction falls under the exception found is 18 U.S.C.
§666(B)(c) which provides that "This section does not apply to
bona fide salary, wages, fees or other compensation paid, or
expenses paid or reimbursed, in the usual course of business."
Therefore, the government has failed to meet its burden.

In <u>United States v. Owens</u>, 697 F. 3d 657 (2012), Dominick
Owens was a zoning inspector for the City of Chicago Zoning
Department.  This department issued certificates of occupancy
certifying that the homes were "ready to be lived in and used."
The building could not be occupied without a certificate being
issued.  Owens was indicted under the Federal Bribery statute for
accepting bribes in exchange for expediting the issuance of the
certificates of occupancy on eight occasions.  The government
admitted that the bribes accepted did not exceed $5,000, so the
governmentpresented documents showing that the homeowners of the
four homes for which Owens issued the certificates received
mortgages with notes ranging from $200,000 to over $600,000.  The
zoning documents indicated that the construction costs for each

were estimated to be between $180,000 and $250,000.  According to
the government, the mortgage value and construction costs for the
homes, 'coupled with the fact that homes could not be occupied
without certificates,' permits the 'reasonable inference that the
certificates involved something valued at $5000 or more.' Id. at
660.

In Owens, the Court determined that in order to understand
why the government's evidence failed, the court had to look more
closely to the "subject matter" of the bribes at issue.  The
government identified the issuance of the certificates of occupancy
for the four properties as the "thing of value of $5000 or more."
The court held that this was an inappropriate valuation because
anyone that complies with the Board of Zoning procedures and has a
home that passes inspection can receive a certificate of occupancy
for free.  Id.  Therefore, "obtaining the issuance of the
certificates through greasing a palm rather than through legitimate
means must therefore create value in some other way." Id.

Further, in United States v. Mills, 140 F. 3d 630 (6th
Cir.), the Chief Deputy Sheriff was accused of approaching several
individuals and obtained $3500 and $3930 from them in exchange for
a promise that Mills could hire them to fill employment slots as
full-time commissioned deputy sheriffs.  Mills did in fact make
such appointments, and then named individuals to serve as fully
compensated employees of Shelby County government.  In Mills,
the district court concluded that a statutory exception to the
Federal Bribery statute precluded prosecution of the defendants

18

for their alleged misdeeds.  The court held that section (c) of the statute clearly states that "this section [i.e. 18 U.S.C. §666] does not apply to bona fide salary...paid...in the usual course of business."  Therefore, the value of the yearly salary of a deputy sheriff's job, if bona fide, should not be considered in establishing the $5000 transactional value.  In the Mills case, the only guide to determining the value would be the amount paid which would be from $3500 to $3930.  The government argued that the salaries paid to the named co-conspirators who obtained deputy sheriff positions could not have been bona fide because of the illegal nature of the employment procurement process.  They argued that subsection (c) exception cannot, therefore, be applied to these dealings.  The court disagreed and held that the indictment did not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment. In the absence of such allegations, the government had no support for its claims that the salaries paid to the deputy sheriffs were not properly earned "in the usual course of business."

In this case, and like Owens the government valued the issuance of the permit and rotation placement based on the potential profit from being placed on the rotation.  Similarly,  as in Mills, there was no indication that any towing companies that the government claimed to be associated with Fiore were in jeopardy of losing a rotation position.  According to evidence obtained after Washington's sentencing hearing, the companies referenced by the

government as being associated with Mr. Fiore all met all of the qualifications to receive a tow permit and rotation. [**Exhibit** 34, **List**] In fact, only three other companies had total compliance with the inspection. Not to mention that Myers in a statement explaining why Gene's Tow was being paid as the sole provider for storage of evidence vehicles, said that "Gene's Tow has been an exemplary tower in Detroit for the City of Detroit since 2001, and has catered to the needs of the City of Detroit and its citizens. [**Exhibit** 15, **memo dated November 2, 2016**]

Moreover, the towing rules provide that the permits are "renewed" and the rules do not require that there be a new process [**Exhibit** 10, **tow rules**] Therefore, unless one of these companies was suspended, revoked or terminated, they were not required to go through a new process to get on the list. In addition, only the Board of Police Commissioners can vote to suspend, revoke or terminate a tower's permit. Such a recommendation could only be made with the approval of Assistant Chief James White – the only person, other than Chief Craig, with authority. [**Exhibit** 6, **White Deposition, P. 64**] Unlike contracts, the towing companies did not have to bid to get on the towing rotation.[6]

There has not been a scintilla of evidence presented in Washington's Indictment or otherwise to even argue that Mr. Fiore was in jeopardy of being excluded from the 2016 rotation, and somehow needed to bribe Washington.

---

[6]In 2011, the City of Detroit Law Department, together with the approval of the City's Purchasing Department and Police Department, implemented the use of permits. [**Exhibit** 16, **Edwards' opinion**] In 2017, the City of Detroit Law Department made the decision to declare all permits void ab initio with the inference that Washington had issued the permits (which she did not) with some sinister motive.

So, like in <u>Owens</u> and <u>Mills</u>, since the government has failed to put forth any evidence linking any alleged action by Washington as creating some additional value outside of what Mr. Fiore would have already received by continuing to follow the general application renewal process or that any of the towing companies referenced did not comply with towing requirements, the government has failed to reach its $5000 threshold.

2. **The government cannot prove that Washington had corrupt intent**

        In <u>United States v. Aguilar</u>, 515 U.S. 593, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995), "[T]he term 'corruptly' in criminal laws has a longstanding and well-accepted meaning.  It denotes '[a]n act done with an intent to give some advantage inconsistent with official duty and the rights of others.'" <u>Id.</u> at 616.  The government cannot prove that any action rendered by Washington was done with corrupt intent.  The wiretaps reveal that on May 2, 2016, Mr. Fiore met with Myers, not Washington, to discuss towing. Shortly thereafter, Mr. Fiore contacted Washington requesting a meeting with her as well. Washington learned from Fiore that a company, E&G, received an authorized police towing permit four (4) years prior, there were current open rotations, and E&G was never placed on the rotation. This information was provided in the May 7, 2016 wiretap where Fiore was talking to a relative and said:

> "She goes [talking about Celia Washington] 'How long have they had a permit?' And I said they had a permit for years. He further says "we have been waiting and paying and paying and never get considered.  So, there being on the waiting list, so anything would be appreciate."

This is additional proof that Washington was not aware of E&G until Fiore provided her with information on this day [**Exhibit _Ω_, wiretap**].

Again, the government cannot argue that Mr. Fiore gave Washington the loan just in case some time in the future she may be asked to help with towing. Clearly, he did not discuss any companies with Washington prior to this conversation. During that conversation. Washington learned from Fiore that before her tenure with Chief's Office, E&G was given a permit from the Detroit Police Department, Resource Management Unit, bearing number 11-006, but was given no equitable towing on the rotation. [Exhibit 37] This was in contravention to the City of Detroit ordinance §55-15-8 which provides for "equitable distribution of police authorized towing to all towers on the list of qualified towers. Further, a "waiting list" with no rotation was not in conformity with the police authorized towing rules. Washington had no information about a towing "wait list".[7] In addition, wiretap conversations also disclosed that a city council member made inquiry on behalf of the Fiore's regarding this "waiting" list. [Exhibit 18, wiretap]

Washington did not know why E&G was given a permit or who owned E&G. After getting this information, Mr. Fiore kept asking for a meeting regarding E&G and explained why this copmany should be on the tow rotaton. Fiore asked for meetings at Detroit Public Safety Headquarters. Mr. Fiore was not trying to make this meeting a secret as he was entitled to a position pursuant to the City ordinance. Mr. Fiore attempted to give Washington a paper, presumably containing information regarding E&G and its permit. She finally

---

[7] It was later confirmed in the FOIA requests filed, that despite telling towers with permits that there was a "wait list" there was no "wait list." Moreover, it is unclear who he was "paying and paying" to get on this list. However, when there were available spots in 2011, the Police Department conducted a "blind draw" for those spots. It is unclear if there were anymore "blind draws" since.

told Fiore to email what he was requesting.  However, Washington never opened the email or otherwise responded as she was awaiting further information related to this company from her superior. **[Exhibit 19, Washington's email]**  The subject email was opened by her attorney during Washington's pretrial period.

Washington tried to talk to the Chief regarding the issue. This is referenced in the wiretap on May 18, 2016:

> Fiore:  Well the other thing, I don't know, I'll talk to you when I see you.  I, I figured whoever's not in...they shouldn't be adding nobody new.  And the guys that have been waiting should be considered.  And, and the guys that are compliant should get put on and all that other stuff that's on hold and who ain't, and who did did this should be waitin'till they figure it all out."

> CW:  I-I got that.  But I'm...I had a conversation ...a brief conversation with him [Chief Craig] before I went on vacation."

So, Washington did not secretly attempt to figure out what was going on with E&G alone, but involved Chief Craig.  However, she never got a response from the Chief, so as provided in her proffer statement, she started brushing Mr.Fiore off, regarding E&G because there was nothing she could do to help without authority from the Chief or Assistant Chief White.  It was not a part of her job description as referenced by Chief Craig's statement.  Obviously, the Chief had authority to make any decision related to towing, and was her superior.

On a June 3, 2016 wiretap, Washington calls Fiore and asks if he is mad at her.  She then says:

> CW:  Okay, you better not be mad at me, Cause I did I did everything I could [meaning she asked her superiors about E&G] and I told um, I told Jennifer that, you know I'm all about fair and they're...**[Exhibit 20, Wiretap]**

As with the "other" towing company referenced earlier, the Detroit Police Department was well aware of Washington's friendship with the Fiore family. In fact, this is precisely why the Detroit Police Department often sent Washington to discuss other business matters with both Fiore and his attorney Nick Bachand. [**Exhibit** 21, List] The Detroit Police Department owed Fiore-owned businesses tens of thousands of dollars in unpaid rent for properties located at Dix and Fort Street where evidence and forfeiture vehicles were stored for safekeeping. In fact, at one point in time the lease had expired at one of the properties and the Detroit Police Department faced eviction as a holdover tenant. [Exhibit 32.] In order to preserve the interests of the Department and the security of these vehicles, Washington was requested by Assistant Chief White to negotiate extensions because alternate facilities owned by the City were not yet suitable for storage. Washington was concerned that the towing issue could affect her negotiation efforts, so she wanted Fiore to know that had done all she could within her power.

Although there was clearly a strong indication that the Detroit Police Department had not followed the towing rules prior to Washington's tenure with the Chief's Office, this did not negate the fact that Fiore, according to the rules, was entitled to get on the rotation. Any assistance from Washington would have been to encourage compliance with rules in order to avoid litigation, and not the result of a bribe.

The Indictment also alleges that Fiore somehow benefitted from the act of Washington's phone call, both to Fiore and to Fiore's attorney Bachand, asking that Fiore get his application in by May 2, 2016. However, this was a courtesy call requested by Myers as he had

24

set this date in contravention to the towing rules which allowed companies to renew their permits anytime within the last year of the permit's expiration date.  [**Exhibit** ⅛ᵥ, **phone records**]  The earlier date was a benefit to Myers, allowing him time to do inspections and ensure compliance.  This was not a required date pursuant to the tow rules.  Therefore, **both** Myers and Washington called tow companies to ensure they couldcomply with the revised deadline. [**Exhibit** ⅛³, **BOPC Minutes**]  In essence, the towers had three more weeks left to renew permits as verified by the City of Detroit attorney in the deposition of Kenyatta Myers as follows:

Q:  (City Attorney) At one point you were asked about whether you had told the applicants when they would have to have their applications submitted.  Do you recall that?

A:  (Kenyatta Myers) Yes.

Q:  And you said that when you sent them out you did not tell them when they had to have the application packet in the city, correct?

A:  Yes

Q:  But isn't it true that the existing permits all expired May 31st of 2016?

A:  Yes they did.

Q:  So you would assume that the applicant would know when that expired?

A:  Yes. [**Exhibit** 1 ]

The towing companies were aware that Washington would assist with questions related to the towing rules.  However, they also knew that she did not assist with anything else towing related until or unless she was asked or told to by her superiors.  As with any legal advice given to the Detroit Police Department either from the City of Detroit Law Department or the legal advisor, sometimes the advice [Exhibit 38] is followed and other times it is not. ∧ It is ultimately up to the

department to follow the advice of counsel. Washington was an advisor, she did not give orders but carried out orders at the direction of her superiors. As corroboration, this was captured in the following conversation with Fiore and another individual on a June 2, 2016 wiretap:

> GF:  ...You think he would do me one more favor?

> GF:  I think Vince just gotta let the mayor say something to the chief and the chief says something to Celia Washington which is...she is the new lawyer for the chief. I don't know if you know her. She was...used to be a lawyer...

> GF:  Anyways, she is kind of heading it up and I have been trying to talk to her in a round about way and I think she is telling me no on E&G but I think I need to go over her head on that issue if the chief says something to her it will be done. I am trying to get it done today because after the meeting today it is going to be too hard to do.

> GF:  All he would have to do is tell him you know put in chief's ear to tell Celia...you know add E&G whatever.  [EXHIBIT 24]

Contrary to the government's contention that Washington was somehow "spinning" Fiore or intentionally misleading him in order to garner ill-gained funds, it is overwhelmingly clear that there was no ambiguity in Fiore's mind. Washington was unwilling and unable to make any decisions with regard to E&G or any other towing matter. Thus his need to "go over her head."

This is also captured in a later conversation where Fiore was aware that a towing competitor was calling Washington regarding towing issues and responded on May 18, 2016 wiretaps:

> GF:  Uh, because I know he'll have uh, he'll have his brother uh, D.C. [Deputy Chief] call you, call you or A.C. [Assistant Chief White] call you.  [Exhibit 25, wiretap]

Additionally, Assistant Chief White, who is the direct chain of command to Myers, has requested that Washington set up and attend meetings regarding towing issues, as well as with tow companies.[8]

---
[8][Exhibit 21]

26

For example, these messages were captured from Washington's cellular phone:

> Washington:   "Need to set up a conference call with you and ac white tomorrow per ac"

> Washington:   "Good morning!  Can you and Louie meet with AC White here at headquarters at 1 today?

[Exhibit 26]

Again, in July 2016, Detroit Mayor Duggan directed the coordinator of his clergy roundtable, Tara DeFoe, to call Washington to have her set up a meeting with another towing company that had been promised additional positions on the rotation.  Washington advised Chief Craig of the call from Ms. DeFoe and the Mayor's directive.  Washington complied, and held the meeting at Detroit Public Safety Headquarters and was attended by Myers and Greg Hicks, Secretary to the Board of Police Commissioners, along with the individuals who had spoken to the Mayor.  During that meeting, the tow company owners were advised that there was nothing that Washington could do, and that any such changes to rotation positions would have to be made through Resource Management and approved by the Board of Police Commissioners.  After the meeting Washington advised Ms. DeFoe that the meeting had been held, and attempted to schedule a meeting with her or the Mayor to discuss further. [Exhibit 27, text message]  Again, this meeting was not initiated by Washington but by Mayor Duggan.  It is a grave miscarriage of justice for Washington to be convicted based on help she provided at the request of her superiors.  Moreover, it is a further travesty that the Detroit Police Department not only sit back silently and allow this false narrative, but has attempted to use Washington's plea to defend itself in recent litigation (i.e. "the Celia Washington defense)  [Exhibit 28]

27

Moreover, the infamous <u>unopened email</u> sent to Washington would not have provided any additional benefit to Fiore. Again, the towing rules provided that this was to be a renewal process. All companies referenced by the government as "Fiore" companies were already police authorized towing companies and were renewing their permits. It should also be noted that "the email," remained unopened until Washington's pretrial period, and was opened by her counsel.[9] In all actuality, the email was duplicative information requested by Myers' questionnaire included in the application packets. **[Exhibit 29, Questionnaire]** At most, the information contained in the email may have gotten a company that had held a permit for 4 years, its "equitable distribution" that the Detroit Police Department, Resource Management and the BOPC entitled it to **prior to Washington's tenure with the Office of the Chief of Police.** Assuming arguendo that they did have new companies, there were available slots so they would have been entitled to be considered for those available spots if they were in full compliance. Further, as held in <u>Miller</u>, the potential profit alleged in the Indictment is considered <u>bona fide</u> compensation and is an exception to the subject statute.

Finally, Washinton has maintained throughout her plea hearing and sentencing that the money received in early 2015 was a loan. **[Exhibits 30 ]** Moreover, this loan occurred in 2015 long before Washington began assisting Myers with towing. **[Exhibit 31 ]** In all candor, as much as the city owed the Fiore owned businesses, Washington had no reason to believe that Mr. Fiore needed to bribe her for any favors with the City.

## IV. CONCLUSION

As demonstrated herein, the government secured Washington's Indictment and guilty plea for Bribery Conspiracy by a) relying on demonstrably false Grand Jury testimony; b) a legally flawed "benefit-of-the bribe" valuation and c) submitting new facts at sentencing never presented to the Grand Jury, i.e., unindicted behavior. Specifically, Washington did not have the authority over towing and could not/did not help Fiore break the rules or receive any benefit he did not already have. Myers' and Parish's statements to the Grand Jury regarding their interpretation of the towing rules <u>and</u> Washington's overseeing the towing permits and rotation process were false and unreliable. The testimony regarding the meaning of the towing ownership rules was wrong, as confirmed by this court, and Fiore's ownership of several towing companies did not violate the rules. Second, whether loan or bribe as characterized by the government, $3,000 does not meet the requisite $5,000 legal threshold. Finally, unindicted so called "propensity" theory - even if true - was not presented to the Grand Jury and thus cannot sustain this conviction.

Any one of these important issues requires remand. Taken together, the Court must vacate Washington's conviction under §2255 to remedy the serious miscarriage of justice that has occurred. It is no answer to say that Washington has already largely served her one year and a day sentence, or that the record reflects certain errors in judgment or appearance of

29

impropriety. Washington was wrongly convicted and is entitled to relief. The factual issues presented are fatal to the government's case. The legal issues presented should still be resolved now, not only to clear Washington but to further clarify the federal bribery law.

For the foregoing reasons, Washington's motion under §2255 should be granted.

Respectfully submitted,

Celia Washington, In Pro Per
Prepared With the Assistance of Counsel

DATED:  April 22, 2019

## CERTIFICATE OF SERVICE

I, CELIA WASHINGTON, certify that on April 23, 2019, I caused the foregoing document, together with the accompanying Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody to be served by first class mail, postage prepaid to:  Clerk of the Court, U.S. District Court, Eastern District of Michigan, Theodore Levin United States Courthouse, 231 West Lafayette Boulevard, Detroit, MI  48226 and Michael Bullotta, United States Attorney's Office, 211 West Fort Street, Suite 2001, Detroit, Michigan  48226, by placing said documents in the prison mailing system.

Executed this 23rd day of April

Celia Washington

30



